# Exhibit 3

**IN THE MATTER OF AN ARBITRATION BEFORE THE
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Jason Chen, Edgar Park, and AirTourist Holdings, LLC, | ICDR Case No. 01-18-0001-7018 |
| Claimants, | |
| v. | |
| HNA Group; HNA Group (International) Co., Ltd.; HNA Capital Ltd.; Wang Jian; Tan Xiangdong; Shi Lei; Charles Mobus; and Li Ming Bi, | |
| Respondents. | |
| AND RELATED CROSS-CLAIMS. | |

## CLAIMANTS' AND COUNTER RESPONDENT'S CLOSING BRIEF

## I.    INTRODUCTION

Claimants Chen and Park lived up to their end of the bargain.  As co-founders they spent countless hours without pay from June through November 2015 organizing Travana as an acquirer of online travel assets, recruiting and hiring talent, creating a strategic plan to establish a great company.  Chen and Park then proceeded to devote all of their time, energy and ability toward executing that plan to build, in 10 months, a world class OTA, superior to what took Priceline two years and $200 million to build. What they didn't know was that HNA would crush their efforts, and deny them any chance of participating in the fruits of what they had built.

This is not a case of simple negligence.  Rather, HNA, in concert with the remaining Respondents, treated Travana as its wholly-owned personal property, under a belief that it could do with Travana whatever it wanted, notwithstanding Adam Tan's current lip service that it was "up to Travana's board and management to decide how to run the company."  Nothing could be further from the truth. Tan's and Wang Jian's actions were the antithesis of this assertion, from Tan condoning Lei's demand for equity, to their joint cease marketing order, to Tan's demand that Chen demonstrate why *Tan should allow marketing to resume*, to Tan telling Chen that he should no longer be CEO, and to Wang's "command[]" that Travana technology be used to help HNA companies expand into international markets.  In keeping step with these outrageous acts, Charles Mobus assured Tan that he had arranged with the Special Committee lawyers to get the situation resolved "appropriately for you," and Li Ming Bi applauded Mobus's "awesome" strategy and "performance" "in the best interests of HNA."

 It gets worse.  Shi Lei couldn't keep his stories straight, asserting in his statement that he was frustrated at the August 2016 board meeting that the "promised" price advantage hadn't materialized (and that Chen had "rigged" the budgets), but then later in his statement claimed he didn't discover the lack of price advantage until October 2016.  His testimony flies in the face of his August 2016 email to Tan praising Travana and its progress, noting that Travana would focus its efforts on, "building a traditional OTA – providing *competitive* air ticket and hotel products …" and making no mention of Chen doing anything inappropriate with the budget. Mobus and

Li gnash their teeth about "concerns" during the August 2016 board meeting, yet, contrary to their duties and roles as directors, they failed to raise one single critical comment at the meeting.

In December 2016, Chen believed that Tan had magnanimously thrown Travana a life line by agreeing to modify the milestones, simply first requiring a board-approved ramp up plan. However, Lei blocked all attempts to hold a board meeting.  Instead, he ramped up his rhetoric of insisting that Travana, without any board deliberation, pivot from an OTA to a technology or product company, which ultimately would enable HNA to enjoy an increase in Travana's value in a manner that didn't require consumer sales/reaching the milestones, thereby depriving Claimants of the value of their stock.  At the same time Lei and his new side kick, Michael Fan, plotted a "revolution" to oust Chen from Travana.

Respondents' defense to this case is to throw an array criticisms against the wall, typically citing outdated emails, misciting other emails and hiring experts who failed to speak with anyone knowledgeable of the inner workings of Travana and who asserted trumped up failures of Travana that were thoroughly rebutted by Travana personnel and experts, with no attempt by Respondents or their experts to contest these rebuttals.

As this case has been extensively briefed, Claimants will focus on addressing the Tribunal's specific questions, though setting the record straight on some of Respondents' misplaced contentions.

The facts compel a finding in favor of Claimants.  Claimants request the Tribunal in considering the appropriate level of damages outlined in the opening statement (Fact Slides 327 to 332 ), to consider the egregious nature the Respondents' collective acts, omissions and cover ups, recognizing that any questions of precisely what Travana could have accomplished and the level of unique harm suffered by Claimants, is 100% the result of Respondents' concerted efforts that prevented the marketing ramp up in October 2016 and that devalued Claimants' stock.

## II. FACTS

### A. Tribunals' Questions (August 3, 2020 Questions unless otherwise noted)

#### 1. Question 1: Exhibits re price competitiveness and conversion rates.

Exhibits C-1031, 1033-1037, 129 all reference price surveys conducted by outside services, Applause and QL2. These show that in the vast majority of routes, Travana either had price parity or price advantage. They also show the dynamic nature of price advantage; the advantages are temporary and shift, thus requiring an OTA's marketing department to react quickly and drive traffic to where the OTA had parity and advantages.

Exhibits C-1458 and 1459 are spread sheets that reflect the conversion rates during the life of Travana. Tab "Trend-Daily-Mktg" shows the daily conversion rates, the marketing spend, and the CPCs (cost per click; what it cost Travana to drive a consumer to its website).[1],[2]  Per Kumar's and Atkins's statements, these conversion rates are not meaningful based on  the level of Travana's marketing spending.  Kumar 2, par. 4; Atkins 2, par. 14, 15.

Also note that the CPCs are much lower than what Atkins assumed ($1.55).[3]  As explained in Fact Slides 240- 241 of Claimants' Opening Statement ("Fact Slide"), the lower the CPC, the more sales will be realized with a given conversion rate.

---

[1]  This tab provides information for a two week period.  To change the date range, scroll to the top of column J, where there is a drop down menu for dates.

[2]  The statistics are broken down for each marketing channel.  You'll note that Paid Search (SEM) was only turned on for two weeks in August, and thereafter the SEM spend was less $300 per month.  You'll also note categories for "Display" and "Meta."  As explained by Atkins, "Meta" in this instance referred to Display Advertising with Meta providers like Kayak, not what Rose referred to Meta XML.  Atkins 2, par. 26.  There is no reference to XML, as that channel had not been turned on due to the cease marketing order.

[3] For example, click on 9/17/16 on the date menu.  Row 35 shows CPC from 9/4/16 to 9/17/16 under 20 cents.

Attached as Chart A is a comparison of the gross bookings modeled based on Atkins' low (5%) conversion rate model, his high (9%) conversion, Travana management's assumed conversion rates and CPCs, and Rose's average CPCs and conversion rates (other than XML, for which 3% was used, as Rose said that was "achievable." Rose par. 211.[4]  Both the Rose and Atkins low model show hitting the gross booking milestones 2 and 3 in December and January. Whereas, both Travana management's pro forma projections and Atkins high model, show meeting the gross booking milestones for both 2 and 3 in November.

Mr. Porter asked that we demonstrate the lowest conversion rate to get $20 million gross bookings by February 2017.  Assuming Rose's average CPCs, a conversion rate of 1.79% results in $20 million in gross bookings, while assuming Atkins' CPC of $1.55, a conversion rate of 2.26% results in $20 million in gross bookings.  See Charts B.1 and B.1  Also, see [ https://bowlesverna.egnyte.com/dl/fnax7twLqs ], which  is the model used to generate these charts.  Using these same assumptions, $20 million of gross bookings also occurs in January based on the presumed marketing spend amounts.

**2.    Questions 2, 6. When HNA International would have known the AFT code required significant development and updates.**

Mobus and Lei knew in August 2015 that significant work was needed on the AFT code. Chen 1, par. 38, 39; Park 1, par. 155.  Lei acknowledged in October 2015 that the AFT website was insufficient and he envisioned much work.  C-1858, p. 77.  Despite Respondents' insistence today that "ready and proven" was critical to the deal, Mobus mentioned no such thing in his October 2015 summary of the deal to Tan.  C-1877. Nor was it mentioned in the Series B reps and warranties.  C-12, p. 6-11.  In March 2016, HNA provided $20 million in funding with no

---

[4]  [ https://bowlesverna.egnyte.com/dl/fnax7twLqs ] is a link to the spreadsheet used for the data in the Chart A. See tab "SUMMARY SHEET." The data for the Travana management assumptions was imported from C-196.  The spreadsheet imported all of the remaining assumptions from Atkins remodel as neither Rose nor Niejadlik challenged any assumptions other than conversion rates and CPCs.

protest when it was known that Travana was not yet capable of selling tickets.  When Lei reported to Tan in August 2016 that Travana had spent $13 million on the "purchase of AFT technology, system development and operations," Lei made no complaint about the time and expense to develop the platform.  C-1184, p. 9.

3. **Question 3, 4. Who was responsible for hiring and firing in general and for past Fareportal employees.**

Chen and Lei played a role in all key hires, including many ex-Farportal persons.[5]  Lei, par. 41; Chen 1, par. 50; Chen 2, par. 46; Park 2, par. 28.  Many hires were approved by the Travana board. C-115, p. 3-5. There is no evidence that Lei complained about Fareportal hires until September 2016 (R-217), the same month that Mobus met with and approved the hiring of Nishith Kumar (Mobus par. 56, 57; C-143), who had been with Fareportal for 10 years.

As to firing of key persons, Lei advised Tan that such was necessary due to performance issues and cultural fit.  C-1184, p. 9, 10.

4. **Question 5. When did HNA liquidity problems begin?**

Lei told Chen in the fall 2016, that HNA had liquidity problems (Chen 1, par. 14, 169), which Lei did not deny in his statement.  While HNA's liquidity problems did not become public until later, the signs were there.  In May 2017, the New York Times reported on HNA's $30 billion spending spree of borrowed funds, including more than $18 billion in 2016.  C-1701, p. 1-6. "It has racked up a debt pile of a size that some analysts wonder is sustainable." Id. at 6. By the end of 2017, the Wall Street Journal reported that HNA was offloading properties to raise cash to pay off debt from funding over $40 billion of acquisitions since 2015.  C-1734, p. 2. Bloomberg reported in late 2017 that "HNA is struggling to control its soaring financing costs. Its interest expenses in the first half of 2017 exceeded the company's earnings before interest and taxes."  C-1735, p. 5.

---

[5] Claimants believe that a total 3 former Fareportal employees (Ware, Kumar and Turk) came to Travana directly from Fareportal  There were six former Farportal employees (Sevket, Groyz, Karayil, Fusco, Azer and someone who worked in the call center) that worked elsewhere after Fareportal and before joining Travana.

     5.       **Question 9.[6]  The Series B liquidation preference is not relevant.**

Under Section 2.1 of the Amended and Restated Certificate of Incorporation (C-15, p. 4), Series B stockholders upon a liquidation event shall be paid the greater of $0.4167 per share (approximately $50 million based on HNA's 120 million shares (C-12, p. 52)) **or** the amount payable had all shares been converted to Common Stock.  For any of the Travana values asserted by Saba, HNA's 88.89% share would have been far greater than $0.4167 per share.

     6.       **Question 10.  Norm Rose issues regarding conversion rates.**

The Tribunal is correct that "XML" was not used during the soft launch.

     7.       **Questions 11, 13 (and 8-7-20 question 6).  Board approval of the marketing budget; why Lei implemented the cease marketing order; was this a board level decision.**

Notwithstanding Respondents' repeated assertions to the contrary, from at least May 24, 2019 and forward, Claimants have not asserted that the board approved the budget; rather, they've said that the multimillion dollar marketing budget was presented to the board without objection.  Statement of Claims, par. 10, 104, 127, 171.

Respondents contend that the cessation of the marketing plan was not significant enough to require board approval, despite the fact that without reaching the funding/vesting milestones, Travana was doomed to failure.  To put this in perspective, consider some of the matters that the board did conclude required its approval:

    a.  August 2016: Establishing a banking relationship with J.P. Morgan Chase Bank. C-122, p. 2.

    a.  March 2016:  Permission to open a bank account in Hong Kong.  C-116, p. 8

    b.  January 2016: Establishment of a Board of Advisors.  C-114, p. 7.

    c.  January 2016: Appointment of Lisa Chen and Robin Wilson to Board of Advisors.  C-114, p.7.

    d.  January 2016: Separation Agreement with Anthony Volpe, despite no board resolution to hire Volpe.  C-114, p. 6.

    e.  September 2016: The hiring of Nishith Kumar as CFO.  C-123.

---

[6] Questions 7, 8 and 21 are discussed in the legal section.

Respondents attempt to characterize the cease marketing order as a mere allocation of expenses: marketing vs. product development. However, this wasn't analogous to whether to allocate money for new color copiers vs. new management software tools. Rather, this was a decision that determined the fate of Travana and the minority stockholders. As an OTA is a marketing-driven business, no marketing means no business and the board knew that stopping the marketing meant that the milestones could not possibly be met. Thus, the board couldn't have acceded to the cease marketing order without also first securing commitments for further funding or similar measures to give Travana a chance for survival.

The state of the evidence is that Lei's implementation of Tan's and Wang's cease marketing order was based on his brief meeting with Tan, lunch with Wang, dinner with Mobus, and a vague assertion of communicating with Li Ming Bi. Lei, par. 124-128. This is consistent with Lei's misinformed deposition testimony that board decisions can be based on informal conversations with board members. C-1181, p. 131:7-133:17.

During the August 4th hearing, the Tribunal asked for evidence of Chen requesting board meetings in December 2016 and January 2017. See C-1350 (Lei's January 5, 2017 email rejecting Chen's request for a board meeting.) Moreover, Lei admits Chen requested a board meeting in December and January, but told Chen they should not have a board meeting without a business plan. Lei, par. 133. See also Chen 1, par. 191, 192, 199. Chen also reached out to Mobus in December for a board meeting, but Mobus did not respond. Chen 1, par. 198.

8. **Question 12. Did Chen disagree with Tan's, Wang's and Lei's decision to stop marketing; are there contemporaneous documents, such as communications to board members, demonstrating Chen's disagreement?**

Chen knew that Tan and Wang were the ones that would determine the fate of Travana.[7] Immediately after the cease marketing order, Tan confirmed the order to Chen, confirmed that HNA wasn't pulling funding and said he would reconsider marketing after a presentation about

---

[7] E.g., when Chen disclosed to Tan the 11th hour equity grab by Lei, instead of terminating Lei, Tan agreed that Lei should have a 2% equity stake; moreover, he suggested that Chen set aside another 1% equity to reward "helpful people." Chen 1, par. 14, 260.

Travana.  Chen 1, par. 170.  Chen knew that the only chance of saving Travana and the minority stockholders was to appease Tan. Id. at 172.  Complaining to the remaining HNA-appointed directors would have been fruitless and likely counterproductive.  Thus, for good reason, there are no contemporaneous documents reflecting Chen's objection to the cease marketing order.

Similarly, there was no reason for emails to the board about marketing following the December 2016 meeting, as the more credible evidence is that the meeting was positive, only requiring that Travana get a board approved business plan for HNA to modify the milestones.  However, Lei blocked all attempts to get a board meeting and Mobus did not respond to Chen's attempts to discuss scheduling a board meeting. Lei, par. 133: Chen 1, par. 192, 198, 199, 201; C-1350.  The true intentions of Tan, Lei and HNA did not become apparent until the February 14, 2017 meeting, where Tan questioned whether Chen should be the CEO.  At that point, it was clear that Chen did have to rock the boat and, thus, his whistle blower letters ensued.

### 9.    Question 14.  Milestone 2: "Validation of Business Model and Technical Capability."

The Tribunal asks whether a marketing push was consistent with "technical capability."  The language is very specific: "Milestone 2 *shall be deemed satisfied* upon the accomplishment" of $20 million in gross bookings, 3% gross margin air only and websites in China and one other country.  Thus, "technical capability" by definition is established by meeting these 3 criteria.[8]

### 10.    Question 15 (and 8-7-20 question 4):  Chen's 12-3-16 email vs. Lei's 2-21-17 email:   statements about platform readiness.

The Tribunal has asked guidance on squaring away email statements by Lei and Chen that are seemingly inconsistent with their positions in this case.  As to Lei, in February 2017 he

---

[8] The evidence that Travana would have met the website criteria was uncontested.  See Slide 127 and Chen 1, par. 275-280. C-1519, 1520 (English translation).[8]  (The other criteria are dealt with elsewhere.)  Respondents certainly knew about Chen's assertion about having a China website, as in par. 68 of Sevket's Statement, he quotes Chen (Chen 1, par. 278) about this and doesn't contest Travana's ability to have had a China website by December 2016. Respondents did not contest this in their Statement of Defense.  In par. 19 of their Rejoinder, Respondents raise this issue for the first time, though failing to cite Claimants' evidence or Sevket's statement, which Respondents had procured. As Claimants did not discuss this issue in their Reply Brief – as there was no reason to – raising this issue in the Rejoinder brief was improper.

described the Travana platform as "an advanced and complete online travel platform, 100% IT architecture in the cloud.  Each module is full of flexibility and scalability."  And that they "provide travelers with more valuable products and extraordinary experiences through technological innovation, and enter the market with differentiated products and services."  Further, he boasted about airline and hotel inventory, personnel, products under development, and website views. C-2022, p. 2, 3.

As to Chen, the Tribunal requests comments on his December 3, 2016 emails exchange with Sevket about the lack of price parity in July 2016 and "We were at a disadvantage, not to mention the advantage we were supposed to have.  How do you expect the marketing team to ramp up" as well as his statement that the ramp up and momentum was "halted by the board's instruction, in many ways, for everyone's best interests.  So we are all tense."

### a. Lei's February statements track with his August 2016 statements and other corroborating evidence.

Lei's statements should be given great weight based on the context, the audience and corroborating evidence.  First, at the behest of Wang and Tan, Lei is reporting to sister HNA companies.  Lei's father works for HNA. Ex. C-1181, p. 289: 20-21.  Lei clearly planned on a long term future with HNA.  Unlike his February 6, 2017 email to Tan (C-1184), this wasn't a mere power grab to wrest control of Travana from Chen.  He had already succeeded in that.  Rather, in promoting the attributes of Travana, Lei was staking his credibility and reputation with senior HNA executives.  He had to make sure his statements were accurate.

Second, his February 2017 touting of Travana's value, is consistent with:

a.      His August 2016 report to Tan where he described the inventory of airlines and hotels and how traffic to the website was steadily growing.  C-1184, p. 8.

b.      The August 11, 2016 presentation to the board (Ex. C-153), a copy of which Lei sent to Tan without criticism (C-1184, p. 12), discussing airline and hotel inventory and website traffic. C-153, p. 5, 9, 22-24.

c.      The March 2016 board presentation describing the website as "State of the art

technology," "Complete cloud based & Service Oriented Architecture" and "Modernized flexible rapid development architecture." Ex. C-152, p. 28.

d.     The March 6, 2017 report by the Travana management team (including Sevket urging the board to meet with the members of the management team to become fully informed on the company's capabilities.  Ex. C-129, p. 1, 3.

### b.  Chen's December 2016 comments are outliers made to one individual, borne in tense circumstances and inconsistent with the bulk of the evidence.

Chen's December 3, 2016 email needs to be viewed in context and with a view of the totality of the evidence supporting platform readiness and price parity by October 2016.

Chen's statements weren't to the board or HNA, but rather to Sevket with whom he was clearly frustrated and angry. Sevket had just embarrassed the company in front of an HNA investment executive less than one week before the planned December 8, 2016 meeting with Adam Tan (R-3, p.2); a meeting where it was critical for Tan and HNA as a whole to have confidence in Travana, so as to modify the vesting and funding milestones.  Sevket's behavior detrimental to HNA's perception of Travana, and the last thing Chen needed to do was complain to Sevket that Tan and Wang made the cease marketing order, considering email cc'd Lei.

As to the comment about how could Sevket have expected the marketing team to ramp up, Chen is continuing to lash out at Sevket.  Moreover, that statement is immediately preceded by the fact that in July there was a lack of inventory and price parity.  The context is the July time frame, not three months later in October when Travana clearly has price parity and some advantages.  Chen would have been clearer had he used the word "did" instead of "do."

Regardless of language Chen used during his heated discussion with Sevket, any suggestion that the platform was not ready is contradicted by an abundance of evidence.  In addition to Lei's February 2017 emails, this evidence includes:

a.     The August 2016 presentation (C-153) to the board, where not one person – board member or otherwise – expressed any concerns about platform readiness.

b.      The price surveys showing price parity and price advantage in October and December.  Ex. 129[9], 1031, 1033, 1034[10]-1037.

c.      The witness statements by Julianna Hill[11], Director Airline Partnerships, who had 16 years of OTA experience by the fall of 2016.  Hill 1, par. 4, 35-41; Hill 2, par. 9-11.

d.      The witness statements by Alex Groyz, Senior Director of Architecture, who had 8 years of OTA experience.  Groyz 1, par. 3, 49-57; Groyz 2, par. 6-18, 30-33.

e.      The witness statements of Nishith Kumar[12], who had 10 years of OTA experience by the fall of 2016.  Kumar 1, par. 25-69; Kumar 2, par. 6-60.

f.      Sevket Seyalioglu's October 7, 2016 email stating that Travana had full content, possibly more than the competitions.  Ex. C-1047.

g.      The content of the December 11, 2016 presentation to Adam Tan (C-154), as well as Lei's deposition testimony recalling no negative statements by him or anyone else.  C-1181, p. 208:18-22; 210:23-211:10; 213:16-23; 220:7-16. [13]

---

[9]  The March 6, 2017 management report (C-129) projected approximately $10 million in gross bookings in December 2016.  However, that was based on a marketing spend ($1.2 million, see p. 13, C-129) that was only approximately 1/3 of the amount nearly $3.6 million contemplated in the budget for October through December 2016.  See Ex. C-153, p. 60, which are the same amounts contemplated in Atkins' model.  See Ex. C-1224.

[10]  C-1034, is a spreadsheet that is sortable and has tabs for both one way and round trip fares.  The presentation of this exhibit in the opening statement (Slides 30, 190), was sorted to group the routes based on their price designation, e.g., "lowest." Moreover, these are not in-house surveys, but rather surveys conducted by an outside company, Applause.  See 1033-1035; Chen 3, par. 93.

[11]  Hill, Groyz and Kumar don't merely state that the platform was ready for marketing.  Rather, the cited paragraphs provide specific details as to why it was ready.

[12]  Respondents contended in their opening statement that Kumar was merely the CFO and had no basis to comment on the readiness of the platform, or other aspects of OTA business.  However, a review of his statements demonstrates his involvement in a host of areas.  For example, see par. 3 of his first statement regarding the breadth of his experience during his 10 years at Fareportal, which included revenue and cost optimization, implementation of fraud prevention system, ARC negotiations, overseeing budgeting and forecasting (including product roadmaps and marketing budgets and forecasts, and revenue forecasts), vendor negotiations, launching of overseas call centers, and creation and implementation of automated processes to enhance productivity.

[13]  Respondents also cite R-287, an October 13, 2016, 5:00 p.m. email from Chen to Susan Shields for the proposition that he agreed with the cease marketing order.  "We're slowing down the growth to spend more time on beefing up our product."  However, this was the same day Lei announced the cease marketing order.  Chen 1, par. 168. Chen's 5:00 p.m. email clearly was been sent after Lei's

Lei was the lone wolf claiming the platform wasn't ready in October. Respondents have not produced one witness statement to corroborate Lei's assertion. Lei's criticism of the platform is based on soft launch issues that were resolved by mid October 2016. He makes no reference to discussing platform readiness issues with any knowledgeable Travana person. In contrast, see the October readiness chart in Fact Slide 79, demonstrating the platform's readiness. The only specific reason Lei cites in his statement for telling Tan, Wang and Mobus that Travana wasn't ready for marketing, was the lack of a price advantage. Lei, par. 122.[14] But recall, in his August 2016 email to Tan, Lei mentioned nothing about promises about price advantage, but rather informed Tan that the focus would be to build a "traditional OTA – providing *competitive* air ticket and hotel products …" C-1184, p. 10.

### 11.    Question 16. HNA's Motives.

Respondents have repeatedly asked why would HNA want to destroy a company worth more than $300 million. The answer is that HNA's plan wasn't to destroy Travana.

Travana could have been a valuable asset to HNA without Travana meeting the funding or vesting milestones. Lei claimed he wanted Travana to become a "product" or "technology" company. Travana could have licensed its products to other companies and generated significant revenues. It wouldn't have met the milestones, but that only meant that Claimants wouldn't vest in their stock. Or as laid out in Lei's February 21, 2017 email, HNA could have utilized Travana's technology for the international expansion of "Tuniu, Caesar, etc." and "Package company's advance technology and technical team and aggressively seek opportunity for an

---

announcement of Tan and Wang's cease marketing order, which Chen knew he was powerless to counteract. (Lei was back in California from his New York meetings with Tan, Wang and Mobus by October 12, per Lei's email to Mobus indicating he would be in New York through Tuesday October 11. R-129, p. 2. ) Chen had to say something to make sure the team throttled back on marketing at least until he had the chance to speak with Tan, which happened on October 15, 2016. See C-2063, showing an attempted call by Tan; Chen called him right back. Again, Chen's email does nothing to contradict that HNA made the order or that Travana was not ready for a ramp up.

[14] While in par. 122 of his statement Lei claimed the alleged lack of price advantage was discovered in October 2016, in par. 104 he claimed that by the August 2016 board meeting there was no price advantage.

IPO." C-2022, p. 1. But for Chen's refusal to quietly bow out, there is little doubt that HNA would have taken advantage of the asset out of an "ABC" or bankruptcy.

However, regardless of the motive[15], what is uncontested is that Lei, without any support from anyone at the Travana marketing, engineering, product or executive teams, told Tan and Wang that the platform was not ready for marketing. Then Tan and Wang, with no due diligence, issued the cease marketing order with no regard to the impact on the minority stockholders or the sustainability of Travana.

Again, HNA punched the minority stockholders in the face. Why they did that may be interesting, but ultimately is irrelevant to determining liability and damages.[16]

### 12. Question 17. Relevance of no one bidding for the Travana platform out of bankruptcy.

First, Claimants believe that had Chen not been so vigilant in protesting the actions of Lei and the board, that HNA would have bought the technology out of bankruptcy, or even better, through a planned assignment for benefit of creditors. See Ex. C-2041-43, 2051, 2055.

Second, the Travana "Solar System" in Fact Slide 81demonstrates that building a functioning OTA is far more complicated than buying source code. As pointed out in the March 6, 2017 Management Report, shutting down the company would result in the loss of the ARC license, the more than 100 commercial contracts with airlines and airline consolidators, hotel wholesalers and Amadeus (GDS) ("other travel suppliers"), customer service capabilities and loss of marketing infrastructure (including bid optimization toolset and analytics). C-129, p. 17.

---

[15] Other possible motives include cash flow, as Lei told Chen in the fall of 2016 that HNA had liquidity issues. Further, Lei knew that Chen was responsible for the drop in Lei's perceived equity stake and for his CFO title being stripped.

[16] During opening statements and rebuttal, Respondents repeatedly misquoted Ergo contending that he said that nothing mattered after October 2016 as Respondents had already killed Claimants' chance to vest. The slides will reflect that the comment was nothing else "essentially" or "really" mattered. E.g., Slides 217, 270, 308  And that is true, particularly given how after the cease marketing order Respondents did nothing to commute the death sentence issued in October. Regardless, it's naïve for Respondents to suggest that any statement by counsel in opening statement constitutes a free pass for Respondents to have engage in improper behavior.

Thus, by the time the bankruptcy trustee took over the assets, the source code was a distressed asset, which would have required much time and effort to replicate what Travana had spent millions of dollars and nearly a year to create.

### 13.    Questions 19, 20.[17]  Resolution of expert witness conflicting positions; no evaluation of Fareportal claims by Respondents

The Tribunal needs to take into account the specific qualifications and what was considered by each expert.

Atkins's career has been focused in digital marketing where he has been involved in more than $1 billion in spending, including being one of the founders of Expedia where he last title was Global Leader in Marketing for Travel.  See Fact Slides 219-222 for specifics.

On the other hand, Rose's and Niejadlik's careers have involved far more than digital marketing, giving them much less of a foundation for their opinions and experience about conversion rates and CPCs.  See Fact Slides 248-251.   While both are critical of Atkins, they can't point to any industry data that contradicts Atkins.  Nevertheless, Rose did attempt to mislead the Tribunal into believing that there was industry data that SEM (Search PPC) conversion rates were 1 to 2.8%.  However, his industry "data" (R-404 and 405) are two general tables that make no reference to SEM or any other specific marketing channel, and no reference as to what travel services are included.  These charts appear to reference overall conversion rates for all marketing channels. Thus, Rose's assertion that these exhibits support conversion rates for SEM of 1 to 2.8% was, at best, misleading.

Rose and Niejadlik simply have nothing to contradict Atkins' knowledge of conversion rates which is based on actual experience in observing conversion rates by OTAs.  Atkins 1, par. 236; Atkins 2, par. 15.  They cannot credibly challenge Atkins' experience of conversion rates of 7 to 12% for SEM (Atkins 1, par. 239.04(b)) and Metasearch/XML (Atkins 2, par. 25), much less his use of the lower rates of 5%, 7% and 9% used in his model.

---

[17] Claimants are not responding to questions 18, 22-24 as they are addressed to Respondents.

See Addenda A and B to Claimants Reply Brief, which catalogues the numerous misplaced and unfounded criticism of Travana by Rose and Niejadlik.  (Links in Fact Slide 251.)

Dr. Don Turnbull's assessment of Travana's technology and platform readiness is far more thorough and credible than Niejadlik's.  Turnbull personally met with Alex Groyz in New York City to get a deep understanding of the Travana architecture.  Turnbull 1, par. 52-67.  Turnbull also conducted a telephonic interview with Sevket.  Turnbull assessed the Google Analytics and Adobe Marketing Cloud data as well as the software tools employed by Travana.  He considered the cloud-based and modular architecture and reviewed numerous materials.

Dr. Turnbull's assessment is corroborated by testimonial evidence from persons who in fact were on the ground when the cease marketing order was given.  This included statements from Groyz, Hill, Kumar as well as Chen and Park.

On the other hand, there is no suggestion that Niejadlik spoke with any witness.  His assessment is limited to a review of emails, which tell an incomplete story.  Most telling is the lack of any criticism of platform readiness in Sevket's statement.  Certainly, Niejadlik and Respondents would have included any assertions by Sevket that the platform wasn't ready.

As to the merits of the Fareportal claims, Dr. Turnbull performed an extensive review (Turnbull 1, par. 106-17) including interviews of Groyz and Sevket, both of whom were software engineers for Fareportal, AFT and Travana.  It included consideration of Fareportal evidence and Fareportal's controls that detected any employees copying of code.  It included an understanding that Fareportal's older technology was of no use to Travana's much newer technology. It included a review of the Fareportal guidelines that Sevket had in his possession showing that they were garden variety, publically available guidelines with no proprietary information.

As to Kennelly vs. Saba, Kennelly simply assumed that the Travana platform was flawed and, thus, inappropriately applied an asset valuation method.  Saba considered negative and positive information and concluded that the platform was ready for marketing and would have met the milestones.  He, thus, valued Travana based on the recognized methods of Discounted

Cash flow and "DCF" with market exit multiple, using a discount rate that appropriately reflected the risks of an early stage company.

    **14.**    **8-7-20 Question 5: Chen's deposition testimony vs. Lei's[18]**

Great weight should be given to testimony, particularly testimony that is harmful to the deponent's position in this case. As to Lei, his testimony on p. 13 of his deposition (C-1181) was quite clear: Tan and Wang made the decision for Travana to cease marketing. This is consistent with his March 2017 email to Mobus's partner, Paul Rahn. C-2085.

Chen's testimony is consistent with his statements and the overall evidence that price advantages were dynamic and not unique. Chen testified that because Travana had not yet connected with multiple GDSs internationally, it had no "unique" price advantage. C-1202, p. 186:12-20. Chen is referring to the unique price advantage that came with MPOS – multiple points of sale – enabling price advantages due to different pricing in different countries for the same flights, as well as advantage from currency fluctuation. Chen 2, par. 32. C-1202, p. 51:13-21. Further, Chen testified while you need to look for price advantages, no advantage lasts forever; thus, an OTA needs to continue to look for price advantages and use them. 179:1-14. This is indeed consistent with Chen's witness statements and the price surveys that show that Travana's price advantages were dynamic. Chen 1, par. 109, 110. C-1031, 1033-1037, 129. It's consistent with Kumar's, Hill's and Atkins' testimony about needing a dynamic marketing plan to take advantage of the price advantages that became available. Kumar 1, par. 17-24; Hill 2, par. 11; Atkins 2, par. 28.

Chen's testimony is consistent with his statement and C-151 (August 2015 presentation) where the only potential price advantage he ever discussed was limited to international flights through MPOS. Chen 2, par. 31-38. It is also consistent with the lack of any mention of price advantage in the Series B Agreement (C-12), Mobus's summary of the deal to Tan in October

---

[18] For question 1, see Chart C. Question 2 is addressed in the legal section.

2015 (C-1877), and Lei's report to Tan following the August 2016 board meeting (C-1184, p. 7-13.)

    **15.   8-7-20 Question 7.  Gross margin requirements for Milestones.**

    The Tribunal asked whether Kumar's methodology of calculating "gross margin" was correct and reasonable. First, while Respondents did contest the *gross bookings* aspect of the milestones, they made no suggestion in their Statement of Defense that the *gross margin* aspect wasn't satisfied or that Kumar's methodology of dividing revenue by gross bookings was incorrect. They should not be permitted to challenge that methodology at this point.[19]

    Regardless, that very same method of calculating "gross margin" appears in the March and August 2016 budgets; budgets that were prepared by HNA representative, Shi Lei. See C-171, tab "Pro Forma P&L," line 49, air only, (showing the marketing ramp up beginning in earnest in September, by which time the air only gross margin without ancillaries was, and continued to be, at or above 4.74%) and C-196, tab "Consol. Budget Summary," line 18, all revenue.[20] This is the best evidence of what the parties intended by "gross margin."

---

[19] The margins that Kumar calculated were based on 2017 pro formas (C-184) created in conjunction with Kumar, Patriek Karayil and Chen. Kumar 1, par. 28. Kumar explained that the forecasts would have been essentially the same whether the marketing commenced in October 2016 or February 2017. Kumar 1, par. 28-31. Neither Respondents nor Niejadlik contested this. The revenue aspect included booking fees, segment fees, flight change fees and net fare mark up. Par. 28.b. The margin %s are reflected in line 108 in tab "Pro Forma 2017 to 2018." While the pro forma included all revenue, the non air revenue was de minimis. See rows 103 (air), 104 (insurance) and 105 (hotel). Regardless, as explained in the next footnote, Chart D hereto is a chart showing the gross margin calculations for air only backing out the de minimis non air revenue and bookings, which still meet the milestone requirements.

[20] Chart D attached hereto includes air-only gross margins from the March 2016 pro forma, August 2016 pro forma and the 2017 pro forma. These gross margins meet the milestones at or about the same time Travana meets the gross bookings aspect of the milestones. Chart D was prepared from the original March pro forma (C-171), which has air-only gross margins in tab "Pro Forma P&L," line 50. The August 2016 pro forma (C-196) shows gross margins for all products in tab "Consol. Budget Summary," line 18. However, see https://bowlesverna.egnyte.com/dl/HRzqIA1TbU, which is a modification of C-196 to back out the air bookings and revenue to show air-only gross bookings. The 2017 pro forma (C-184) tab "Consol. Budget Summary," line 18, also shows gross margins for all products. However, see https://bowlesverna.egnyte.com/dl/WJ3IkwzRQl, which likewise backs out the non air bookings and to show air-only gross bookings.

The pro formas are reliable and were not prepared for litigation; they were prepared by Travana personnel with years of OTA experience. Chen 1, par. 35, 60, 122, 122, 123, 128, 142; Chen 3, par. 58; Kumar 1, par. 28, 33; Kumar 2, (who was working as a consultant with Travana as of June 2018, see par. 46) par. 39-42, 46-60.  The assumptions were repeatedly vetted internally under Chen's and Lei's guidance, recognizing that gross bookings and revenue were functions of the marketing spend.  Lei testified that, as CFO, in preparing and presenting the August 2016 budget to the board, he wanted to ensure that the budget was accurate with "my best expectations, estimations, and projections by that time." C-1181, p. 27:7-28:25.  Chen, in particular, repeatedly told the team members to be reasonable and conservative. R-91 (requests to accurately reflect assumptions); R-92 (discussion re the various departments providing budgets); R-94 (weekly meetings to review budget updates);  R-109 (email exchange stressing reasonableness and noting that projections were a function of  the marketing and conversions); R-102 (discussions about sensitivity analysis, challenging the team's assumptions, ensuring "we stay on the reasonable but conservative side").

Moreover, while Niejadlik took issue with Travana's revenue assumptions, he used the same methodology for his own "Gross Margin" calculation in Table 1, p. 54 of his report.

Niejadlik's Table 1 only challenges Travana's booking fees assumptions.  All the other revenues that Niejadlik projected were either equal to or greater than Travana's assumptions. Specifically, Niejadlik "estimate[d]" that Travana's booking fees should be in a range of $10 to $30.  Niejadlik, par. 150.  However, he only considered international booking fees and none for domestic.  See at the top of Table 1 where he assumes that 60% of all bookings would be international and then, with no basis, he assumes that Travana would only get booking fees on 60% of the international flights.  Thus, he reduces the booking fees from $10 to $30 by

---

Per the March and August 2016 pro formas, by Q4 2017, the gross margins stabilize at over 5%.  In the 2017 pro forma, by Q4, the gross margin is over 8% and by March 2018 is over 10%, based on the increased margins from Quantum Saver and Fare Class Optimization.  Kumar 1, par. 33.

multiplying by .6 (= $6 to $18) and then multiplies those reduced numbers again by .6 for his ultimate assumption of $3.60 to $10.80.  His table omits any booking fees for domestic travel.

However, Kumar disagreed stating that OTAs get booking fees for domestic and international flights. Kumar 2, par. 59. He said while Niejadlik's assumptions may have been what he experienced at Vayama, that was not the norm in the industry.  Kumar explained how Travana built its budget for booking fees on industry averages and was conservative compared to competitors.  Kumar 2, par. 59.  Moreover, Kumar pointed out that Niejadlik's booking fees numbers were flawed by apparently only assuming a booking fee per booking, rather than per ticket.[21]   Niejadlik did not submit a rebuttal report to challenge Kumar's assertions.[22]

Irrespective of the gross margin requirement, based on Saba's valuation of Travana, had Tan and Wang not given the cease marketing order, Travana would have been a valuable company.  Even if HNA refused to adhere to its funding commitment, VC funding expert, Jim Timmins states that from 2014 through 2019 there were unprecedented amounts of money flowing into venture capital funds, and that Travana resembled other emerging growth companies that went on to success. Timmins, par. 1-7, 15.a, 17, 57.  Timmins opined that venture capital firms would have been willing to provide equity funding of $25 million in late 2016 and another $50 million in 2017. Id. at 15.d.  Respondents did not challenge Timmins's testimony.

---

[21]  Kumar 2, par. 59.  Indeed, in par. 150, Niejadlik states "my booking fee assumptions result in a range of average fees *per air booking* of between $3.6 and $10.8."  Kumar, however, explained that *OTAs charge booking fees per ticket, not per booking.*  Kumar 2, par. 59.  See, e.g., Ex C-172, tab "FY16 Budget Assumptions," line 66, reflecting a bookings to ticket ratio of 1.2 in the first month and 1.4 tickets per booking thereafter.   Again, this is conservative as Mr. Atkins remodel reflects an average of 2.1 and 2.3 tickets per bookings for domestic and international travel, respectively.  (See "Avg party size" in the first column of C-1224.)  Niejadlik did not challenge Atkins' or Travana's assumptions of number of tickets per booking.  What this means is that even accepting Niejadlik's booking fee assumptions of zero domestic booking fees, his numbers should be multiplied by a factor of 1.4 to 2.3.

[22] Niejadlik also asserted that Travana's budget did not sufficiently account for variable costs such as merchant fees and consolidator fees.   However, Kumar disagreed explaining that such miscellaneous fees were accounted for by using conservative revenue assumptions.  Moreover, he explained that the merchant fees would have been charged to the airlines, not Travana.  Kumar 2, par. 60.  Again, neither Niejadlik nor Respondents challenged Kumar's explanation.

### B.    Miscellaneous Issues

#### 1.    HNA's Counterclaims for fraud and breach of contract against Chen have no merit

Chen's Statement of Defense addresses the counterclaims extensively. HNA's Rejoinder devoted less than two full pages to the counterclaim, with no discussion about the breach of contract claim and no reference to any of the alleged Chen representations on which HNA relied. In a nutshell, the fraud claim asserts that HNA relied on Chen's representations as to the capabilities of the platform and that it was essentially turnkey.  However, HNA negotiators, Lei and Mobus, knew that Sevket was the only person who understood the AFT platform; HNA conducted extensive due diligence, including retaining Weil Gotshal with a $500,000 budget and it was HNA that negotiated with the AFT bankruptcy Trustee.  Fact Slides, 95-103.[23]  There is no basis for any claim of justifiable reliance on Chen.  Defense of Counterclaims, pages 61-69.

The breach of contract claims is based on the reps and warranties in a contract between HNA and Travana, not Chen.  There were no such breaches.  Defense of Counterclaims, pages 76-90.  And the claim that Travana was the later ego of Chen has no basis.  Id. at pages 90-103.

#### 2.    No evidence that Chen terminated for cause.

The Tribunal asked whether there was any dispute that Chen was terminated without cause.  There is no evidence to the contrary; his termination was part of the termination of nearly all personnel when Travana was shuttered.  Chen 1, par. 250.

#### 3.    Respondents' objections to absent witnesses lack merit.

Respondents assert that the entire opinions of Atkins and Turnbull be disregarded because they spoke with some witnesses that did not submit statements, despite the fact that their opinions are based on their own knowledge and evidence in the record that corroborates any

---

[23]  HNA claims that Chen represented that he would get the AFT title free and clear.  However, the only evidence related to this is the presentation made during the August 2015 meeting on slide 3 entitled "The Objective," which included acquiring the AFT IP free and clear.  C-151 However, that was by no means a warranty or guarantee.  Regardless, as discussed in the Statement of Defense, the AFT assets were acquired free and clear despite the per the Section 363 sale order, which was never modified.  See pages 79-88.  Moreover, the Fareportal claims were without merit and HNA has not contested this.

information from these interviewees.  (Respondents also assert that since Carl Saba relied on the reports of Atkins and Turnbull, Saba's report should also be disregarded.)  However, Respondents are wrong.  Any relevant information provided by absent witnesses is already in the record and Claimants are not attempting to backdoor any third party testimony into the record through the experts. Moreover, experts always been given great latitude as to matters on which they base their opinions if they are the sort of matter that experts in the field would normally rely on.  As such, Respondents objections should be overruled.

### a. The expert opinions are supported by experience and a broad base of information.

The experts' opinions are based on sufficient evidence even without considering the absent witnesses.  Moreover, all of the relevant statements attributable to absent witnesses are corroborated by extensive evidence in the record to support the experts' assumptions.

**David Atkins:**  The key testimony by Atkins is modeling the gross bookings Travana would have achieved by engaging in the full marketing ramp up in October 2016.  The keys to the modeling were conversion rates, PPCs (price per "click" to drive consumers to Janbala.com), average numbers of tickets purchased and average fares.  That information was within his personal knowledge based on his more than 20 years of digital marketing in travel space. His assumed marketing spends came directly from the August 2106 pro forma (C-196).

The specific information provided by the interviewees that Mr. Regan complained about in his June 13, 2019 letter is corroborated as shown below.

a. <u>That the Travana team had deep knowledge and expertise in OTA marketing</u>. Corroborating evidence includes: Fact Slides 13-15: C-901; Chen 1, par. 60; Hill 1, par. 4, 6-9, 21-23, 28-33, 38-41; Hill 2, par. 10-15; Kumar 1, par. 3-5, 19, 20; Groyz 1, par. 47-50, 66;  Alonzo Jennings, par. 31-35.

b. <u>Travana's vision:</u> Corroborating evidence includes: the board presentations and the presentation to Adam Tan (C-152, 153, 154); C-129 Chen 1, par. 81-85; Chen 3, par. 6, 38-41; Kumar 1, par. 5, 6; Kumar 2, par. 10;  Alonzo Jennings, par. 8-10; Hill 1, par. 13.

c. <u>Travana was properly focused on gross bookings</u>. Corroborating evidence includes: Kumar 1, par. 25-30; Chen 1, par. 64, 154, 264; Chen 3, par. 14, 58; C-171 tab "Pro

Forma P&L," line 38;  C-196 tab "Consol. Budget Summary," line 17; C-152, p. 58; C-153, p. 60

   d.   <u>Travana properly implemented and deployed fraud protection</u>.  This assertion is particularly spurious.  Kumar explained the fraud prevention system in great detail in his first statement, par. 36-54.

   e.   <u>Improved conversion rates were a goal, and that the Travana team should use ultra conservative pro formas</u>. Corroborating evidence includes:  Kumar 1, par. 18, 28.a, 30; Kumar 2, par. 15, 35, 42, 51-53, 59, 60; Groyz 2, par. 25; Chen 1, par. 17, 98, 264, 274; Chen 3, par. 15; Chen tells team to be reasonable and conservative, see R-91, R-92, R-94, R-102.

**Dr. Don Turnbull:**  Dr. Turnbull conducted a deep analysis of the quality and functionality of the Travana technology, as well as an analysis of Fareportal's infringement claims.  His assessment of the technology was based on extensive meetings and follow ups with Groyz who provided detailed information about the Travana platform.  Turnbull 1, par. 52-67.  His assessment was also based on objective analytics on the performance and consumer use of the platform from Google Analytics and the Adobe Marketing Cloud.  Id., 68-79.  In addition to Groyz, Dr. Turnbull also spoke with *non absent witnesses* Sevket, Hill, Kumar, Chen, and Park.

The 3 platform technology "absent witnesses" were referenced only briefly in Turnbull's report[24]; there was no reference to any information provided by Lisa Chen, who no one contends was a computer engineer.  Other than the page 12  list of persons he spoke with , Turnbull only mentions Kyle Barnes once (par. 47), regarding his hiring to work on hotel source code (essentially redundant to Groyz's discussion on the hotel product, Groyz 1, par. 26, 27);  only mentions Joshua Kibbey once (par. 32) regarding his statement that the Travana code was the "cleanest" code he ever worked on; and only mentions of Monica Dominguez related to the Adobe Marketing Cloud metrics she prepared and which Turnbull included as Figures 14 and 15 in his report.  (Par. 38, 39, and footnotes 9.)

In contrast, Turnbull references Groyz and Sevket extensively in his report. He references 171 documents he reviewed. (See all post p. 80.) There is no reference to any of these witnesses

---

[24]  Regan's letter referred to Sevket as an absent witness.  However, that status changed when Respondents subsequently provided a statement by Sevket.  Respondents and their experts had every opportunity to question Sevket about his discussions with Turnbull.

in his infringement analysis section, par. 108-173.  As with Atkins, to the extent Turnbull relied on any statement by an absent witness, such information was redundant to the extensive information he otherwise relied on.

Footnote 13 to Mr. Regan's letter to the Tribunal references eight paragraphs in Turnbull's report that allegedly were "exclusively from an Absent Witness or from an Absent Witness and some source."  However, paragraph 47 (Barnes comments re hotel product) is the only instance where only an absent witness is referenced.

The only complaints by Respondents as to other experts relying on absent witnesses are that Carl Saba and Jim Timmins relied on reports by Turnbull and Atkins.  However, as demonstrated, any absent witness statement relied on by Atkins or Turnbull is corroborated by independent evidence in the record and/or is not critical to their findings.

### b. Expert witnesses are routinely allowed to rely on hearsay statements.

Here, neither Atkins nor Turnbull is attempting to backdoor testimony of witnesses into the case.  The absent witness interviews are essentially no different than Respondents' experts' reliance on 100s if not 1000s of hearsay statements in the form of documents. (Niejadlik lists nearly 70,000 documents he reviewed, the majority of which provide no indication as to the source or content.)  Moreover, expert witnesses are allowed to rely on hearsay statements pursuant to Delaware Rule of Evidence 703, which is a direct adoption of Federal Rule of Evidence 703.  Both of these rules of evidence provide that "If experts in the particular field would reasonably rely on those kinds of facts of data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  DRE § 703.

Courts have long recognized that expert testimony was an exception to the rule against hearsay testimony. *United States v. Brown* 299 F.3d 1252, 1258 (11th Cir. 2002).  This exception is based upon the reasoning "that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion." *Id*. Moreover, Arbitrators have "substantial leeway to admit any evidence that

they find useful – even hearsay evidence." *ARMA, S.R.O. v BAE Sys. Overseas, Inc.,* 961 F. Supp. 2d 245, 263 (D.D.C. 2013); American College of Trial Lawyers, Alternative Dispute Resolution Committee, *Best Practices Regarding Evidence in Arbitrations* (February 2008).

## III.    LEGAL ARGUMENT

### I.    Standing ~ Claimants are Stockholders and Have Asserted Direct Claims ~ Questions 31, 32, Aug. 3 List; Question 8, Aug. 7 List

Under Delaware law, to determine whether a claim is derivative or direct, a court must consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy?" *Tooley vs. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031, 1035 (2004).

Claimants were the only stockholders whose shares were subjected to vesting milestones. Respondents' Cease Marketing Order prevented vesting, subjecting Claimants' stock to Travana's and HNA's repurchase rights $0.001 per share.

Prior to HNA's investment, Claimants held their shares free of restrictions. However, as a condition to HNA's investment, Claimants agreed to enter into Vesting Agreements with Travana and HNA International, which provided Travana and HNA the right to repurchase Claimants' unvested shares at $0.001 per share.

### a.    Rights, Privileges and Protections of the Claimant Minority Stockholders

Even though the shares had not vested, Claimants held rights as stockholders under Travana's Certificate of Incorporation, under statutory and common law and under the Series B Agreements. First, under the Vesting Agreements, only Claimants held the following rights:

- Implied right to render Continuous Service in order to achieve the Milestones, free of interference (Section 2);

- Right to unrestricted, fully vested shares in the event that Travana or HNA do not timely exercise their right to purchase the Unvested Founders Shares;

- Right to receive a Founders Warrant, which effectively provided anti-dilution protection to the Claimant minority stockholders;

- Right to make permitted transfers of the Claimant's stock, if allowed by the board;

- The right to receive additional shares, in the event of any stock dividend, liquidating dividend, stock split or similar recapitalization of Travana;

- The right to a share certificate which states the restrictions on its face, and to have those restrictive legends removed once the applicable restrictions lapsed;

- The right to have all vesting conditions removed in the event of an IPO of Travana (Section 8 of the Vesting Agreement, which automatically terminates the agreement if there is an IPO);

- "Except as otherwise provided herein and the Voting Agreement, Founder shall, during the term of this Agreement, <u>exercise all rights and privileges of a stockholder of the Company</u> with respect to the Common Stock and issued and outstanding Warrant Shares." (Section 9(a) of the Vesting Agreement);

- Notice rights under Section 9(c) of the Vesting Agreements;

- The right to stockholder protections under Delaware General Corporation Law, as the applicable law (Section 9(d) of the Vesting Agreements); and

- The right to refuse modification of the Vesting Agreement without the written agreement of the Claimant stockholder (Section 9(h)).

Second, under the Series B group of agreements, only Claimants possessed the following rights, privileges, benefits and protections not shared by other stockholders:

- **A Put Right** (i.e. rights under the structured liquidation provision in the Investors' Rights Agreement, §3, C-0012-080);

- **The right to board representation** (common stockholders could appoint one director) (Voting Agreement);

- **The right to have vesting conditions and other restrictions removed in the event of an IPO or sale of Travana** (multiple Series B agreements);

- **The right to consent to certain major changes in the capital structure, particularly those that harm the minority stockholders** (Voting Agreement);

- Series A right to convert to common stock (Amended and Restated Certificate of Incorporation);

- **The right of the common stockholders as a class, and the Series A Stockholders as a class, to consent to any alteration or change in the rights, preferences, privileges or**

**restrictions of the Series A Preferred Stock** or the holders thereof or amend any class or series of capital stock so as to change the priority of such stock relative to any other series of Preferred Stock (Section 3.2(i) of the Voting Agreement);

- The right of the common stockholders as a class, and the Series A Stockholders as a class, to consent to any amendment, alteration or repeal the Certificate of Incorporation of the Company or the Company's Bylaws in a manner that adversely affects the rights, preferences, or privileges of the Founders or Series A Stockholder (Section 3.2(ii) of the Voting Agreement).

- The right of the common stockholders as a class, and the Series A Stockholders as a class, to consent to any exchange, reclassification or cancellation of Series A Preferred Stock (Section 3.2(iii) of the Voting Agreement);

- The right to sell the Claimant's stock to any third party, if HNA or the Company did not exercise their right of first refusal to buy those shares on the same terms as offered between Claimants and the third party (Section 2.6 of the Right of First Refusal, Co-Sale and Drag-Along Agreement);

- The right to "co-sell" the Claimant's stock to any party that buys stock from HNA (Section 3.1 of the Right of First Refusal, Co-Sale and Drag-Along Agreement);

- The right to be released from the restrictions of the Right of First Refusal, Co-Sale and Drag-Along Agreement, in the event of an IPO or company sale or assignment for the benefit of creditors; and

- The right to have all vesting conditions removed in the event of an IPO of Travana (Section 8 of the Vesting Agreement, which automatically terminates the agreement if there is an IPO);

Third, statutory protection prevented HNA from conducting a short form merger (where another shareholder owns at least 90% of each class of stock of a corporation). HNA owned 89%, not over 90%. (DGCL Section 253). Minority stockholders were also protected under common law from oppression by the majority stockholders.

Fourth, as stockholders, Claimants held the following rights shared by all stockholders:

- The underlying ownership right of the common and Series A stock, which had the potential to become unrestricted;

- The underlying voting rights which had the potential to become unrestricted;

- The right to receive dividends, which for the MS, would ripen once the stock became vested;

- Information rights/Inspection Rights;

- Appraisal rights under DGCL Section 262, and the right to bring suit; and right to attend meetings of the shareholders.

Thus, Respondents' argument that Claimants contracted away all of their rights, privileges, benefits and protections, such that they were no longer stockholders, is simply not true, and is contrary to the evidence. .

Respondents' wrongful acts eviscerated the value of Claimants' equity ownership and all the rights attached to their stock ownership.  However, not meeting the milestones did not injure HNA in the same manner.  In fact, it meant that HNA could repurchase Claimants' shares for $0.001 per share and could own 100% of Travana instead of 89%. Even if Travana repurchased the Claimants shares, the effect would be the same to HNA.  Accordingly, the Claimants suffered individualized harm not suffered by all of the stockholders, or by Travana, which is why their claims are direct, not derivative.

Respondents suggest that a failure to meet milestones meant that Travana would receive no funding, which is a harm to the corporation and to *all* stockholders.  But this ignores the fact that Respondents *caused* the milestones to be unachievable, and thus devalued the Claimants' shares to $0.001.  It also ignores the fact that once Travana were to become a 100% wholly-owned subsidiary, HNA could then legally fund and operate Travana in any manner it pleased without having to be accountable to minority stockholders and without being bound by the Series B funding plan. Once Travana became a division of HNA, whether or not Travana would receive funding, and the timing, amount and usage of that funding, would be entirely within HNA's unfettered discretion and control.  Specifically, HNA could break free of the constraints of the Series B agreements – HNA would be relieved of the obligation to provide $23 million of funding to Travana and instead could dictate the amount, timing, and terms of any funding, entirely on its own terms.

Despite brewing their own secret plan to develop Travana in China as its own division, Respondents failed to do so and chose to shutter Travana following Chen's whistleblower letters

that threatened to publicly expose all of Respondents' misdeeds through legal proceedings. Consequently, Travana lost most of its value.  It was only *after* the misdeeds were committed and Respondents realized their potential legal exposure that HNA decided to shut Travana to sweep these grievous problems under the rug and make them disappear.  Although the record suggests that it was not HNA's intention at the time, closure of the company and creditor action to place Travana into Chapter 7 would ultimately lead to HNA's loss of control of the remaining assets.

That Respondents' acts and omissions also injured Travana, does not foreclose Claimants possessing and asserting their own direct claims. "Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim." *Grimes vs. Donald*, 673 A.2d 1207, 1212 (1996); *See Also Rhodes vs. Silkroad Equity, LLC*, 2007 Del. Ch. LEXIS 96, *18-19 (Del. Ch. Jul. 11, 2007)("controlling shareholder sold assets it owned…to the corporation for greater than fair value…for the sole purpose of driving down the value of the corporation and driving out the Plaintiffs. As a result,..became the sole owners…when they acquired all of the remaining shares…that they did not previously own…**caused a direct harm** to the Plaintiffs by the extraction of economic value and residual voting power" and also caused harm to the company by "dissipate[ing] corporate assets.") Thus, even though Travana was injured by Respondents' halting of marketing and failure to consider strategic alternatives for funding or pivoting of the company, that does not preclude a direct claim by the Claimants.

### b. *Grimes vs. Donald*, 673 A.2d 1207, 1213 (1996) ~ Questions 8, 11(a) (August 7 List of Questions)

*Grimes vs. Donald*, 673 A.2d 1207, 1213 (1996): "a plaintiff may assert a direct claim for an injury which is separate and distinct from that suffered by other shareholders,…***or a wrong involving a contractual right of a shareholder***…***which exists independently of any right of the corporation***" remains Delaware law.  The Delaware Supreme Court in, *Tooley, supra* 845 A.2d 1031 at 1039 affirmed *Grimes* as having utilized the proper analysis to distinguish the two types of claims.  Indeed, Delaware Courts have held that a wrong involving a shareholder's contractual

right independent of any right of the corporation is a direct claim. *See e.g., MCG Capital Corp. vs. Maginn*, 2010 Del. Ch. LEXIS 87 at 27, 47-48 (Del. Ch. Mar. 3, 2010)

In addition, the Delaware Supreme Court in *El Paso Pipeline GP Co., LLC s. Brinckerhoff*, 152 A.3d 1248, 1259 (Del. 2016) expressly instructed that the direct/derivative analysis under *Tooley* was **not** "intended to be a general statement requiring all claims, whether based on a tort, contract, or statutory cause of action…to be brought derivatively whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm." *El Paso, supra* at 1259. When "a plaintiff asserts a claim based upon the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply." *Id.* (citing *NAF Holdings vs. Li & Fung*, 118 A.3d 175, 182 (Del. 2015).) **A suit "by a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law**." *Id.*

*Grimes* applies in this case as Claimants have been uniquely harmed when Respondents' acts/omission injured their equity value and their related unique contractual rights attached thereto. These are rights and benefits that neither Travana nor HNA possessed.

### c. *El Paso Pipeline GP Co., LLC s. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) ~ Question 11(b) (August 7 List of Questions)

The dicta the Tribunal referenced from *El Paso Pipeline GP Co., LLC s. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) does not bar Claimants from making a claim for the loss of their equity value (11% of the Company). The dicta must be considered in the factual context of *El Paso*. *El Paso* involved corporate overpayment and the plaintiffs' only alleged injury to the partnership (the corporation in the case) directly by wrongfully depleting its funds and injury to the stockholders only derivatively so far as their stock lost value. *Id.* at 1261. Plaintiffs sought to recover their pro rata share of the overall diminution in value of the company without alleging or proving the corporate overpayment caused the plaintiffs any direct harm, such as dilution of his voting rights or relative control. *Id.* at 1264. Accordingly, the Court found that the harm was derivative because all of a corporation's stockholders were harmed and plaintiff only sought to recover their proportional share of the loss. *Id.*

### d. *Feldman vs. Cutaia,* 951 A.2d 727, 733 (Del. 2008) ~ Question 11(c) (August 7 List of Questions)

*Feldman vs. Cutaia,* 951 A.2d 727, 733 (Del. 2008) is also inapplicable.   *Feldman* involved a claim of wrongful equity dilution based on stock options that resulted in the company issuing stock for inadequate consideration.  *Id.* at 732.  The Court found "equal injury" to the company's shares resulting from a corporate overpayment and that the plaintiff failed to plead any facts that plaintiff suffered harm separate and distinct from the alleged harm to the company, or individualized harm not suffered by all of the stockholders and is simply seeking to recover pro rata in proportion to his ownership of the corporation's stock.

### e. The Claimants Have Been Uniquely Harmed ~ Question 32, Aug. 3 List

When Respondents, on their own, without board-level deliberation, meeting, or action, decided to change the fundamental business model for Travana from an OTA to a so-called "technology" or "product development" company, that was the first step in precluding achievement of the milestones and preventing the minority stockholders from ever vesting in their stock, yet it would permit Travana itself to increase in value.

Respondents attempt to argue that the pivot would have benefitted Travana, and so the stockholders were not harmed. That is a false proposition. If the Respondents had converted Travana to a "product" development company, it could have made no sales to consumers, and thus would have generated no gross bookings.  Instead, Travana could have licensed its products to other travel companies to generate revenue from those licenses, thus building up the value of Travana.  This would have been greatly beneficial to the HNA majority stockholders.  However, since it would generate no gross bookings, Claimants are harmed.  The preclusion of the vesting milestones would prevent the Claimant's from having any chance of vesting, and would thus have no choice but to turn over their shares to Travana/HNA for $0.001 per share versus the $2.33 - $3.38 per share price based on Saba's valuation as of October 2016.[25]

---

[25] Note that HNA Group (International) Co., Ltd. invested in Travana at a per share price of $0.4167 per share on November 25, 2015 (Letter Agreement C-0011-004, subparagraph (c); Series B Preferred Stock

Indeed, Shi Lei laid out a similar strategy in his February 28, 2017 email regarding Wang's "command[]" to use Travana's technology to help Tuniu, Caesar (Caissa Travel Group) "break into the U.S. and international market , Package company's advance technology and technical team and aggressively seek opportunity for an IPO." (C-2022, p. 1.)  With that plan, HNA profits while Claimants lose any chance of vesting.

Under these scenarios, the Claimants are uniquely harmed.  Instead of being vested in a company worth more than $300 million, they are forced to give up their shares for a nominal price, while the HNA majority stockholders enjoy ownership of a company worth as much or more than Saba's projected values.

### II.      Marketing is the Lifeblood of an OTA ~ Questions 30, 36 37, Aug.3, List

Marketing was not simply a "spending" decision.  It was foundational to building Travana as an OTA, a corporate mission to which all stakeholders had agreed and staked their equity interest in.  Because OTA is a "marketing-driven business," without marketing, Travana could not drive traffic to its website, build brand awareness, generate bookings, and revenue. Marketing is to an OTA, what lifeblood is to a growing infant. Marketing was a critical component of the milestone-based business plan established by the Series B agreements.

The following testimony from the Travana team illustrates why marketing is essential to breathe, and sustain, life into Travana:

- "Our search algorithms and system were so well designed that we could handle over 500 simultaneous searches per second and over 4000 concurrent users per second. All that was missing for our platform to realize its potential were the users driven in by a marketing campaign." (C-1303, Alex Groyz Witness Statement, ¶50)

- "It is well known in the OTA industry and the online industry in general that if you "purchase" the correct search terms from Google and other search engines, traffic will be driven to your web site and if your products are price competitive and your website looks professional, you will have sales." (C-1304, Witness Statement of Julianna Hill, ¶40)

---

Purchase Agreement, C-0012-001, Section 1.1(b)), valuing Travana at approximately $56 million on that date.

- "[H]ad HNA not prevented Travana from marketing, Travana would have met both of these milestones" (C-1306, Witness Statement of Nishith Kumar, ¶27)

- "Early stage companies like Travana need the lifeblood that come from Marketing to drive innovation and progress." (C-1321, Atkins Expert Report, ¶223.0)

HNA knew that marketing was foundational to building Travana. In fact, per Mobus' and HNA's request, the Series B Agreements established a milestone-based course of development for Travana to become an OTA that distinctly included the marketing plan as a centerpiece. (C-0012-129). The Travana Board were well aware that digital marketing campaign was essential to grow Travana. During the board meetings in March, and August of 2016, the marketing plan was discussed in detail and multi-million marketing budget set forth in the board presentations (see C-0152 and C-0153) with no objections. Shi Lei sent the August 2016 board presentation to Adam Tan in his August email. (C-1991-011; C-1184, p.12)

After over ten months of building, testing, training, preparation, and board meetings, in mid-October 2016, Travana was ready to launch the planned marketing program. However, the Claimants and Travana's management team did not expect the Pearl Harbor-like attack by HNA that torpedoed its marketing launch at the last minute; which sabotaged Milestone 2, and took Travana off of its established course to become an OTA.

The Respondent's position that stopping marketing and making a major paradigm shift for Travana from an OTA to a "technology or product development company" (the "pivot") did not require board deliberation and approval contradicts the cardinal precept of Delaware Corporate Law that: "the business and affairs of a corporation are managed by or under the direction of its board of directors." 8 Del. C. § 141(a). Indeed, the board's "duty to manage or supervise the management of the business and affairs of a corporation ordinarily entails:

> the duty to establish or approve the **long-term strategic, financial and organizational goals** of the corporation; to approve **formal or informal plans** for the achievement of these goals; to **monitor corporate performance**; and **to act, when in the good faith, informed judgment of the board it is appropriate to act**." *In re Bally's Grand Derivative Litig.,* 1997 Del. Ch. LEXIS 77, *13-14 (Del. Ch. Jun. 4, 1997).

The HNA-appointed directors breached their duties by failing to do any of the

foregoing.  In the "broad context of corporate governance, including issues of fundamental corporate change, a board of directors is not a ***passive instrumentality***." *Unocal, supra* at 954.

This pivot would violate the Series B Agreements, thwart the established milestones, throw away ten months of progress toward building an OTA, and abandon an established course of company development since inception.  Most importantly, this pivot would *eliminate the equity value* of the Claimant minority stockholders and breach the directors' fiduciary duty to protect all stakeholders, including the minority stockholders.  **The board's power to act "derives from its fundamental duty and obligation to protect** the corporate enterprise, which includes **stockholders, from harm reasonably perceived**, irrespective of its source." *Unocal, supra* at 954.  Directors "**are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders**." *Cede, supra,* at 360.

HNA argues that it is sufficient that Shi, Mobus and Tan discussed and agreed that delaying marketing was a good idea at that particular moment right before Milestone 2 was about to be met.  However, this position contradicts the fundamental principle that the Delaware Supreme Court set forth in *Optimis Corp vs. Waite*, 137 A. 3d 970 (2016): "Delaware corporate law embraces a **'board-centric' model of governance**. **This model expects that all directors will participate in a collective and deliberative decision-making process**." *Id.* at fn. 8.

Fundamentally, the Delaware General Corporation Law ("DGCL"):

allocates fundamental decision-making power **to the board as a whole**, and not to any individual director *qua* director, **all directors** must have the opportunity to participate meaningfully in any matter brought before the board and to discharge their oversight responsibilities. In more granular terms, **directors must be afforded, at a minimum**, (i) **proper notice** of all board meetings, (ii) the **opportunity to attend and to express their views** at board meetings, and (iii) **access to all information that is necessary or appropriate** to discharge their fiduciary duties, including the opportunity to consult with officers, employees, and other agents of the corporation. *Id.* at fn. 8.

This is precisely why having a board meeting to discuss a possible major departure from its well-

planned trajectory, was so critical.

In *Optimis,* the defendant directors intentionally failed to provide plaintiff director with notice that an important amendment to a stockholders' agreement to which he was a party would be on the agenda at a special meeting of the board.  The *Optimis* Court reprimanded such behavior and specifically instructed:

> we are reluctant to accept the notion that it vindicates the board's right to govern the corporation to encourage board factions to develop Pearl Harbor-like plans to address their concerns about the company's policy directions or the behavior of management. Rather, **it has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information.**  *Id.* at *9-10.

The HNA-appointed Directors did exactly what the *Optimus* Court instructed not to do: they excluded director Chen, circumvented the board process, and devised a Pearl Harbor-like plan to radically alter Travana's established course without having considered all material information and without requisite collaboration or deliberation.

### a.   Shi Lei Was Not Delegated the Authority to Make Decisions About the Marketing Plan, or the Established Course of Travana ~ Question 12, Aug. 7 List

*Rosenblatt vs. Getty Oil Co.,* 493 A.2d 929 (Del. 1984), does not apply because the Travana board did not delegate the responsibility for deciding whether or when to implement marketing to Shi Lei.  Fundamentally, "a director cannot authorize any one to act for him, because his associates are entitled to his judgment, experience and business ability, just as his associates cannot deprive him of his rights and powers as director." *Optimus, supra* at footnote 8. More importantly, Directors may not delegate duties which lie "at the heart of the management of the corporation." *Grimes v. Donald,* 673 A.2d 1207, 1214 (1996).

The Board did not delegate the duty to determine Travana's business direction to Shi Lei.  Rather, the record indicates that Shi Lei implemented the instructions of Adam Tan.

Regardless, any such delegation would have been invalid as an abdication of directorial authority.  A court "cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on

management matters." *Grimes, supra* 673 A.2d 1207 at 1214.  The board must retain "the ultimate freedom to direct the strategy and affairs of the Company." *Id.* at 12.

   *Rosenblatt* is factually distinguishable from our case. In *Rosenblatt*, the defendants employed D&M, a prominent and experienced independent firm of petroleum geologists, *i.e.* an engineering consultancy firm, to estimate the oil and natural gas reserves to value the subsurface assets at issue. *Id.* The Court found that D&M was independent, not beholden to either party, and had the requisite experience to perform the assigned and delegated task.  *Id.* at 943.  Thus, the delegation was proper.  These facts simply do not exist in our case.

   The *Rosenblatt* case sets forth the principle that a board may delegate tasks to a third party, and that the decision to delegate is itself an exercise of business judgment.  In our case, even if the board of directors were to have decided to delegate broad authority as to the overall direction of Travana, that delegation must still be consistent with the company's agreements and the fiduciary duties of the directors and officers.  Furthermore, like in *Rosenblatt*, that decision would be reviewed under the entire fairness standard.  In our case, Shi Lei was *not* independent (as would be the case with a prominent non-affiliated advisory firm), and Shi Lei did *not* have the requisite reputation and experience to make a decision concerning the overall direction of Travana.  Shi Lei was not an independent advisor.  Moreover Shi Lei's and HNA's self-declared plan to pivot the company into a technology or product company were contrary to the established course under the Series B agreements.

   **b.  Shi Lei's Responsibility to Review and Approve Corporate Expenses ~ Question 12, Aug. 7 List**

   Shi Lei (or HNA) was given review or approval rights over expenses or reimbursements (1) in connection with the October 25, 2015 bridge loan of $550,000 to Travana, in Section 3.5 of the Note Purchase Agreement, where Travana covenants that "[a]ny individual expense of Company in excess of $5,000 shall be subject to prior written approval of Lender (HNA Group (International) Co., Ltd.) before the payment is made" (C-0107-010; see the Letter Agreement,

C-0011-005, §5(a) Interim Funding; (2) in the November 19, 2015 board consent authorizing payment procedures for Travana's bank account at Bank of America that checks in an amount in excess of $25,000 must be signed by both Jason Chen and Shi Lei" (C-0109-001, referenced in C-0098-002;); and (3) CEO Chen's delegation of responsibility for reviewing and monitoring company expenditures and reimbursements (*i.e.* expense account charges through *Expensify*) that are over $1,000 (R-193).

> ### c. The Tribunal is Entitled to Disregard Testimony that it Does Not Find Credible ~ Question 41, Aug. 3 List

As the trier of fact, "the arbitrator [is] not bound to accept anyone's testimony as true, even if contradicted." *Masse v. Commercial Union Ins. Co.*, 620 A.2d 1041, 1045 (N.H. 1993). As the trier of fact, "the arbitrator [is] entitled to reject or accept the testimony of the various witnesses and to make credibility determinations." *Sampson v. City of Babbitt*, No. A03-380, 2004 Minn. App. LEXIS 103, at *6-7 (Ct. App. Feb. 3, 2004).

## III.    Standard of Review to Evaluate Breach of Fiduciary Duties

To determine whether directors have met the standard of conduct imposed by their fiduciary obligations, Delaware courts evaluate the directors' actions through the lens of a standard of review. *In re Orchard Enters., Inc.,* 88 A.3d 1, *81 (Del. Ch. Feb. 28, 2014). Delaware's default standard of review is the business judgment rule. However, that rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson vs. Lewis*, 473 A.2d 805, 812 (1983).

> ### a. The Board Failed to Act, and Respondents are Not Entitled to Protection of the Business Judgment Rule ~ Questions 39, 40, Aug. 3 List

On the one hand, Respondents contend the HNA-appointed Directors did not act because their duties did not require them to act. On the other hand, Respondents claim that the HNA-appointed Directors discussed amongst themselves and "made the decision" to cut marketing –

but this would mean they acted without a duly called board meeting.  Under either scenario, the BJR cannot be used to protect them.

To invoke the rule's protection:

> directors have a duty to inform themselves, prior to making a business decision, of **all material information reasonably available to them**.  Having become so informed, they must then act with requisite care in the discharge of their duties. *Aronson vs. Lewis*, 473 A.2d 805, 812 (1983).

The HNA-appointed Directors clearly failed to consider all material facts.  They failed to consult the Travana team with its collective wealth of OTA and relevant industry experience, and instead relied on Shi Lei's subjective belief without foundation, and agreed over dinner that marketing should be called off. (Mobus ¶¶60-62)  They then implemented this invalid and uninformed decision without a board meeting, which clearly violated the established principles under *Smith vs. Van Gorkom*, 488 A.2d 858, 872 (1984):

> [a] director's duty to inform himself in preparation for a decision derives from the fiduciary capacity in which he serves the corporation and its stockholders. Since a director is vested with the responsibility for the management of the affairs of the corporation, he must execute that duty with the recognition that he acts on behalf of others...**Representation of the financial interests of others** imposes on a director an **affirmative duty to protect those interests** and to **proceed with a critical eye in assessing information** of the type and under the circumstances present here. *Smith, supra* 488 A.2d 858 at 872.

As to inaction, "**the business judgment rule operates only in the context of director** *action*...**it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.**" *Aronson, supra* at 813; *Accord, Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 748 (Del.Ch. 2006) ("**where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply**.")  Here, the HNA-loyal directors cowered on the sidelines like "passive instrumentalities" allowing Tan's order to be implemented through HNA's "representative", Shi Lei. They clearly failed to act when they needed to act to protect Travana and the minority stockholders.  Accordingly, they cannot hide under the covers of the Business Judgment Rule.

In summary, Claimants have sufficiently rebutted the Business Judgment Rule presumption for all the reasons the *Walt Disney* Court set forth below, in addition to director inaction:

> **In the area of director action**, "plaintiffs must prove by a preponderance of the evidence that **the presumption of the business judgment rule does not apply either because the directors <u>breached their fiduciary duties</u>, acted in <u>bad faith</u> or that the directors <u>made an "unintelligent or unadvised judgment,"</u> by <u>failing to inform themselves of all material information</u> reasonably available to them before making a business decision**." *Walt Disney, supra* at 756 (emphasis added.)

> **b.  The HNA-appointed Directors Breached Their Duty of Loyalty and Failed to Act in Good Faith ~ Question 39, Aug. 3 List**

Directors of a Delaware corporation owe two fiduciary duties – care and loyalty.[26]  *In re Orchard Enters., Inc., supra* 88 A.3d 1 at *77.  The duty of loyalty requires acting in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Id.* (citing *Stone*, 911 A.2d at 370).  A plaintiff can call into question a director's loyalty by:

> showing that the director was interested in the transaction under consideration ***or*** not independent of someone who was… or… that the director failed to pursue the best interests of  the corporation and its stockholders and therefore failed to act in good faith…the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. *Id.* at 77-78.

A failure to act in good faith "may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Id.* at 78.

The good faith required of a corporate fiduciary includes: "not simply the duties of care and loyalty…but all actions required by a true faithfulness and devotion to the interests of the corporation and its stockholders." *Walt Disney, supra* 907 A.2d 693 at 755.  Directors are "fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders." *Sealy Mattress Co. v. Sealy, Inc.*

---

[26] Delaware Supreme Court has also recognized these as "a triad of primary fiduciary duties, due care, loyalty, and good faith."  *See Emerald Partners vs. Berlin*, 787 A.2d 85, 90 (Del. 2001).

532 A.2d 1324, 1338 (Del.Ch. 1987).

When "evaluating, negotiating, and deciding whether to approve and recommend" an action, directors are "to act loyally, prudently, and in good faith for the purpose of maximizing the long-term value of the corporation for the benefit of its residual claimants, viz., the common stockholders.[27]

At a minimum, good faith requires that the decision-maker act "honestly and without pretext." *In re Dole Food, supra* at *129-130 (explaining that as part of the business judgment rule, directors are presumed to act "in good faith and in the honest belief that the action taken was in the best interests of the company"); *In re Walt Disney Co. Deriv. Litig. (Disney I)*, 907 A.2d 693,755 (Del. Ch. 2005) ("To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."), *aff'd,* 906 A.2d 27 (Del. 2006); *Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del. Ch. 1977) (stating that directors must act "in good faith, with honest motives, and for honest ends").

In this case, the HNA-appointed Directors woefully breached their fiduciary duty of loyalty and to act in good faith by failing to consider and protect the minority stockholder's equity interest. They knew or should have known that the cessation of the marketing program would sabotage any chance of the minority stockholders' shares vesting.[28] Yet there is no evidence that they ever considered or discussed the consequences of how stopping marketing and pivoting the Company would preclude vesting and obliterate the Claimants' equity interests.

---

[27] *In Re Orchard, supra* at *34-35. See Also, *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 93 A2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder [] owners." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 195) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *eBay*, 16 A.3d at 34 (explaining that directors must seek "to promote the value of the corporation for the benefit of its stockholders").

[28] See February 19, 2017 E-mail exchange between Shi Lei and Mobus: "Based on the current [Series B] agreement, [Chen] wouldn't save his shares either ways, but if he cooperate, we can see if there is a chance to save bridge loan holders." (see C-1511). The term "bridge loan holders" refers to the Claimant AirTourist Holdings, LLC, which was organized as a vehicle for the former investors in the $15 million AFT bridge loan, to hold founders shares in Travana. (Park Witness Statement, ¶¶23-27, 213, 248; Shi Witness Statement, ¶29).

### c. Motive is Irrelevant in Determining Lack of Good Faith ~ Question 16, Aug. 3 List

Lack of good faith "is when a director acts in a manner "unrelated to a pursuit of the corporation's best interests." *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 754 (Del. Ch. Aug. 9, 2005) (citing *In re RJR Nabisco, Inc. S'holder Litig.,* 1989 Del. Ch. LEXIS 9, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989); *cf. Strassburger,* 752 A.2d at 581 (holding that certain directors breached their duty of loyalty by "indifference to their duty to protect the interests of the corporation and its minority shareholders," because their primary loyalty was instead given to the interests of their employer).

It makes "no difference the reason why the director intentionally fails to pursue the best interests of the corporation." *Id.* (citing *Guttman*, 823 A.2d at 506 n.34) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious actions not in the corporation's best interest does not make it faithful, as opposed to faithless."); *Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) (The duty of good faith, "if it is useful at all as an independent concept, [good faith's] utility may rest in its constant reminder . . . that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.")

### d. Majority Stockholders Have No Right to Usurp the Authority of the Board of Directors ~ Question 39, Aug.3 List

The "duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base." *Id.* Directors must exercise their independent fiduciary judgment: "Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives. The fiduciary duty to manage a corporate enterprise "includes the selection of a time frame for achievement of corporate goals. That duty may not be delegated to the stockholders." *Id.* Citing *Time*, 571 A.2d at 1154.

Director "primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present." *Id.*

> The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes…That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.

*Id.* At *90. Directors owed a "duty of loyalty to the stockholders to seek the alternative that maximized the value of their residual claims without regard to the particular interests of the controller." *Id.*

### e. The HNA-Appointed Directors Breached Their Duty of Loyalty by Failing to Oversee ~ Question 39, Aug. 3 List

Directors have a duty "to exercise oversight" and to monitor the corporation's operational viability, legal compliance, and financial performance.[29] A board's "utter failure to attempt to assure a reasonable information and reporting system exists" is an **act of bad faith** in **breach of the duty of loyalty**." Under Delaware's seminal *Caremark* decision directors face liability if "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." (*Stone v. Ritter*, 911 A.2d at 370). For both prongs of *Caremark*, the plaintiff must establish bad faith conduct. *Id*. A plaintiff establishes bad faith by "showing that the directors knew that they were not discharging their fiduciary obligations." *Id*.

The *Marchand* Court further articulates that "[b]ad faith is established, under *Caremark*, when "the directors [completely] **fail to implement any reporting or information system or controls** [,] or . . . having implemented such a system or controls, **consciously fail to monitor or oversee its operations** thus disabling themselves from being informed of risks or problems requiring their attention." (*Marchand* at 30, quoting *Stone v. Ritter* at 370-72). The *Clovis Oncology* Court cites *Marchand* and *Caremark* – "As explained in *Marchand*, "to satisfy their

---

[29] *In re Caremark Int'l Inc.*, 698 A.2d 959 (Del. Ch.1996) (Allen, C.); *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019); *In re Clovis Oncology, Inc.*, C.A. No. 2017-0222-JRS (Del. Ch. Oct. 1, 2019).

duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it." (*In re Clovis* at 2).

The board's Caremark duties are not limited to oversight in the health care (Caremark), food (Marchand) and drug (Clovis) regulatory contexts.  In Hughes v. Hu30, the plaintiffs contended that the directors consciously failed to establish a board-level system of oversight for the Company's financial statements and related-party transactions, choosing instead to rely blindly on management while devoting patently inadequate time to the necessary tasks. (Hughes at 35).  The plaintiff contended that the oversight claim had a secondary consequence of inflating the Company's financial results, leading to unjust enrichment for the officer defendants, thereby harming stockholders. Id.  The Hughes Court acknowledged unjust enrichment as a properly conceived form of damages, and denied the defendants motion to dismiss. (Hughes at 38-39).

The Hughes Court wrote that "The board of a Delaware corporation has a fiduciary obligation to adopt internal information and reporting systems that are 'reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.'" (Hughes at 29, Citing In re China Agritech, Inc. S'holder Deriv. Litig., 2013 WL 2181514, at *18 (Del. Ch. May 21, 2013) (quoting Caremark, 698 A.2d at 970)).

***The HNA-Appointed Directors Consciously Failed to Monitor Travana's Finances, Operations and Management.***

The Series B agreements established a milestone-based plan for Travana to build an international OTA.  After the August 11th special meeting, as Travana was approaching its most critical inflection point – the long-awaited launch of its marketing program, the board of directors went dark and failed to meet for 6 ½ months. (Kelly, ¶¶128-129).

---

[30] *Hughes v. Hu*, C.A. No. 2019-0112-JTL (Del. Ch. Apr. 27, 2020) (Laster, V.C.).

The HNA-dominated board shirked its duty and failed to consider strategic alternatives for Travana (Kelly, ¶¶33-34).  Mobus and Lei in particular, undermined the company's ability to respond to threats to its viability with Lei implementing decisions made outside of legitimate management channels and Mobus by actively supporting Lei in his unauthorized activities. Id. ¶33. Instead of acting in an informed manner to head off catastrophe, the board refused to meet, and Respondent Directors became a significant part of the problem. Id at ¶34.

The board had no internal reporting system reasonably designed to provide the board with timely, accurate information sufficient to allow informed judgments as to the corporation's compliance with law and its business performance.  After August 2016 Shi Lei prevented calling board meetings in numerous instances, namely in December 2016 and January 2017: "[d]uring December 2016 and January 2017, Chen demanded that I call a meeting of the Board, but I explained to him that we should not have a Board meeting until we had a clear business plan to present to the Board and a plan to lower Travana's high burn rate of almost $2 million a month." (Shi Lei Statement ¶133).

Because the board failed to meet, the board could not possibly: clarify lines of executive authority,31 fairly deliberate with respect to the Fareportal litigations,32 consider the legitimacy of the order to drastically cut marketing expenditures,33 consider whether it was right to discontinue a multi-million dollar marketing program that was built into the company's business plan,34 deliberate over any "restructuring" of Travana,35 and consider and ensure compliance with bylaw contractual obligations (including the Series B suite of agreements)36 which had monumental implications to the Claimant minority stockholders. All of these were

---

31 Kelly Expert Report, ¶¶39, 178-190, 201-203, 464-469.
32 Id., ¶¶443-453.
33 Id., ¶¶212-222.
34 Kelly Supplemental Expert Report, ¶¶44, 49.
35 Kelly Expert Report, ¶¶230-235.
36 Kelly Supplemental Report, ¶19, 27, 29; Kelly Report, ¶135.

responsibilities of the board of directors.  The actions and lapses in responsibilities of the HNA-appointed director Respondents was a proximate cause of Travana's demise.37

Respondents attempt to argue that the board never formally approved the budget, in order to posit that Shi, Mobus' and Tan's proposal to turn the company into a technology or a product development business was somehow not a fundamental pivot, and to pretend that no plan really existed.  First, this is contrary to the evidence which shows that the board supported and acknowledged the milestone-based plan to become an OTA embedded in the Series B agreements, in all three meetings during 2016.  Second, it is inconceivable that HNA would have agreed to invest $50 million in a company with no plan.  Third, it is the board's affirmative duty and obligation to develop a plan (including budgets) and direct and oversee that plan – there is no evidence that Travana's strategic plan included becoming a technology or product development company prior to the date that Shi Lei brought it up in December of 2016, after Travana had made over a year of progress building an OTA.

Here, the HNA-appointed directors failed both prongs of Caremark, in that (1) they failed to implement any reporting methods or controls that would have brought the foregoing critical issues and risks to their attention, and (2) they failed to monitor any issues whatsoever.

### f.    A Breach of Duty of Loyalty can be Shown Through Either Interest, or Lack of Independence ~ Question 29. Aug. 3 List

The business judgment rule presumption that "a board acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the board **was either** interested in the outcome of the transaction **_or_ lacked the independence** to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."  *Orman vs. Cullman,* 794 A. 2d 5, *22 (Del. Ch. 2001).  To establish that "a board was interested **or** lacked

---

[37] Kelly Expert Report, ¶493, "The actions of the Respondents undermined Chen and his management team, created operational chaos, forced Travana to abandon its Board approved strategic plan, and hampered the ability of Travana management to tackle and resolve the serious challenges the company faced. Instead of emerging as a viable player in the online travel agency market, Travana ended up in bankruptcy."

independence, a plaintiff must allege facts as to the interest and lack of independence of the *individual members* of that board." *Id.* To rebut successfully business judgment presumptions in this manner, "thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating that a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director." *Id.*

The *Aronson* Court defined "independence" as "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman, supra* at *24. Such "extraneous considerations or influences may exist when the challenged director is controlled by another." *Id.*

"Independence" does not involve a question of whether the challenged director derives a benefit *from the transaction* that is not generally shared with the other shareholders." *Orman, supra* at *fn. 50. Rather, it inquires "whether the director's decision resulted from that director being *controlled* by another." *Id.*

In sum, "interest" and "independence" are two separate and distinct grounds to show a breach of fiduciary duty of loyalty.

### g. Entire Fairness is the Applicable Standard of Review[38] ~ Questions 25, 33, Aug. 3 List

If the presumption of the business judgment rule is rebutted, the burden of proof shifts to the director defendants to prove to the *trier of fact* that the challenged transaction was "entirely fair" to the shareholder plaintiff. *Emerald Partners vs. Berlin,* 787 A.2d 85, 91 (Del. 2001). *In*

---

[38] "Enhanced scrutiny" is Delaware's intermediate standard of review. *In re Trados, supra*, at *43. Framed generally, it requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Id.* Enhanced scrutiny applies "to specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors." *Id.* This standard of review has only been applied to limited contexts, such as sale of a company or hostile takeovers, and does not apply in this case. *Id.* at *44.

*re Walt Disney Co., Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006) (explaining that the business judgment rule can be rebutted by establishing that "the directors breached their fiduciary duty of care or of loyalty or acted in bad faith" and that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"). See Generally, *Gentile vs. Rossette,* 2010 Del. Ch. LEXIS 123, *33 (May 28, 2010.

Despite the fact that this case does not involve a merger or a transaction, Entire Fairness is still the applicable standard of review. *See e.g., Encite LLC vs. Soni,* 2011 Del. Ch. LEXIS 177 (Del. Ch. Nov. 28, 2011). *Encite* involved a claim for breach of the fiduciary duty of loyalty regarding a defunct tech startup company, IFCT, that was never able to develop its technology into a commercially viable product and never produced a consistent stream of revenue. *Id.* at *2-3. As IFCT approached insolvency, the board decided to sell the company's assets through a bidding process unsuccessfully, and ultimately, IFCT went into bankruptcy. *Id.* at *4. The Court used Entire Fairness to evaluate whether the defendant directors used fair process in seeking and negotiating bids for IFCT's assets for a fair price, or whether they breached their duty of loyalty by favoring one bidder in such a way that discouraged or precluded higher bids, thus causing IFCT to lose its chance to secure the highest value for its assets. *Id.* at * 63. The court acknowledged that the case did not involve the ordinary scenario where the contested action is the sale of a company and the "fair price" aspect requires the directors to demonstrate that the price offered was the highest value reasonable available. *Id.* In this case, even though the defendants did approve their preferred bidder's offer, that offer was never voted on by the stockholders and never finalized. *Id.* at *67. Regardless, the Court still applied the Entire Fairness standard and instructed that the directors "must provide the details of what actions they took during the sales process, what discussions they had and what advice they were provided by counsel, and it is the Director defendants who, through those details, must demonstrate that the process was entirely fair." Id. at *70 (providing a list of factual questions that are relevant to determine whether the outcome of the bidding process was a product of fair dealing.)

Under Entire Fairness, the concept of fairness has two basic aspects: fair dealing and fair price. However, **the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness**. *Id.* at 97.

Judicial analysis "must begin with an examination of the *process* by which the directors discharged their fiduciary responsibilities…" *Id.* at 96. **To demonstrate entire fairness, "the board must present evidence of the cumulative manner by which it discharged *all* of its fiduciary duties**." *Id.* The HNA-appointed Directors have failed to show any evidence that the process that led to the marketing stoppage was entirely fair to the Claimants. There were no discussions or deliberation regarding the consequences of such a decision to Claimants' equity ownership. They failed to consider the consequences to the company that was operating under limited funds and had a short window of opportunity to grow as an OTA and to meet its milestones. They failed to consult the Travana team as to whether the platform was ready for a marketing launch. They allegedly agreed to delay the marketing. However, there were no discussions as to how long the delay, and how many more months Travana could survive without generating revenue without additional funding. In summary, they abdicated their responsibility to direct and manage the business of Travana.

As a consequence of the unfair process of failing to consider and protect the Claimants' equity interests, the Respondents' acts/omissions effectively devalued the Claimants' shares to the repurchase price of $0.001 per share.[39] At the time of the breach in October, 2016, the price per share based on Claimants' damages expert, Carl Saba's valuation (conservative and optimistic & reasonable valuation) is in the range of $2.33/share to $3.38/share, as follows:

---

[39] Founders Vesting Agreement (Chen), C-0019; Founders Vesting Agreement (Park), C-0020; Stockholders Vesting Agreement, C-0021). By the same token, elimination of the Claimants' 11.11% ownership interest would necessarily entail an increase in HNA's percentage ownership from 88.89% to 100%. As a consequence of the breach, the value of the Claimant's stake was effectively re-distributed to the other stockholders of Travana, in this case, HNA.

| Damage Calculation | | | | |
|---|---|---|---|---|
| | Saba Conservative Valuation | | Saba Optimistic and Reasonable Analysis | |
| Value of Options based on Saba Valuation | $ 315,200,000 | Note 3 | $ 456,100,000 | Note 4 |
| Total Number of Shares Outstanding | 135,000,000 | | $ 135,000,000 | Note 5 |
| Value Per Share | $ 2.33 | | $ 3.38 | |

When evaluating the "fair price" component of Entire Fairness, Delaware courts appraise the "fair value" of the stock at issue. *In Re Orchard,* at *29. If the appraised fair value is greater than the proposed price at issue, that "is **certainly evidence of financial unfairness**" and courts would award plaintiff the difference between the fair value and the unfair price. *In Re Orchard* at *30. ("On the aspect of fair price, the appraisal decision's holding that the fair value of Orchard was $4.67, more than two times the merger price of $2.05, is certainly evidence of financial unfairness.")[40]   Claimants are seeking, and are entitled to recover, the fair value of their stock ownership interest, at the time when the breach and tortious acts occurred.

*Fair Value*

Fair value requires the court to award the full proportionate value of the shares in the going concern. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996). The fair value of minority shares is "the pro-rata value of the entire firm as a going concern." *Kahn v. Tremont Corp.*, Civil Action No. 12339, 1996 Del. Ch. LEXIS 40, at *32 (Ch. Mar. 21, 1996) (finding that the market price paid to minority shareholders was fair value, overturned on other grounds).

---

[40] See also, *Weinberger*, 457 A.2d at 713-14 (equating fair price aspect of entire fairness with fair value standard in appraisal); Accord *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 Del. C. §262); See, e.g., *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342-44 (Del. Ch. 2006) (finding company's per-share <u>value</u>, then using that "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority . . . as a matter of equity," and granting the same amount as <u>damages</u>); *Emerging Communications*, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745 at *24 (finding that "fair *value*" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the *Delaware* fiduciary duty case law beginning with *Weinberger*," and granting the difference as *damages*).

This standard, as worded, does not allow for discounts for lack of control, lack of marketability, or liquidation preferences. Also, based Carl Saba's experience, Delaware's fair value standard does not allow for these discounts. Saba Reply Report, ¶81. Therefore, Claimants are entitled to their 11.11% pro-rata share of the conservative going concern valuation of $315.2 million up to the optimistic and reasonable valuation of $456.1 million of Travana as of October 1, 2016, which is $33.5 million up to $50.7 million. *See* Saba Report, par. 14 and 20, Ex. A and C.7.

***Appropriateness of the Valuation Date***

Mr. Saba uses a valuation date of October 1, 2016 for a multitude of reasons, first and foremost, that it is a reasonable approximation of the date of the breach and tortious acts (the same month in which those acts occurred). This date is less than two months after management's detailed 18 month forecast prepared on August 11, 2016, but before the planned ramp up in mid-October following the July 2016 soft launch. There was not any significant increase in marketing spending over July levels before that valuation date. Also, as of the valuation date, Travana had a viable technology and product for launch and a marketing plan that if implemented would have resulted in bookings exceeding the August 2016 management forecasts. No other date would be appropriate because an earlier date would not fairly take into account all facts and circumstances that reflected Travana's potential prior to the breach and tortious acts, and a later date would have been needlessly tainted by facts and circumstances caused by the wrongful acts of the Respondents which are the subject of this case.

In Carl Saba's rebuttal report, he offered further DCF calculations of what Travana's value would have been upon meeting each milestone: $315 million in December 2016, $330 million in February 2017, and $372 million in August 2017 for milestones 2 through 4, respectively. (Saba 2, par. 67 and exhibits J1- J6 thereto).

The damages calculations presented in Slides 327-332 presume Claimants selling their stock in October 2018. That date is based on Saba's projections of when Travana's revenue would have been similar to the revenues of 16 peer companies when they were acquired. Saba 1,

par. 202-210. That was well before COVID-19 was an issue. As to the Fareportal claims, Respondents have offered zero evidence that there was any merit to the claims; while the legal fees would have been an annoyance, they would have been trivial in comparison to the value of Travana. Thus, but for the wrongful acts and omissions of Respondents, Claimants would have the opportunity to sell their stock by October 2018 when they would have been fully vested.

In *Matthew vs. Laudamiel*, 2015 Del. Ch. LEXIS 247 (Del. Ch. Sep. 28, 2015), a former co-CEO of a LLC established breach of fiduciary duties and breach of contract arising from defendants' unlawful dissolution of the parties' LLC, Aeosphere, creation of a competitor, termination of Plaintiff's employment agreement, and disposal of the LLC assets without the unanimous vote of all the parties as required. *Id.* At the time of dissolution and winding up, Aeosphere had $21,000 in its bank account. The plaintiff sought compensation "for the value of his ownership interest" in Aeosphere. *Id.* at *63. The parties debated over whether Aeosphere should be valued as a "going concern or should be treated as if it had been liquidated." *Id.* at *63. The *Matthew* Court selected a valuation date of May 12, 2010, which was the **date of the wrongful dissolution** of Aeosphere. *Id.* at *26 and *63. The Court further found that at the time of the winding up "Aeosphere, despite its troubles, was a going concern with value in its intellectual property and potentially lucrative contracts…" *Id.* at *67-68.

***Fair Price***

When conducting "a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept." *In Re Orchard, supra* at *70. Once the Respondents made it impossible for Claimant's shares to vest, what they did was to secure for themselves an option to buy the Claimants shares at $0.001 per share.[41] In practical effect, the Claimants were forced into a

---

[41] For the purchase option clause, see Section 3.1 of the Founders Vesting Agreement (Chen), C-0019; See Section 3.1 of the Founders Vesting Agreement (Park), C-0020; See Section 3 of the Stockholders Vesting Agreement, C-0021. With respect to each Claimant's shares the option could be exercised by the company or by HNA at the end of the five year term of the vesting agreements.

position of giving up their shares for a mandatory sale price of $0.001 per share – an unfair price.

**h.  The Exculpatory Clause Does Not Exonerate the HNA-Appointed Director Respondents ~ Question 35, Aug. 3 List**

Although a Section 102(b)(7) provision may exculpate "directors against the payment of monetary damages that is attributed exclusively to violating the duty of care, even in a transaction that requires the entire fairness review standard *ab initio,* **it cannot eliminate an entire fairness analysis** by the Court of Chancery." *Emerald Partners vs. Berlin,* 787 A.2d 85, 93 (Del. 2001).  When entire fairness is the applicable standard of judicial review, the "injury or damages becomes a proper focus only *after* a transaction is determined *not* to be entirely fair." *Id.* at 93.

The court "must identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." *Id.* at 94.  If there is a determination that the transaction was unfair, then the Court would need to "identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated." *Id.*  It will then be necessary "to examine each of the individual defendants to determine whether the Exculpatory Clause applies."

Directors "can avoid personal liability for paying monetary damages **only if** they have established that their failure to withstand an entire fairness analysis is **exclusively** attributable to a violation of the duty of care." *Id.* at 98.  The burden of making this showing in an entire fairness case "falls upon the director." *Emerging Communications*, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745 at *40; accord *Gesoff v. IIC Indus., Inc.* 902 A.2d 1130, 1164 (Del. Ch. 2006).

In light of the evidence that shows "an unfair process and an unfair price, **the plaintiffs' claims are inextricably intertwined with issues of loyalty**." *In Re Orchard, supra* at *95 (citing *Emerald II*, 787 A.2d at 93.)   None of the HNA-appointed Directors have presented any evidence to negate their breach of duty of care, loyalty, or good faith.  The voluminous record lacks any evidence that these directors acted to protect the Claimant minority stockholders, or gave due consideration to their interests.  Accordingly, each of them is liable for damages caused

by their breach of fiduciary duties.

    **IV.**    **Damages ~ Questions 42, 43, Aug. 3 List**

        **a.**    **The Wrongdoer Rule: Applicable Law Requires That Respondents Bear the Risk of Any Uncertainty in Estimation of Damages Caused by Respondents' Wrongful Acts ~ Questions 26 28, Aug. 3 List**

Any suggestion that Claimants cannot recover damages because they are speculative, contradicts the fundamental principle as to recovering damages from a wrongdoer, as proscribed by the U.S. Supreme Court:

> [n]or can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture. This characterization of the basis for the verdict is unwarranted. **It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.** The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount…
>
> **Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of <u>just and reasonable inference</u>, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision** that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 562-563, 51 S. Ct. 248, 250, 75 L. Ed. 544 (1931)).

Delaware Courts have embraced this principle and have frequently applied this "wrongdoer rule" "where the wrongdoer's breach contributed to uncertainty over the amount of damages." *SIGA Techs., Inc. vs. Pharmathene, Inc.*, 132 A.3d 1108, footnote 132 (2015). See e.g*., Duncan vs. TheraTx, Inc.,* 775 A.2d 1019, 1023 (Del. 2001)

Likewise, the Court in *Thorpe vs. CERBCO, Inc.*, 1993 Del. Ch. LEXIS 257, 1993 WL 443406 at *40 (Del. Ch. Oct. 29, 1993) instructed:

> [i]t is, of course, fundamental that a fiduciary who breaches his duty is liable for any loss suffered by the beneficiary of his trust…While courts will not award damages which require speculation as to the value of unknown future transactions, **so long as the court has a basis for a responsible estimate of damages, and plaintiff has suffered some harm, mathematical certainty is not required.** *Red Sail Eastern Ltd. Partners, L.P. v. Radio City Music Hall Productions, Inc.,* Del. Ch., C.A. No. 12036 at 14, Allen, C. (Sept. 29, 1992). Furthermore, once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer.

Similarly, *Beard Research, Inc. vs. Kates,* 8 A.3d 573 (Del. Ch. 2010), (the case that was referenced in footnote 187 to *Encite LLC vs. Soni,* 2011 Del. Ch. LEXIS 177 (Del. Ch. Nov. 28, 2011), found the defendants collectively breached their fiduciary duties, aided and abetted such breaches, and tortuously interfered with prospective business relations and instructed:

> Delaware does not "require certainty in the award of damages where a wrong has been proven and injury established." **Indeed, "[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage." Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.** Public policy has led Delaware courts to show a general willingness to make a wrongdoer "bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven." *Id.* at 613.

This principle was also acknowledged in the case that the Tribunal referenced. *See e.g., Lake Treasure Holdings, Ltd. vs. Foundry Hill GP, LLC*, 2014 Del. Ch. LEXIS 205, *36 (Oct. 10, 2014).

Similarly, when a party breaches a contract,

> that party often creates a course of events that is different from those that would have transpired absent the breach. **The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer.** Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate. *SIGA Techs., Inc. vs. Pharmathene, Inc.*, 132 A.3d 1108, 1111 (2015).

In *SIGA*, SIGA challenged the Court's award of $113 million in expectation damages claiming that such damages were too speculative because expectation damages are difficult to measure for undeveloped products and new businesses, especially in the case of new drugs subject to regulatory approval. *SIGA, supra* at 1130. The Supreme Court rejected such an argument and instructed:

> [w]here the injured party has proven the *fact* of damages—meaning that there would have been some profits from the contract—**less certainty is required of the proof establishing the *amount* of damages**. In other words, the injured party need not establish the amount of damages with precise certainty "where the wrong has been proven and injury established." *Id.*

The Court further instructed that the court correctly applied the wrongdoer rule, that if SIGA's breach caused the lack of information and the uncertainty underlying the damages estimate, "the court resolved the uncertainties" against SIGA. *Id.* at 1132. For instance, as the court found, if SIGA had negotiated in good faith, and the parties had executed a final agreement, there would have been no uncertainty about the research and development costs under the final license agreement. *Id.* Accordingly, the court resolved the uncertainties about those costs against SIGA.

Here, it was the Respondents' wrongful acts that stopped marketing and precluded Travana from reaching milestones. The Respondents cannot now take advantage of their own wrong, and any uncertainty as to if and when Travana would meet the milestones must be resolved against Respondents under applicable law.

### b. The Tribunal Possesses Broad Powers to Fashion Equitable and Monetary Relief ~ Question 42, Aug. 3 List

Once a breach of duty has been established, the court's "powers are complete to fashion **any form of equitable and monetary relief as may be appropriate** . . . ." *In re Dole Food, supra* at *148 (citing *Weinberger*, 457 A.2d at 714). At that point, the remedy could be a damages award equal to the fair value of the shares, but "the measure of any recoverable loss . . . under an entire fairness standard of review is not necessarily limited to the difference between

the price offered and the 'true' value as determined under appraisal proceedings." *In re Dole Food, supra* at *148 (citing *Cede & Co., v. Technicolor, Inc.,* 634 A.2d 345, 371 (Del. 1993).

In determining damages, "the powers of the Court of Chancery are **very broad in fashioning equitable and monetary relief** under the entire fairness standard as may be appropriate..." *In re Dole Food, supra* at *148.  An award exceeding the fair value of the plaintiffs' shares may be appropriate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Id.*

Delaware law "dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *In re Dole Food, supra* at *150 (citing *Thorpe v. CERBCO, Inc.* (Thorpe II), 676 A.2d 436, 445 (Del. 1996).  Damages must be "**logically and reasonably related to the harm** or injury for which compensation is being awarded."  *In re Dole Food, supra* at *150 (citing *In re J.P. Morgan Chase & Co. Shareholder Lit.*, 906 A.2d 766, 773 (Del. 2006).  But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." (*In re Dole Food, supra* at *150, see also *Encite* cited above).

### c.  Claimants' Damages are Distinguishable from Those Alleged in *Cline v. Grelock* ~ Question 10, Aug. 7 List

In *Cline vs. Grelock*, 2010 Del. Ch. LEXIS 43 (Del. Ch. Mar. 2, 2010), is factually distinguishable. In *Cline*, two friends, Cline and Grelock, started a towing company, American Asset Recovery, LLC ("AAR") that lasted eight months. *Id.* at 3.  After accumulating debt and with lackluster business prospects, Grelock, without notifying Cline dissolved AAR, and used some of the vehicles from AAR to start another towing company, Hound Dog.  *Id.*

The Court found that Grelock breached his fiduciary duty to Cline by dissolving AAR without notifying Cline.  *Id.* at 5. However, the court found "the harm stemming from Grelock's conduct, however, is entirely speculative" as the court found little or no positive value that was likely to come from AAR.  *Id.* at 5-6.  The Court also found that the vehicles taken from AAR

were heavily liened and had nominal value, leading the court to conclude that there was not much of any value transferred from AAR to the new company Hound Dog. *Id.*

*Cline* was a case "marked by several failures of proof". *Id.* at fn 8. Specifically, Cline failed to prove any damages from Grelock's ministerial act of dissolving AAR and failed to provide any basis for assessing damages, including notably, no expert opinion. *Id.*

> "**Cline offered no fair value of AAR** or **any reasonable basis for calculating a value** of AAR at the time of dissolution. If AAR had a positive fair value at the time of dissolution, then some percentage of that value should accrue to Cline's benefit. **Without expert opinion, the Court is reluctant to engage in its own analysis of the financial records of AAR**. Without going into any detail, AAR's failure to achieve profitability, the absence of any data showing the growth of the business, and the high debt burden carried by AAR all cut against a finding that AAR at any time in its existence had any positive value." *Id.* at footnote 11.

"Cline has not sought to share in any profits of AAR from the time he was ousted until the time of its dissolution or, for that matter, until the present," *Id.* at footnote 10, thus Cline was not even an equity holder of AAR. Cline's assertion that he ought to be an equity holder of Hound Dog was dubious -- the Court held that Cline, who never made any capital contribution to AAR, has shown no basis in law or in equity as to why he was entitled to an interest in Hound Dog. *Id.* at 9. Moreover, the amount of capital which he would reasonably have been required to contribute, but did not, far exceeds any value fairly attributed to AAR, including those assets which are now used for Hound Dog's benefit." *Id.* Ultimately Cline was not able to demonstrate to the court what percentage equity interest he supposedly owned in Hound Dog, or how the court should calculate it. *Id.* at 8.

Because of the lack of evidence presented, the *Cline* court could not fairly assign a value to the assets or income of Hound Dog, nor could it determine what interest if any Cline owned or should have owned in Hound Dog. Id. at 7. For these reasons, the court determined that Cline was unable to prove that he was harmed, or if harmed, what his compensation should be. The *Cline* court found the plaintiffs' damages theory to be speculative because there were too many uncertainties, including that: (i) it was highly questionable and unproven whether the plaintiff

ever owned an equity interest in AAR; (ii) it was highly questionable and unproven whether the plaintiff was entitled to an equity interest in Hound Dog; (iii) it was highly uncertain whether the plaintiff would have made a capital contribution into Hound Dog and if so, how much; and (iv) plaintiff provided no basis, by means of any expert opinion or otherwise, for assessing damages.

Here, Claimants are and were clearly stockholders; Claimants owned a specific number of shares of common stock and Series A Preferred Stock. The record contains a great deal of evidence and support for the value of Travana. The Claimants have obtained an opinion of value from a qualified expert who has based his opinion on the evidence, and which has been presented to the Tribunal. The Claimants have provided evidence to form the basis of a responsible estimate of damages, which is related to their injuries.

### d. Claimants' Damages are Factually Distinguishable from Those Alleged in *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC* ~ Question 9, Aug. 7 List

In *Lake*, the Delaware Chancery Court found the damages too speculative because the high frequency trading software at issue did not have value, and the plaintiff's damages theory was based on multiple tiers of hypotheticals that were not grounded on facts. Plaintiff's theory is without Klee's involvement, the Partnership would have dissolved, and the Foundation would have received the Partnership's IP in the liquidation. The Foundation then could have and would have used the Chess Champions software to generate trading profits, which the plaintiffs' expert projected would yield investment returns of $2.3 million to $29 million over a two year period.

In *Lake*, the plaintiffs put forth the dubious assumptions that the plaintiffs would have invested $2 to $4 million dollars to trade with Chess Champions, and that the trading would have generated trading profits. However the Plaintiffs had previously refused to invest more capital in Chess Champions and other trading algorithms, and the court was not convinced that the plaintiffs would have put this amount of money at risk, in order to generate $2.3 to $29 million in investment returns. The court found that the plaintiffs' "ability to stomach the volatility of the Chess Champions' trading results" was "doubtful".

In *Lake*, the high frequency trading software "did not have any value as intellectual property" because it was no more than "a simplistic arrangement of public domain components and concepts." *Id.* at 2-3. Moreover, the "software had not generated any trading profits" and "was not likely to produce trading profits in the future." *Id.* In order to be of value, the trading software needed to generate trading *profits*. Evidence at trial established that "the performance of even successful algorithms deteriorates over time, rendering it speculative that Chess Champions could have retained an edge over a two year period. *Id.*

The *Lake* court also noted that the "wide range of potential results provides little guidance, essentially inviting the court to pick a number between $2.3 million and $29 million." *Id.* The plaintiff's estimate of damages thus varied by a factor of more than ten, when comparing the low end with the high end.

Accordingly, in *Lake*, despite finding a breach of fiduciary duty and aiding and abetting, because the plaintiffs failed to provide a basis for a reasonable estimate of damages reasonably related to their injuries, the Court awarded nominal damages. The *Lake* court found the plaintiffs' damages theory too speculative because there were too many uncertainties in the multiple tiers of hypotheticals, that were not adequately supported by the facts: (i) it was highly uncertain that plaintiffs would have obtained the trading software through the sale and foreclosure process, (ii) it was highly uncertain that the plaintiffs would have put their capital at risk to trade with the trading software, (iii) it was highly uncertain that the software would have performed as expected to generate trading profits, the sole purpose and basis for its value, (iv) it was highly uncertain that the trading software would have sustained that performance over a two year period, and (v) the wide range of potential results, from $2.3 million to $29 million, combined with all the facts of the case, left the *Lake* Court with no basis to determine any responsible estimate of damages.

Every operational aspect of Travana required for launch was ready and in place by mid-October 2016. Travana owned its platform. The evidence shows that Travana had the necessary capital to launch its marketing program; that Travana's platform *and* experienced online travel

*team*, were capable of executing the program to generate the expected results, *i.e.* gross bookings, which was the basis for the company's value. There is no evidence to suggest that the value of that platform would have decayed over time – in fact as Saba explained, the value of the platform increases over time upon meeting milestones, as more and more users visit and use Janbala.com. (Saba 2, ¶67 and exhibits J1 – J6 thereto). Finally, valuation expert Carl Saba presents a well-reasoned range for company value of between $315 million and $456 million, a comparatively tight range. The low (conservative) end of this range is 70% of the high (optimistic and reasonable) end of the valuation, which Claimants believe should render greater comfort that the damages estimate is responsible.

> ### e.  Claimants' Expert Carl Saba's Report Constitutes a Responsible Estimate of Damages, Based on Just and Reasonable Inference.

As further discussed below, Claimants' expert Mr. Atkins bases his reasonable projections of gross bookings and other metrics on the actual state of Travana and its platform in October 2016. Claimants' damages expert, Carl Saba, utilized the well-accepted discounted cash flow method to value Travana, relying in part on Travana's management forecasts and benchmaking the forecast with a peer group of 11 OTAs.

### Valuation of Early Development Stage Companies Under Delaware Law

*Matthew vs. Laudamiel*, 2015 Del. Ch. LEXIS 247 (Del. Ch. Sep. 28, 2015) involved a case where a former co-CEO of a LLC proved his breach of contract claim arising from defendants unlawfully dissolved the parties' LLC, Aeosphere, then created a competitor, terminated his employment agreement, and disposed the LLC assets without the unanimous vote of all the parties as required. *Id.* In addition, he also proved defendants breached a duty of loyalty by failing to act to promote the best interests of the LLC, including improperly winding up and distributing the assets of the LLC and sharing confidential information. *Id.* In *Matthew*, the plaintiff sought compensation "for the value of his ownership interest" in Aeosphere, which

the Court awarded. *Id.* at *63.  In determining the value, the Court viewed its task of valuation "as analogous to an appraisal." *Id.* at *63.

Aeosphere was in dire financial straits, with inadequate cash flow, considerable debt, and "at best a suboptimal product to sell."  *Id.* at *66.  No evidence existed of any potential investor other than defendant Capua, and Capua refused to commit additional capital. *Id.*  Successful adaption of "the technology to the commercial context was far from certain and never in fact materialized." *Id.* The Court did not accept Plaintiff's damages expert Vannucci's valuation wholesale because his "cash flow projections assumed a viable product." *Id.*

However, despite being in financial dire straits, the Court valued the company as a going concern because it found that at the time of the winding up "Aeosphere, despite its troubles, was a going concern with value in its intellectual property and potentially lucrative contracts with well-established entities." *Id.* at *67.  Recognizing that "Aeosphere had some value as a going concern, but mindful of the speculative nature of Aeosphere's product and future cash flows," the *Matthew* Court adopted discounted cash flow model put forth by the plaintiff's damages expert, albeit with a reduced enterprise value. *Id.* at *68.

Similar to our damages expert, in *Matthew* in his valuation the plaintiff's damages expert "utilized venture capital rates of return for purposes of selecting a discount rate" and classified Aeosphere as an "early development stage investment", which involves "companies that have developed prototypes that appear viable and for which further technical risk is deemed minimal." *Id.* The Court agreed with the classification of Aeosphere as an "early development stage" company and noted the following facts: (1) Aeosphere had been in business for over a year, had contracts of value, and held some expectation that the Prolitec technology would suffice until EFET became marketable; (2) the parties were clearly interested in EFET, and [defendants] did not just walk away from Aeosphere; (3) while the valuation [of plaintiff's damages expert] utilized projected cash flows assuming a viable EFET technology, the Court's calculation considered EFET a mere expectancy and assumed use of the then-viable Prolitec technology.

Accounting for cash and cash equivalents, working capital, and non-operating assets the

Court valued Aeosphere's enterprise at $1,405,256.56 and awarded the plaintiff $491,839.79 for his ownership share of the enterprise. *Id.* at *72.

*TV 58 Ltd. Partnership vs. Weigel Broadcasting Co.*, 1993 Del. Ch. LEXIS 146 (Del. Ch. July 22, 1993) also involved valuation of an early stage, in that case, start-up company. Plaintiff TV58 Limited Partnership ("TV58LP") brought an appraisal action pursuant to 8 Del. C. §262 for the value of its 200 shares of stock of Milwaukee TV58, Inc. ("MTV58"), a Delaware corporation. *Id.* at *1. MTV58 merged with and into defendant Weigel Broadcasting Company ("Weigel"). *Id.* Both parties agreed that TV58LP should be compensated for the fair market value of its interest in MTV58. *Id.* The parties disagreed substantially as to how fair market value should be determined, and by employing different valuation methods, reached very disparate conclusions as to the value of TV58LP's shares. *Id.* In *MTV58* the plaintiff asserted that the value of its interest was not less than $475,600; defendant, on the other hand, asserted that plaintiff's interest was worth approximately $15,000. *Id.* Accordingly, the issue was determining the best method of calculating the correct value of TV58LP's shares. *Id.* at *2.

Because MTV58 was a functioning business at the time of the merger, the Court found that "the most appropriate method of valuation is as a going concern, not a liquidation value." *Id.* at *7 (citing *Weinberger*, 457 A.2d at 713). In determining the value of a shareholder's interest in a company as a going concern, "the appraiser must take into account the future prospects of the merged corporation." *Id.* (citing *Weinberger*, 457 A.2d at 713). This is generally accomplished through "the discounted cash flow analysis, which theoretically values the future earnings of an entity and then discounts them to present value." *Id.*

The *MTV58* Court rejected the defendant's valuation which utilized the cost (or "asset value") approach, "an approach typically used in contemplation of liquidation." *Id.* at *8. The Court found that the cost approach "tends to undervalue intangible factors of a business (*i.e.*, goodwill and synergy), making it less accurate than the discounted cash flow method in valuing an existing and viable business." *Id.* at *8 ("The notion that a business interest is worth the value of its underlying assets is basically fallacious in most cases, at least for an operating company.")

Because MTV58 did not have an earnings history, the Court recognized that "a discounted cash flow analysis must be based purely on speculation as to the company's future performance." *Id.* at *10.  However, the *MTV58* Court specifically held that this fact "does not undermine the method's validity or appropriateness." *Id.* at *10 (citing *Associated Imports, Inc. v. ASG Industries, Inc.*, 1984 Del. C.h. LEXIS 483, *43-44, Del. Ch., C.A. No. 5953, Duffy, J. (June 20, 1984), *aff'd sub nom.  Hubbard v. Associated Imports*, 1985 Del. LEXIS 558, Del. Supr., No. 286, 1984 (July 16, 1985) (Although courts usually consider historical earnings in valuation, "for present purposes, the Company should be regarded as a "new" enterprise. Thus earnings should be viewed prospectively.)) This is the case with most start-up businesses. Accordingly, the *MTV58* Court adopted the plaintiff's valuation and held that the discounted cash flow method was reasonable and accurate to value a start-up company.  *Id.* at *25.

***Damages and Valuation Expert Carl Saba Properly Applied Discounted Cash Flow (DCF) Methodology to Value Travana, and the Damages to Claimants.***

Mr. Saba's valuation methodology and reliance on management forecasts have been well-received by Delaware courts.  See the following case citations as examples.  The discounted cash flow model of valuation "is a standard one that gives life to the finance principle that firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk. The [discounted cash flow] method is frequently used in this court and, I, like many others, prefer to give it great, and sometimes even exclusive, weight when it may be used responsibly**.**" *Andaloro v. PFPC Worldwide*, Nos. 20336, 20289, 2005 Del. Ch. LEXIS 125, at *35 (Ch. Aug. 19, 2005).  A reliable discounted cashflow valuation "starts with management's contemporaneous projections." *In re Rural Metro Corp. Stockholders Litig.,* 88 A.3d 54 (Del. Ch. Mar. 7, 2014).  See, e.g., *S. Muoio & Co. LLC v. Hallmark Entertainment Invs. Co.*, 2011 Del. Ch. LEXIS 43, 2011 WL 863007, at *19 (Del. Ch. Mar. 9, 211) ("This Court has consistently recognized the importance of management's contemporaneous projections . . . .") *Andaloro, supra* at *11. (giving "heavy weight" to management projections, so long as "they are prepared under circumstances that do not undercut the court's confidence in their

trustworthiness"); *Emerging Communications*, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at

*14 ("This Court has consistently expressed a preference for the most recently prepared

management projections available as of the merger date."); *Cede & Co. v. JRC Acq. Corp.*, 2004

Del. Ch. LEXIS 12, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("[T]his Court prefers

valuations based on management projections available as of the date of the merger . . . . Expert

valuations that disregard contemporaneous management projections are sometimes completely

discounted").

      The Travana executive team had prepared reliable projections based on the business plan

that it had developed, and prior to the breach these projections were presented to the Board.

Management's projections (referred to as "pro formas") were prepared in the context of the need

to plan the best strategic use of the company's cash resources, at that point in time.

      Mr. Saba considered various valuation methods and determined that the most appropriate

methods for Travana, as an early stage company, was the discounted cash flow ("DCF") and

DCF with a market exit multiple.  Saba 1, par. 138-162.  Saba conducted extensive

benchmarking against other OTAs to validate the reasonableness of his assumptions.  Saba 1, par.

181-193, 202-212, ex. C.3, E.1 G.1-6.  As discussed above, Saba had reliable Travana

management pro formas that were properly vetted and created well before litigation.  Saba

thoroughly addressed the criticisms of Mr. Kennelly. (See "Claimants' Reply Brief Legal

Section, par. 155-158.)  Mr. Kennelly made no attempt to address Saba's points.

      Saba considered Travana's strengths and weaknesses, including the general state of the

economy.  Saba 1, par. 35, 85-95, 108-125; Saba 2, par. 27-42, 71, 72.  While he considered

products that were being worked on, such as *Quantum Saver*, *MPOS* and *Cabin Class*

*Optimization* (Saba 1, 48-71), Saba's DCF was based on the August 2016 pro formas.  Saba 1,

par. 169-172, 177, 190, 191, 199, 203; Saba 2, par. 15-21, 40, 64, 67.

      The 2016 pro forma did not attribute any revenue for those features, e.g., see C-197, tab

"FY16 Budget Assumptions," lines 23-41, vs. C-184 (2017 pro forma), tab "Pro Forma 2017 to

2018," lines 99 and 101, which projects Quantum Saver and Class Optimization revenues starting in the Spring of 2017.

To account for the risk factors for Travana, Saba applied a discount rate of 25%.  Saba 1, par. 194-200.  (The higher the discount rate, the lower the DCF calculations will be.)  In determining the appropriate discount rate to apply to his DCF projections, Saba considered that the discount rate must match the risk profile of the projections.  *Id.*  Travana was an early stage OTA on the valuation date.  Accordingly Mr. Saba cited two sets of published data that are widely used to derive discount rates for early stage companies – *actual* rates of return on venture capital portfolios of early stage companies, and *target* rates of return on those same VC portfolios.  *Id.,* Tables 1-3 of Exhibit C.4. *Actual rates of return are significantly lower than target rates of return*, because the *actual* returns include both early stage companies that succeeded and failed in a VC portfolio fund. Saba 2, par. 27-41. *Target* rates of return are not what VCs are able to earn across their portfolio of early stage companies; they are a rate of return they are *targeting* (aiming for) assuming the early stage company they invest in will succeed, while knowing that some will fail. Saba 1, par. 198, Tables 2-3 of Exhibit C.4.

Whether a *target* or *actual* rate of return should be applied to DCF forecasts, depends on what those forecasts represent in terms of risk profile of the company and achievability of the forecasts. If they represent only an unrealistic wild success scenario without consideration of downside risk, a *target* rate of return should be applied because the overstated *target* rate of return will compensate for the overstated and optimistically biased forecast.  A preferable and more conceptually sound approach is to match *expected value* forecasts, that is the weighted average of all possible outcomes with the lower *actual* rate of return. This is what Saba did. Saba 1, par. 194-200; ex. C.4, Table 1; Saba 2, par. 34-35.   This results in both the rate of return and the forecasts reflecting expected value, as opposed to over-optimistic forecasts being "corrected" with an overstated *target* discount rate.

In the case of Travana's DCF projections, which were derived from and extended the August 2016 pro forma, Saba cites numerous factors as to why they reflected *expected value*;

that is a reasonable and realistic weighted average outcome. Saba 1, par. 199; Saba 2, par. 34, 57-58. All of these factors reduced the risk profile of Travana and supported the achievability of the DCF forecasts. As a result, Saba selected 25% which is within the range of seed / early stage company *actual* rates of return. Saba 1, Table 1 of Exhibit C.4, par. 197. Although overstated *target* rates of return would not be appropriate to pair with Travana's reasonable forecasts, Saba notes that the only recent *target* rate of return data from the Everett 2017 study shows as median return of 25% for first stage companies. Saba 1, par. 198, 200. The older data showing much higher ranges of returns between 40% - 60% for first stage companies, is not only much higher than what investors actually earn on such companies, but it is very dated, back to the 1980s and 1990s. Saba 1, Tables 2-3 of Exhibit C.4.

While Respondents dispute Saba's valuation of Travana, recall that in May 2015, HNA was willing to invest $200 million for a 55% interest in AFT (C-1221), a company that at the time had lost its licenses, owed airlines more than 60 million Euros, and had primarily an airline-only platform with an inferior hotel product. What Travana built was far superior to AFT, and this time around, HNA had a nearly 90% interest for ¼ of the investment dollars. In fact, using HNA's AFT transaction, Saba's backsolve valuation was $296 million, without interest and without grossing up. Saba 1, par.221.

In an attempt to discredit Saba, at least three times during the August 3 and 4 hearings Respondents misrepresented that Saba projected Travana to be the world's second largest OTA within 10 years. 8-3-20 transcript 159:5-14; 8-4-20 transcript, 424:20-23, 437:24-438:3. It appears that they were referring to Saba 1, par. 187 and ex. G.3. However, Saba's chart (ex. G.3) projected Travana's total revenue 10 years into the future versus what other OTAs experienced after *their first 10 years*. The chart projects that by 2026 Travana's revenue would be $1.89 billion, second to Expedia's more than $2 billion in revenue after *its first 10 years*.[42] But by

---

[42] While per Saba's projections, Travana's revenues over its first 10 years would be the second highest of other OTAs *during their first 10 years,* Saba noted that growth potential in 2016 was superior to what other OTAs experienced in the 1990s (when their first 10 years began) when internet used was much more limited and contrasted with today's trend toward online bookings. Saba 1, par. 188.

2016, Expedia's and Priceline's revenues grew to $8.7 and $10.7 billion in revenue, respectively, with annual growth rates between 9% and 31% since 2010. Saba 1, Ex. G.1.  Projecting those revenues out to 2026 (when Saba allegedly says Travana would be the second largest OTA) at a 15% annual non-compounded growth rate and those revenue numbers grow to $21.75 and $26.75 billion, completely dwarfing Travana's projected $1.89 billion revenues on the same date.

For the foregoing reasons, Mr. Saba's valuation is responsible and well grounded. Accordingly the Claimants respectfully request that the Tribunal uphold Mr. Saba's valuation.

***Guiding Principles for Valuation.***

As a general principle, "[a]s a matter of law, a court must consider all relevant factors involving the value of a company when conducting an appraisal. In doing so, all facts which were known or which could be ascertained as of the [valuation] date [] are to be considered." *Gholl v. eMachines, Inc*., 2004 Del. Ch. LEXIS 171, citing 8 Del. C. §262(h), and *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 74 A.2d 71, 72 (Del. 1950).  In an appraisal, both sides have the burden of proving their respective valuations by a preponderance of the evidence. *Id.*, citing *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513, 520 (Del. 1999).  Any "techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" may be used. *Id.*, citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).  If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value. *Id.*, citing *Gonsalves v. Straight Arrow Publ'rs*, 701 A.2d 357, 361 (Del. 1997) (noting this Court's responsibility to "*independently* determine the value of the shares that are the subject of the appraisal action").

Consistent with these principles, in determining whether to apply Saba's conservative valuation or his optimistic valuation, the Tribunal may consider the egregious nature of Respondents' acts, including those that devalued the Claimants' stock, as well as the Respondents' misrepresentations in their statements that fly in the face of the evidentiary record.

Courts do not approach the question of preponderance of evidence in a wholesale all-or-nothing manner – Delaware case law provides a great deal of precedent for an approach that

examines the particular components and inputs of a valuation model, such as in the case of a "discounted cash flow" analysis: debt ratio, cost of equity, cost of debt, and thus Weighted Average Cost of Capital (WACC) (otherwise known as a "discount rate") (*Gholl* at 48, and see *Matthew* and *MTV58*); and in some cases courts will independently derive its own valuation model. (*Gholl*, citing *Gonsalves v. Straight Arrow Publ'rs*, 701 A.2d 357, 361 (Del. 1997)).

In *Gholl*, the defendant corporation obtained a fairness opinion from the investment banking division of Credit Suisse First Boston (CSFB) in the context of a company sale. CSFB issued an opinion that a final offer of $1.06 was "fair, from a financial point of view", utilizing several valuation methods. However CSFB never explained which valuation method or methods it actually relied on in finding the transaction fair. The petitioner shareholders moved for an appraisal under 8 Del. C. §262, and called as their expert Daniel Larson ("Larson"), an Accredited Senior Appraiser at EaglePoint Group, and MBA from the Stanford School of Business. The defendant corporation called Gregg Jarrell ("Jarrell"), a professor of economics and finance at the William E. Simon Graduate School of Business Administration of the University of Rochester in New York. CSFB came up with a discount rate of 13.7 – 14.8%, Larson 18%, and Jarrell 18-22%. (*Gholl* at 48). The *Gholl* Court examined each expert's valuation methodology and the components thereof, the available data, and the projections of the corporation's management at the relevant time – and rather than accept one expert opinion over another, the court conducted *its own* DCF analysis. (*Gholl* at 41, "The Court's DCF"). For the Court's DCF model it independently decided and quantified variables such as the debt ratio, cost of debt and cost of equity, to derive a WACC and discount rate. The *Gholl* Court then utilized its own DCF model, with independently ascertained variables, to determine fair value.

But not every case obliges the court to give equal regard to competing expert reports, such as in *Gholl*. In *Matthew*, the court examined two opposing expert opinions with widely differing results – on the one hand the defendant's expert opinion by Mr. Barberich showing a low value, and the plaintiff's expert opinion by Mr. Vannucci showing a higher value. The *Matthew* Court examined the valuation methodologies used by both sides, and concluded that

neither was correct, because "neither side's account presents the entire story". (*Matthew* at 66). However, the Court determined that the liquidation approach used by Barberich was inappropriate, ruling that value should be determined based on the enterprise as a "going concern" (*Matthew* at 64 - 67) (Barberich's report was essentially disregarded), and the Court proceeded to examine the components and variables of Vanucci's DCF valuation model.  The Court adopted Vannucci's DCF model, but applied its own independently derived inputs, reducing projected free cash flows to one fifth of Vannucci's projections. (*Matthew* at 70). Accordingly, the *Matthew* Court determined an adjusted fair value for the enterprise of $1.9 million, and awarded Matthew his pro rata share of that enterprise value. (Matthew at 72).

In *MTV58*, the defendant corporation Weigel Broadcasting Co. obtained a valuation report from Merrill Lynch Business Brokerage and Valuation, Inc. ("Merrill"). The plaintiff TV58 Limited Partnership obtained two independent appraisals, one from Bruce Cheen ("Cheen" of Kagan Media Appraisals, Inc., and one from Dr. Donald Puglisi ("Puglisi").  The *MTV58* Court proceeded to examine the valuation methodologies utilized by all three appraisers, and determined that it would disregard the Merrill appraisal, because it was based on a "cost approach" typically used in contemplation of liquidation. (*MTV58* at 8). The court added that a cost, or "asset value" approach tends to undervalue intangible factors of a business (such as goodwill and synergy), making it less accurate than the discounted cash flow method in valuing an existing and viable business. *Id.*  The MTV58 Court then turned to the Cheen and Puglisi appraisals, evaluating the assumptions and methodologies used in each, and the court accepted "Cheen's valuation analysis as accurate, reliable and persuasive". *Id.* at 21. The defendant challenged the discount rates of Cheen and Puglisi's reports as "inordinately low", and challenged various assumptions made by Cheen and Puglisi, but the court dismissed those challenges as "moot" due to the "absence of substantive evidence" behind them. *Id.* at 21-23.

***A Pro Rata Approach to Valuing the Claimants' Minority Ownership Stake, Excluding any Discount for Minority Status, is Appropriate and Supported by Contract and Legal Precedent.***

The parties to the Series B agreements negotiated and mutually agreed to the structured liquidation provision in Section 3.1 of the Investor's Rights Agreement in order to provide a means of liquidity for the Claimant minority stockholders. (C-0028-016)  Section 3.1 includes a general procedure for appraisal, and a definition for "fair market value" of the minority equity interest[43]:

> 1.8 "Fair Market Value" means the **enterprise fair value of the corporation**, less debt, **divided by the number of issued and outstanding shares of capital stock** on an as-converted fully-diluted basis, with reference to and based upon the amount at which **the corporate enterprise** would change hands between a willing buyer and willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.  (C-0028-002)

Notably the definition of fair market value does not refer to the shares themselves, but the value of the corporate enterprise (*i.e.*, the price at which the entire company would be sold). Thus the parties specifically agreed to no discount due to the fact that the Claimants' 11.11% stake was a minority interest in Travana.  Accordingly it is appropriate for Mr. Saba to apply, with no minority discount, a *pro rata* approach to calculating the value of the Claimants' equity stake, *i.e.* by multiplying Company Value times 11.11%.

Fair value requires the court to award the full proportionate value of the shares in the going concern. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996). This fair value of minority shares is "the pro-rata value of the entire firm as a going concern." *Kahn v. Tremont Corp.*, Civil Action No. 12339, 1996 Del. Ch. LEXIS 40, at *32 (Ch. Mar. 21, 1996) (finding that the market price paid to minority shareholders was fair value, overturned on other grounds). This standard, as worded, does not allow for discounts for lack of control, lack of marketability, or liquidation preferences.

### *The Tribunal Has the Proper Authority to Award Interest*

---

[43] It is acknowledged that the Investors Rights Agreement utilizes the term "fair market value" instead of the accounting term "fair value" as used in Delaware case law, nonetheless the Claimants consider Section 3.1 of the Investors' Rights Agreement to be valid evidence as to the intent of the parties with respect to the inapplicability of any "minority discount".

A successful plaintiff "is entitled to interest on money damages as a matter of right from the date liability accrues." *In re Dole Food Co., Stockholder Litig.,* 2015 Del. Ch. LEXIS 223, *156 (Del. Ch. Aug. 27, 2015). The *In re Dole* Court awarded damages for breach of duty of loyalty and also awarded pre-and post-judgment interest that accrued at the legal rate, "fluctuating with the underlying Federal Discount Rate and compounded quarterly, until the date of payment." *Id.* (citing 6 Del. C. §2301(a)).

The Delaware General Corporation Law further enables courts to determine a "fair rate of interest":

> In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. *TV58 Ltd. Partnership vs. Weigel Broadcasting Co.,* 1993 Del. Ch. LEXIS 146 (Del. Ch. Jul. 22, 1993) (citing 8 Del. C. §262(i)).

Under §262(i), "the Court may award either simple or compound interest." *Id.* (citing 8 Del. C. §262(i)). The legal rate of interest, as prescribed in 6 Del. C. §2301, is simple interest at the Federal Reserve discount rate plus 5.0%.

In *TV58*, at the time of the alleged wrongful merger, "the discount rate was 6.5%, making the legal rate 11.5%." *TV 58, supra* at *24. Accordingly, the *MTV58* Court awarded "simple interest of 11.5%" in part because the action had taken a very long time to get to trial. *Id.*

**The Tribunal Has the Proper Authority to Include a Tax Gross-Up in Claimants' Award.**

Delaware courts allow for the increase or gross-up of damages to account for taxes that would be paid on damages awarded. *See Paradee v. Paradee*, No. 4988-VCL, 2010 Del. Ch. LEXIS 212, at *38-39 (Ch. Oct. 5, 2010); *Gans v. MDR Liquidating Corp.*, C.A. No. 9630, 1998 Del. Ch. LEXIS 76, at *6-7 (Ch. May 22, 1998); *see also* Federal Judicial Center Reference Manual on Scientific Evidence, Third Edition, p. 454. Accordingly, Mr. Saba's inclusion of a tax gross-up in his quantification of damages is appropriate.

**V.    Claimants are Entitled to Recover Expectation Damages from HNA's Breach of Implied Covenant of Good Faith/Fair Dealing ~ Question 42, Aug. 3 List**

The standard remedy for breach of contract is based upon "the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." *SIGA, supra* 132 A.3d 1108 at 1130.

Under Delaware law, "the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach." *SIGA, supra* at 1132-1133. Claimants agreed to enter into the Vesting Agreements expecting that Respondents would not interfere with the vesting of their shares, and expected the full value of their percentage ownership of Travana. Accordingly, the Claimants are entitled to expectation damages under the contract equal to that value.

## VI.    Apportionment of Damages ~ The Respondents are Jointly and Severally Liable ~ Question 2, Aug. 7 List

Delaware law provides that there is no apportionment of damages and the Respondents in this action, who have, acted in concert to breach their fiduciary duties, aid-and-abet the breach, tortiously interfere, and breach the implied covenant of good faith and fair dealing. The Respondents are jointly and severally liable for Claimants' damages. Furthermore, the exculpatory provision discussed above "does not extend to aiders and abettors." 8 Del. C. 102(b)(7); *In re Rural Metro Corp. Stockholders Litig*. 88 A.3d 54, 86-87 (Del. Ch. 2014). The Delaware Supreme Court has noted that Section 102(b)(7) does not protect officers. *Id.* (citing *Gantler,* 965 A.2d at 709 n. 37.)

First, in *In re Dole Food Co., Stockholder Litig.,* 2015 Del. Ch. LEXIS 223 (Del. Ch. Aug. 27, 2015), defendant David H. Murdock paid $13.50 per share to acquire all of the common stock of Dole Food Company, Inc. that he did not already own. *Id.* at *2. Before the transaction, Murdock owned approximately 40% of Dole's common stock, served as its Chairman and CEO, and was its *de facto* controller. *Id.* The transaction was structured as a single-step merger

(the "Merger"). *Id.* A committee of the Board made up of disinterested and independent directors was appointed to approve the Merger. *Id.* at *3. During the process, Murdock, and his right-hand man, Carter, sought to undermine the Committee by providing false disclosures and lowball management projections. *Id.* at *6. The Court found by taking these actions, Murdock and Carter deprived the Committee of the ability to negotiate on a fully informed basis and potentially say 'no' to the Merger. *Id.* Murdock and Carter likewise deprived the stockholders of their ability to consider the Merger on a fully informed basis and potentially vote it down. *Id.*

Murdock acted in two capacities in connection with the Merger: as a controlling stockholder and as a director. *Id.* at *127. As a controlling stockholder, Murdock "breached his duty of loyalty to . . . the plaintiff shareholder class, by eliminating [Dole's unaffiliated] stockholders for an unfair price in an unfair transaction . . . For that breach of duty [Murdock was found] liable." *Id.*at *128. Murdock was also found liable in his role of a director. *Id.* He breached his duty of loyalty by orchestrating an unfair, self-interested transaction. *Id.*

The Court also found Carter personally liable both as a director and as an officer for Dole. *Id.* at *129. The Court found DFC Holdings, LLC, an entity Murdock controlled and used as one of the acquisition vehicles for the Merger, liable as an aider-and-abettor. *Id.* at *129.

The Court held Murdock and Carter liable for breaches of the duty of loyalty; they were not exculpated and that Murdock, Carter, and DFC Holdings were jointly and severally liable for damages resulting from the Merger in the amount of $148,190,590.18. *Id.* at *7 and *158.

Under Delaware law, "a person or entity that knowingly and substantially participates in a breach of fiduciary duty is jointly and severally liable with the fiduciary for the breach." *Fannin v. UMTH Land Dev., L.P.*, No. 12541-VCF, 2020 Del. Ch. LEXIS 253, at *54 (Del. Ch. Jul. 31, 2020), quoting *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 872 (Del. 2015); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 619 (Del. Ch. 2010) (imposing joint and several liability on defendants for breach of fiduciary duties, aiding and abetting those breaches, and tortious interference with economic advantage). In *NAMA Holdings, LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232 (Del. Ch. Nov. 17, 2014), the Court found the subsidiary

breached an implied covenant of good faith and fair dealing and found the parent corporation

liable for tortious interference with the contract and held that both parent and subsidiary are

"jointly and severally liable" for damages caused to the Plaintiff.  *Id.* at *113.  *See*

*eCOMMERCE Indus. v. MWA Intelligence, Inc.*, No. 7471-VCP, 2013 Del. Ch. LEXIS 245, at

*169 (Ch. Sep. 30, 2013); *Seibold v. Camulos Partners LP*, No. 5176-CS, 2012 Del. Ch. LEXIS

216, at *39 (Ch. Sep. 17, 2012).

      In our case, Respondents are jointly and severally liable under Delaware law, and

accordingly apportionment is moot.

**VII.**     **Claimants' Breach of Implied Covenant of Good Faith/Fair Dealing Claim Does Not Negate or Supersede Claimants' Breach of Fiduciary Duties Claims Because These Claims are Independent of One Another ~ Question 34, Aug. 3 List**

      *Blaustein vs. Lord Balt. Capital Corp.,* 2013 Del. Ch. LEXIS 108, 2013 WL 1810956

(Del. Ch. Apr. 30, 2013) (affirmed by *Blaustein vs. Lord Balt. Capital Corp.,* 84 A.3d 954 (Del.

Jan. 21, 2014)) held, "where a dispute arises from obligations that are expressly addressed by

contract, that dispute will be treated as a breach of contract claim…any fiduciary duty claims

arising out of the same facts that underlie the contract obligations would be foreclosed as

superfluous" has no application to our case.  *See Blaustein* at *37.

      *Blaustein* involved a minority stockholder's unsuccessful attempts to sell her stock back

to the company.  The issue was whether a minority stockholder in a closely held corporation has

a right to a non-conflicted board decision on whether to repurchase her shares, because a contract

between them provided that the corporation *may* (but is not required to) repurchase those shares.

Blaustein argued that even though her contract did not explicitly require the corporation to

repurchase her shares, that an obligation to *consider* a repurchase existed due to an implied

covenant of good faith and fair dealing. The Court of Chancery found that the common law does

not impose any such duties on the directors to consider buying out minority stockholders.  The

contract provided the company **may** repurchase Shares upon terms and conditions agreeable to

the Company…" Moreover, the contract does not provide any obligation to negotiate a

reasonable repurchase price.  Accordingly, the Court dismissed the complaint.

The Supreme Court of Delaware affirmed the judgment and held that under common law, the directors of a closely held corporation have no general fiduciary duty to repurchase the stock of a minority stockholder and an investor must rely on contractual protections and has no inherent right to sell her stock to the company at "full value," or any other price.

As distinguished from *Blaustein* and *Nemec vs. Shrader*, 991 A.2d 1120 (Del. 2010), discussed in *Blaustein,* the Claimants here are not asserting a breach of an express contractual right of the corporation, such as the right to repurchase in *Blaustein* or the right to redeem a stockholder's shares under the Stock Plan in *Nemec*.  Accordingly, the principle "where a dispute arises from obligation that are expressly addressed by contract, that dispute will be treated as a breach of contract claim…any fiduciary duty claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous" is inapplicable.  *See Id.* at *37.

Claimants' fiduciary duty claims do not arise from any obligations of the corporation that are expressly addressed by contracts.  The Series B suite of agreements established the conditions for vesting, and thereby positioned the Claimant minority stockholders differently from HNA. While the Series B agreements set up conditions that the HNA-Appointed director Respondents had the duty to give due recognition and consideration, the Claimants are not asserting that the agreements themselves created any obligation for the directors to cause the corporation to take affirmative action (such as redemption or repurchase).  HNA was the party who had an implied obligation not to interfere with meeting the milestones. To be clear HNA was an investor under the Series B agreements, it was not the corporation.

Separate from any contracts, the HNA-appointed directors had fiduciary duties to address and deliberate over HNA's illegal order to cease marketing and pivot, and to seek alternatives or a resolution to the impasse.  The directors' duties arise from a conflict between stockholder groups and over the fundamental direction and future of Travana.  Their fiduciary duties do not arise from a contractual obligation by Travana the corporation to take any action (such as the

repurchase of someone's shares) that the corporation had a *privilege* to take under the Series B agreements, but *no actual obligation* to take.

## VIII. CONCLUSION

The Claimants were not given any chance to succeed.  Rather, any such opportunity was ripped away in October 2016 and thereafter Respondents prepared to take Travana in a completely different direction without any board deliberation or resolution and without any possibility of reaching the vesting milestones.  Had Chen gone away quietly, then no doubt HNA would have profited either directly through Travana as a "product company" or by use of Travana technology to benefit other HNA companies.  Respondents' actions uniquely harmed Claimants and Respondents should now be held accountable.

Dated: August 21, 2020                    BOWLES & VERNA LLP


                                          By:   */s/ Richard A. Ergo*
                                                RICHARD A. ERGO
                                                CATHLEEN S. HUANG
                                                GERALD C. KIPPER
                                                Attorneys for Claimants
                                                AIRTOURIST HOLDINGS, LLC,
                                                JASON CHEN and EDGAR PARK



## Chart B. 1. - 1.79% Minimum XML and SEM Converion Rate to Meet Milestone II in February 2017 - By using Rose's Average CPCs

**Marketing Spent by Channel (Atkins Model)**

|  | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 Note 2 |
|---|---|---|---|---|---|
| PPC | $ 173,100 | $ 354,000 | $ 473,100 | $ 552,000 | $ 549,000 |
| Meta | $ 346,200 | $ 708,000 | $ 946,200 | $ 1,104,000 | $ 1,098,000 |
| Meta Display/Display    Note 1 | $ 28,850 | $ 59,000 | $ 78,850 | $ 92,000 | $ 91,500 |
| Social    Note 1 | $ 28,850 | $ 59,000 | $ 78,850 | $ 92,000 | $ 91,500 |
| Total Marketing Spent | $ 577,000 | $ 1,180,000 | $ 1,577,000 | $ 1,840,000 | $ 1,830,000 |

**CPC**

| | Respondent's Expert - Rose CPC Numbers | |
|---|---|---|
| | Average | Range |
| SEM/PPC | $ 1.725 | $1.55 to $1.90 |
| Meta - XML | $ 1.075 | $0.60 to $1.55 |

**Conversion Rates**

| | Comparison with Rose Asserted Conversion Rates | |
|---|---|---|
| | Min Rate | Rose |
| SEM/PPC | 1.79% | 1.0% to 2.8% |
| Meta - XML | 1.79% | 3% Achievable |

**# of Transactions and Gross Bookings**

| | Lowest Conversion Rate for XML to meet Milestones In February 2017 by using Rose's Average Numbers | | | | |
|---|---|---|---|---|---|
| | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 |
| SEM/PPC | 1,796 | 3,673 | 4,909 | 5,728 | 5,697 |
| Meta - XML | 5,765 | 11,789 | 15,755 | 18,383 | 18,283 |
| Meta - Display | - | - | - | - | - |
| SEO (Organic Transactions) | | | | | |
| Total # of Transactions | 7,561 | 15,462 | 20,665 | 24,111 | 23,980 |
| Seasonality Adjustment | 0.0% | 8.0% | 3.0% | 13.2% | 13.2% |
| Adjusted # of Transactions | 7,561 | 16,699 | 21,285 | 27,294 | 27,145 |
| **Gross Bookings** | $ 5,575,786 | $ 12,314,416 | $ 15,695,632 | $ 20,127,058 | $ 20,017,672 |

Meeting Milestone 2

Note 1: As in Atkins Model, no gross bookings were assumed for these channels.

Note 2:  February Total Marketing Spent based on C-0196 Travana August Pro Forma.

**Chart B. 2.   2.26% Minimum XML & SEM Converion Rate to Meet Milestone II in February 2017**

**- By using Atkins CPCs**

**Marketing Spent by Channel (Atkins Model)**

|  |  | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 Note 2 |
|---|---|---|---|---|---|---|
| PPC |  | $ 173,100 | $ 354,000 | $ 473,100 | $ 552,000 | $ 549,000 |
| Meta |  | $ 346,200 | $ 708,000 | $ 946,200 | $ 1,104,000 | $ 1,098,000 |
| Meta Display/Display | Note 1 | $ 28,850 | $ 59,000 | $ 78,850 | $ 92,000 | $ 91,500 |
| Social | Note 1 | $ 28,850 | $ 59,000 | $ 78,850 | $ 92,000 | $ 91,500 |
| Total Marketing Spent |  | $ 577,000 | $ 1,180,000 | $ 1,577,000 | $ 1,840,000 | $ 1,830,000 |

**CPC**

|  | Atkins CPC Assumptions |
|---|---|
| SEM/PPC | $ 1.550 |
| Meta - XML | $ 1.550 |

**Conversion Rates**

| Comparison with Atkins Asserted Conversion Rates | | |
|---|---|---|
|  | Min Rate | Atkins |
| SEM/PPC | 2.26% | 5% - 9% |
| Meta - XML | 2.26% | 5% - 9% |

**# of Transactions and Gross Bookings**

| | Lowest Conversion Rate for XML to meet Milestones In February 2017 by using Rose's Average Numbers | | | | |
|---|---|---|---|---|---|
|  | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 |
| SEM/PPC | 2,524 | 5,162 | 6,898 | 8,049 | 8,005 |
| Meta - XML | 5,048 | 10,323 | 13,796 | 16,097 | 16,010 |
| Meta - Display | - | - | - | - | - |
| SEO (Organic Transactions) |  |  |  |  |  |
| Total # of Transactions | 7,572 | 15,485 | 20,694 | 24,146 | 24,014 |
| Seasonality Adjustment | 0.0% | 8.0% | 3.0% | 13.2% | 13.2% |
| Adjusted # of Transactions | 7,572 | 16,723 | 21,315 | 27,333 | 27,184 |
| **Gross Bookings** | $ 5,583,802 | $ 12,332,121 | $ 15,718,198 | $ 20,155,996 | $ 20,046,452 |

Meeting Milestone 2

Note 1: As in Atkins Model, no gross bookings were assumed for these channels.
Note 2:  February Total Marketing Spent based on C-0196 Travana August Pro Forma.

**AirTourist Holdings, LLC, et al. v. HNA Group, et al.**
ICDR Case No. 01-18-0001-7018

**Chart C**
**Claimants' Summary of Claims, Elements, Findings, Key Evidence, and Relief**

August 21, 2020

| | | |
|---|---|---|
| **Breach of Fiduciary Duties**<br>against **Charles Mobus** as a director and officer of Travana. | | |
| **Elements:**<br><br>"The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, C.A. No. 1484-K, 2002 Del. Ch. LEXIS 17, at \*9 (Ch. Feb. 27, 2002) (RL-024). | **Element 1:**<br>**A fiduciary duty exists.**<br><br>"[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders." *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 43 (Del. 1994) (CL-11).<br><br>Directors are "fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders." *Sealy Mattress Co. v. Sealy, Inc.* 532 A.2d 1324, 1338 (Del.Ch. 1987).<br><br>The stockholders are entitled to rely upon their board of directors to discharge each of their three primary fiduciary duties at all times. *Emerald Partners vs. Berlin*, 787 A.2d 85, 90 (Del. 2001), (CL-99).<br><br>"[O]fficers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, […] the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708-709 (Del. 2009) (CL-06). | **Record Cites for Element 1:**<br><br>**as Director**<br>"A new Board of Directors was constituted, consisting of Jason Chen, Chod Mobus, Li Ming Bi, Paul Fusco, and me." Witness Statement of Lei Shi, ¶ 40 (citing C-0112, November 24, 2015 Action by Unanimous Written Consent of the Board).<br><br>**as Officer**<br>"On March 1, 2017, a special meeting of the board of directors was called to order. […]At the board meeting the board then appointed Mobus as "Interim Senior Management Supervisory Officer" (ISMSO) effectively suspending Chen's authority as Chief Executive Officer." Witness Statement of Edgar Park, ¶ 884.<br><br>"On March 1, 2017, a general board meeting was finally called to order […] Counsel for Mobus and Li also proposed to appoint Mobus as "Interim Senior Management Supervisory Officer" and suspend my authority as CEO. The board decided to defer that issue and allow the Special Committee to decide whether such a step was necessary after its investigation." Witness Statement of Jason Chen, ¶ 238. |

| | | "RESOLVED, that Charles B. Mobus is hereby elected Interim Senior Management Supervisory Officer of the Corporation [...]" C-0147. |
|---|---|---|
| | **Element 2:**<br>**The fiduciary breached that duty.**<br><br>**What are the directors' fiduciary duties?**<br><br>    i.    Duty of due care;<br>    ii.   Duty of loyalty;  and<br>    iii.  Duty to act in good faith.<br><br>**DUTY OF CARE**<br><br>•     requires directors to use that amount of care which ordinarily careful and prudent men would use in similar circumstances.<br><br>•     requires directors to "consider all material information reasonably available in making business decisions…" *Walt Disney, supra* 907 A.2d 693 at 749.<br><br>The *Walt Disney* court gave examples of <u>two examples of a breach of the duty of care</u>:<br><br>•     [f]irst, such liability may be said to follow from a board decision that results in a loss because that decision was ill advised or "negligent".<br><br>•     Second, liability to the corporation for a loss may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss.<br><br>*Walt Disney, supra* 907 A.2d 693 at 749.<br><br>The duty of care is the duty of a director to make an informed and deliberate business decision. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985) (CL-13). | **Record Cites for Element 2:**<br><br>**Lack of Independence as a Director**<br>"Adam, See below. I have discussed the situation at length with the lawyers, and will get the situation resolved appropriately for you. Best, chod" C-2016 (February 27, 2017 email from Mobus to Tan).<br><br>"Chod, Thanks very much for your performance over the special board meeting call just now. Your argument and strategy are awesome and in the best interest of HNA. Keep in touch. Kind regards, Mab" C-2025 (March 2, 2017 email from Li Ming Bi to Mobus and Tan).<br><br>"My professional relationship with HNA goes back over twenty years, to about 1994, shortly after I joined BGC. Since then I have assisted HNA Group and its subsidiaries with a variety of financing, acquisition, and restructuring matters, and I have served as a board member of several HNA Group subsidiaries." Witness Statement of Charles Mobus, ¶ 7.<br><br>"I first met HNA Group's current CEO, Adam Tan, in 1995. We have worked on a number of projects together over the years and enjoy a productive professional relationship." Witness Statement of Charles Mobus, ¶ 8.<br><br>[Please refer to Claimant's Reply Brief (Legal Section), ¶¶ 71-75 for further details.]<br><br>**Respondents' Insufficient Production of Evidence of Fair Dealing and Fair Price**<br>[Note, Delaware law places the burden on RESPONDENTS to |

**DUTY OF LOYALTY**

•    The duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Frederick Hsu Living Trust vs. ODN Holding Corp.,* 2017 Del. Ch. LEXIS 67, *44 (Del. Ch. Apr. 14, 2017).

•    "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone vs. Ritter*, 911 A2d 362, 370 (2006).

**DUTY TO ACT IN GOOD FAITH**

•    The good faith required of a corporate fiduciary includes: not simply the duties of care and loyalty…but all actions required by a true faithfulness and devotion to the interests of the corporation and its stockholders. *Walt Disney, supra* 907 A.2d 693 at 755.

•    To act in good faith, "a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation." *Id.*

"A court determines whether directors have fulfilled their fiduciary duties by evaluating the challenged decision through the lens of the applicable standard of review." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013).

"Under Delaware law, the standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the

demonstrate that their conduct was the product of both fair dealing and fair price to their fiduciaries—the Claimants. The record is devoid of any evidence that Respondents made an informed and deliberated decision. Therefore cites to the record for the fiduciary duty claims are to demonstrate the flippant nature with which Respondents approached their duties to the minority stockholders.]

**Breach of Duty of Loyalty**

"Over dinner, Shi brought up his concerns about Travana, particularly regarding Chen's spending and Travana's cash position. […] Shi said he had raised these concerns at his meeting with Adam Tan as well, consistent with his role at Travana as liaison with HNA." Witness Statement of Charles Mobus, ¶ 59.

"Adam, See below. I have discussed the situation at length with the lawyers, and will get the situation resolved appropriately for you. Best, chod" C-2016 (February 27, 2017 email from Mobus to Tan).

"Chod, Thanks very much for your performance over the special board meeting call just now. Your argument and strategy are awesome and in the best interest of HNA. Keep in touch. Kind regards, Mab" C-2025 (March 2, 2017 email from Li Ming Bi to Mobus and Tan).

"I agreed with Shi's assessment that Travana was not ready for a marketing campaign and suggested to Shi that in my view, Travana would best be served reducing its marketing spend and focusing its remaining resources on developing a viable and competitive product." Witness Statement of Adam Tan, ¶ 30.

"I told Chen that HNA would consider continuing to support Travana, but suggested that the company not implement Chen's marketing plan until a new ramp-up plan could be considered by the board of directors." Witness Statement of Adam Tan, ¶ 36.

decision did not comprise a disinterested and independent board majority (entire fairness)." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013).

"[The business judgment rule] is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[The BJR's] protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (CL-01).

"This lack of independence can be shown when a plaintiff pleads facts that establish 'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized.'" *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (CL-101).

"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.

"After my conversation with Shi, I called Adam Tan over the phone and told him what Shi had told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]"Witness Statement of Jason Chen, ¶ 170.

"I personally confronted Shi Lei several times both one-on-one and in meetings to ask why he was interfering with my management and drastically changing Travana's business model. Shi told me that he was not interfering, but was implementing what Wang Jian and Adam Tan had told him to do." Witness Statement of Jason Chen, ¶ 180.

"I reached out to Charles Mobus twice in late December in the hopes that he would agree with me that a board meeting should be held as soon as possible, but he did not respond." Witness Statement of Jason Chen, ¶ 198.

"Shi emailed Charles Mobus behind my back in a February 8-12, 2017 email chain, touting his secret plan. Contrary to his fiduciary duties to Travana, Shi asked Mobus for his advice on Shi's new plan to move Travana's platform elsewhere in the HNA family, and asked Mobus to talk to Adam Tan about the plan as well." Witness Statement of Jason Chen, ¶ 224; see C-1188.

"Mobus responded on February 17, 2017, telling Shi, "You have my full support and help" and that Mobus' business partner, Paul Rahn, a non-board member, could sign documents on Mobus' behalf if something time-critical came up." Witness Statement of Jason Chen, ¶ 227; see C-1192.

"Entire fairness places the burden on the Director Defendants to establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price." *Encite LLC v. Soni*, Civil Action No. 2476-VCG, 2011 Del. Ch. LEXIS 177, at *65 (Ch. Nov. 28, 2011) (footnote and quotes omitted) (CL-03).

"I received no further reply from Wang Jian or Adam Tan, and so on February 20, 2017 I sent a letter to the full Board of Directors to advise them of the current state of affairs at Travana. (The letter is Ex. C-0124.) In this letter, I told the Board about Shi's destructive behavior and that he had been inappropriately wielding authority that only the Board of Directors should have been permitted to." Witness Statement of Jason Chen, ¶ 235.

"In my March 6, 2017 letter, I included a Report to the Board of Directors of Travana, Inc., by our entire management team[.]" Witness Statement of Jason Chen, ¶ 243.

"As far as I know, the Special Committee did not make any effort to interview the executives at Travana regarding the issues I raised in my whistleblower letter or the management report." Witness Statement of Jason Chen, ¶ 244.

"Because I had not heard from the Board, I followed up with letters dated March 9, 2017, one to the Board and one to Adam Tan. In the letter to the Board, I stated that the Board must take immediate action to protect Travana and admonished the Board for continuously postponing Board meetings. (Exhibit C-0133.) I also questioned whether Chod Mobus had taken any actual steps to address the crisis facing Travana in his 'supervisory' executive position of the Special Committee, particularly given that Mobus had cancelled at the last minute a trip to visit Travana in San Francisco on March 7." Witness Statement of Jason Chen, ¶ 245.

**Breach of Duty of Due Care/Good Faith**

The HNA-appointed Directors failed to inform and apprise themselves by failing to obtain and consider information and analysis directly from the OTA experts at Travana, indicating readiness to launch marketing, that stood contrary to Shi Lei's personal views.

| | | The HNA Directors failed to review or consider any objective, validated data or analysis in connection with Travana's readiness to launch its marketing program.<br><br>"I reached out to Charles Mobus twice in late December in the hopes that he would agree with me that a board meeting should be held as soon as possible, but he did not respond." Witness Statement of Jason Chen, ¶ 198.<br><br>"On March 1, 2017, a general board meeting was finally called to order […]"Witness Statement of Jason Chen, ¶ 238.<br><br>"After postponing a meeting four times, the directors called a final Board meeting on March 15, 2017." Witness Statement of Jason Chen, ¶ 248. |
|---|---|---|

   **\*\*All three HNA-appointed Directors, Mobus, Shi, and Li, failed to act with good faith.  (Please see pages 42-58 of Claimants' Reply Brief for legal and factual support of their breach.)**  The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Dole Food Co., Stockholder Litig.,* 2015 Del. Ch. LEXIS 223, \*118, \*129 (Del. Ch. Aug. 27, 2015).  The concept of "***intentional dereliction of duty*, a *conscious disregard for one's responsibilities*, is an appropriate (although not the only) standard for determining** whether **fiduciaries have acted in good faith**."  *In re Walt Disney Co. Deriv. Litig,* 907 A.2d. 693, 754 (Del. Ch. 2005).  "**Deliberate indifference and inaction** *in the face of a duty to act* **is,…conduct that is clearly disloyal to the corporation. It is the epitome of faithless conduct**."  *Id.* The good faith required of a corporate fiduciary includes: not simply the duties of care and loyalty…but all actions required by a true faithfulness and devotion to the interests of the corporation and its stockholders. *Walt Disney, supra 907 A.2d 693 at 755.*  One of the most egregious examples of the HNA-appointed directors' failure to act with good faith is their utter failure to discuss and consider the consequences to minority stockholders' equity interest/value when they acquiesced to HNA's marketing stop order; utterly failing to protect the minority stockholders' interest, as they were duty-bound to do.

**Examples Of The HNA-appointed Directors Failed To Act In Good Faith:**

•        The HNA Directors knew or should have known that the cessation of the marketing program would harm the minority stockholders, but they acquiesced to HNA's cease marketing order

regardless.

- The HNA Directors failed to deliberate over the dire consequences of ceasing marketing – a proposed fundamental change to Travana's business direction – they knew or should have known that this was a fundamental departure from the Series B investment terms and Milestones.

- The HNA Directors acquiesced and voiced absolutely no concerns, regarding a major pivot of Travana into a product/technology company, with zero consideration for the devastating impact on the Claimant minority stockholders, and with no regard to the Series B agreement terms and Milestones.

The HNA Directors, who had the power to call board meetings (Chen alone did not), failed to conduct regular *quarterly* board meetings as they were obligated to under the Series B terms.

- The Board held zero meetings between August 11, 2016 and March 1, 2017, over 6 months – when Travana was sinking under tidal waves caused by HNA's stop marketing order.

- After August 2016 Shi Lei prevented calling board meetings in numerous instances, namely in December 2016 and January 2017: "[d]uring December 2016 and January 2017, Chen demanded that I call a meeting of the Board, but I explained to him that we should not have a Board meeting until we had a clear business plan to present to the Board and a plan to lower Travana's high burn rate of almost $2 million a month." (Shi Lei Statement ¶133)

**Relief for Breach of Fiduciary Duties cause of action against Charles Mobus:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Breach of Fiduciary Duties**
against **Shi Lei** as a director and officer of Travana.

| Elements: | Element 1: | Record Cites for Element 1: |
|---|---|---|

| | **A fiduciary duty exists.** | **as Director** |
|---|---|---|
| "The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, C.A. No. 1484-K, 2002 Del. Ch. LEXIS 17, at *9 (Ch. Feb. 27, 2002) (RL-024). | "[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders." *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 43 (Del. 1994) (CL-11).<br><br>Directors are "fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders." *Sealy Mattress Co. v. Sealy, Inc.* 532 A.2d 1324, 1338 (Del.Ch. 1987).<br><br>The stockholders are entitled to rely upon their board of directors to discharge each of their three primary fiduciary duties at all times. *Emerald Partners vs. Berlin*, 787 A.2d 85, 90 (Del. 2001), (CL-99).<br><br>"[O]fficers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, […] the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708-709 (Del. 2009) (CL-06). | "A new Board of Directors was constituted, consisting of Jason Chen, Chod Mobus, Li Ming Bi, Paul Fusco, and me." Witness Statement of Lei Shi, ¶ 40 (citing C-0112, November 24, 2015 Action by Unanimous Written Consent of the Board).<br><br>**as Officer**<br>"Per the parties' agreement, I had three roles at Travana. First, I served as a Board member with oversight for the entire business. Second, I served as President, responsible for day-to-day operations under Chen as the CEO. Third, I served as a liaison with HNA, the company's sole investor." Witness Statement of Lei Shi, ¶ 45.<br><br>"On or around April 15, 2015, Shi Lei accepted the terms of his employment, and signed the Employment Agreement with Travana." Witness Statement of Edgar Park, ¶ 582.<br><br>"Subject to the terms and provisions of this Agreement, Executive is hereby employed by the Company as a full time President and Chief Financial Officer of the Company." C-0916, p. 1 (Employment Agreement between Travana and Shi Lei). |
| | **Element 2:**<br>**The fiduciary breached that duty.**<br><br>**What are the directors' fiduciary duties?**<br><br>    iv.    Duty of due care;<br>    v.    Duty of loyalty;  and<br>    vi.    Duty to act in good faith.<br><br>**DUTY OF CARE**<br><br>•    requires directors to use that amount of care which ordinarily careful and prudent men would use in similar | **Record Cites for Element 2:**<br><br>**Lack of Independence as a Director**<br>"I returned to China and joined HNA International, the overseas arm of HNA Group, in 2009 as a senior investment manager and was gradually promoted to Managing Director focusing on overseas investments. Around 2009, HNA began doing large-scale international acquisitions. I have participated in practically all of the major acquisitions that HNA has done internationally since that year." Witness Statement of Lei Shi, ¶ 7.<br><br>"I was the General Manager of Hong Kong International Aviation |

circumstances.

• requires directors to "consider all material information reasonably available in making business decisions…" *Walt Disney, supra* 907 A.2d 693 at 749.

The *Walt Disney* court gave examples of <u>two examples of a breach of the duty of care</u>:

• [f]irst, such liability may be said to follow from a board decision that results in a loss because that decision was ill advised or "negligent".

• Second, liability to the corporation for a loss may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss.

*Walt Disney, supra* 907 A.2d 693 at 749.

The duty of care is the duty of a director to make an informed and deliberate business decision. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985) (CL-13).


**DUTY OF LOYALTY**

• The duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Frederick Hsu Living Trust vs. ODN Holding Corp.,* 2017 Del. Ch. LEXIS 67, *44 (Del. Ch. Apr. 14, 2017).

• "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone vs. Ritter*, 911 A2d 362, 370 (2006).

Leasing, Co., Ltd., an HNA International subsidiary specializing in aircraft and aviation equipment leasing with total assets exceeding $3.2 billion USD." Witness Statement of Lei Shi, ¶ 8.


"Myself as an employee of Travana, as a board member of Travana, and Travana as a subsidiary of HNA Group, they have the rights to order and make decisions on how we run the company. So as an employee of Travana and of HNA, I listen to the orders." C-1181, p. 10 (Confidential Videotaped Deposition of Lei Shi).


"I was representing HNA on the board." C-1181, p. 280 (Confidential Videotaped Deposition of Lei Shi).


C-2181 (Shi Lei's LinkedIn resume).


"I will be an activist investor because I have to step in when it is necessary, investor comes with power and authority, not just monitoring and guiding." C-1351 (January 23, 2017 email from Shi Lei to Jason Chen).


"In October 2016, I arranged a meeting with Adam Tan in New York to report to him on the product development of Ingram Micro, an HNA acquisition that I was involved with. My major involvement in the transaction occurred before officially joining Travana. I remained on the deal team after I joined Travana, but I only devoted a very small percentage of my time to the matter it after starting at Travana." Witness Statement of Lei Shi, ¶ 124.


[Please refer to Claimant's Reply Brief (Legal Section), ¶ 76 for further details.]


**Respondents' Insufficient Production of Evidence of Fair Dealing and Fair Price**

**DUTY TO ACT IN GOOD FAITH**

• The good faith required of a corporate fiduciary includes: not simply the duties of care and loyalty…but all actions required by a true faithfulness and devotion to the interests of the corporation and its stockholders. *Walt Disney, supra* 907 A.2d 693 at 755.

• To act in good faith, "a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation." *Id.*

"A court determines whether directors have fulfilled their fiduciary duties by evaluating the challenged decision through the lens of the applicable standard of review." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013).

"Under Delaware law, the standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013).

"[The business judgment rule] is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[The BJR's] protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

[Note, Delaware law places the burden on RESPONDENTS to demonstrate that their conduct was the product of both fair dealing and fair price to their fiduciaries—the Claimants. The record is devoid of any evidence that Respondents made an informed and deliberated decision. Therefore cites to the record for the fiduciary duty claims are to demonstrate the flippant nature with which Respondents approached their duties to the minority stockholders.]

**Breach of Duty of Loyalty**

"Q. Now, Wang Jiang and Adam Tan gave you directions on how to run Travana, correct?
MR. REGAN: Objection to the form.
THE WITNESS: Wang Jiang and Adam, as ultimate decision-makers of HNA, they clearly have the rights to make decisions on how they want to run subsidiaries of the companies.
BY MR. ERGO:
Q. Such as Travana?
A. Travana is controlled 90 percent by HNA. So I think in theory, yes." C-1181, p. 9 (Confidential Videotaped Deposition of Lei Shi).

"Myself as an employee of Travana, as a board member of Travana, and Travana as a subsidiary of HNA Group, they have the rights to order and make decisions on how we run the company. So as an employee of Travana and of HNA, I listen to the orders." C-1181, p. 10 (Confidential Videotaped Deposition of Lei Shi).

"I agreed with Shi's assessment that Travana was not ready for a marketing campaign and suggested to Shi that in my view, Travana would best be served reducing its marketing spend and focusing its remaining resources on developing a viable and competitive product." Witness Statement of Adam Tan, ¶ 30.

"I told Chen that HNA would consider continuing to support Travana, but suggested that the company not implement Chen's marketing plan until a new ramp-up plan could be considered by the board of directors." Witness Statement of Adam Tan, ¶ 36.

"[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (CL-01).

"This lack of independence can be shown when a plaintiff pleads facts that establish 'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized.'" *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (CL-101).

"Entire fairness places the burden on the Director Defendants to establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price." *Encite LLC v. Soni*, Civil Action No. 2476-VCG, 2011 Del. Ch. LEXIS 177, at *65 (Ch. Nov. 28, 2011) (footnote and quotes omitted) (CL-03).

"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.

"After my conversation with Shi, I called Adam Tan over the phone and told him what Shi had told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]"Witness Statement of Jason Chen, ¶ 170.

"I personally confronted Shi Lei several times both one-on-one and in meetings to ask why he was interfering with my management and drastically changing Travana's business model. Shi told me that he was not interfering, but was implementing what Wang Jian and Adam Tan had told him to do." Witness Statement of Jason Chen, ¶ 180.

"Shi emailed Charles Mobus behind my back in a February 8-12, 2017 email chain, touting his secret plan. Contrary to his fiduciary duties to Travana, Shi asked Mobus for his advice on Shi's new plan to move Travana's platform elsewhere in the HNA family, and asked Mobus to talk to Adam Tan about the plan as well." Witness Statement of Jason Chen, ¶ 224; see C-1188.

"Mobus responded on February 17, 2017, telling Shi, "You have my full support and help" and that Mobus' business partner, Paul Rahn, a non-board member, could sign documents on Mobus' behalf if something time-critical came up." Witness Statement of Jason Chen, ¶ 227; see C-1192.

"I received no further reply from Wang Jian or Adam Tan, and so on February 20, 2017 I sent a letter to the full Board of Directors to advise them of the current state of affairs at Travana. (The letter is

Ex. C-0124.) In this letter, I told the Board about Shi's destructive behavior and that he had been inappropriately wielding authority that only the Board of Directors should have been permitted to." Witness Statement of Jason Chen, ¶ 235.

"In my March 6, 2017 letter, I included a Report to the Board of Directors of Travana, Inc., by our entire management team[.]" Witness Statement of Jason Chen, ¶ 243.

"As far as I know, the Special Committee did not make any effort to interview the executives at Travana regarding the issues I raised in my whistleblower letter or the management report." Witness Statement of Jason Chen, ¶ 244.

"Because I had not heard from the Board, I followed up with letters dated March 9, 2017, one to the Board and one to Adam Tan. In the letter to the Board, I stated that the Board must take immediate action to protect Travana and admonished the Board for continuously postponing Board meetings. (Exhibit C-0133.) I also questioned whether Chod Mobus had taken any actual steps to address the crisis facing Travana in his 'supervisory' executive position of the Special Committee, particularly given that Mobus had cancelled at the last minute a trip to visit Travana in San Francisco on March 7." Witness Statement of Jason Chen, ¶ 245.

"Over dinner, Shi brought up his concerns about Travana, particularly regarding Chen's spending and Travana's cash position. [...] Shi said he had raised these concerns at his meeting with Adam Tan as well, consistent with his role at Travana as liaison with HNA." Witness Statement of Charles Mobus, ¶ 59.

"Adam, See below. I have discussed the situation at length with the lawyers, and will get the situation resolved appropriately for you. Best, chod" C-2016 (February 27, 2017 email from Mobus to Tan).

"Chod, Thanks very much for your performance over the special board meeting call just now. Your argument and strategy are awesome and in the best interest of HNA. Keep in touch. Kind regards, Mab" C-2025 (March 2, 2017 email from Li Ming Bi to Mobus and Tan).

**Breach of Duty of Due Care/Good Faith**

The HNA-appointed Directors failed to inform and apprise themselves by failing to obtain and consider information and analysis directly from the OTA experts at Travana, indicating readiness to launch marketing, that stood contrary to Shi Lei's personal views.

The HNA Directors failed to review or consider any objective, validated data or analysis in connection with Travana's readiness to launch its marketing program.

"I reached out to Charles Mobus twice in late December in the hopes that he would agree with me that a board meeting should be held as soon as possible, but he did not respond." Witness Statement of Jason Chen, ¶ 198.

"On March 1, 2017, a general board meeting was finally called to order […]"Witness Statement of Jason Chen, ¶ 238.

"After postponing a meeting four times, the directors called a final Board meeting on March 15, 2017." Witness Statement of Jason Chen, ¶ 248.

**Relief for Breach of Fiduciary Duties cause of action against Shi Lei:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation: $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Breach of Fiduciary Duties**
against **Li Ming Bi** as a director of Travana.

| Elements: | Element 1:<br>A fiduciary duty exists. | Record Cites for Element 1: |
|---|---|---|
| "The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, C.A. No. 1484-K, 2002 Del. Ch. LEXIS 17, at *9 (Ch. Feb. 27, 2002) (RL-024). | "[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders." *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 43 (Del. 1994) (CL-11).<br><br>Directors are "fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders." *Sealy Mattress Co. v. Sealy, Inc.* 532 A.2d 1324, 1338 (Del.Ch. 1987).<br><br>The stockholders are entitled to rely upon their board of directors to discharge each of their three primary fiduciary duties at all times. *Emerald Partners vs. Berlin*, 787 A.2d 85, 90 (Del. 2001), (CL-99). | "A new Board of Directors was constituted, consisting of Jason Chen, Chod Mobus, Li Ming Bi, Paul Fusco, and me." Witness Statement of Lei Shi, ¶ 40 (citing C-0112, November 24, 2015 Action by Unanimous Written Consent of the Board). |
| | Element 2:<br>The fiduciary breached that duty.<br><br>**What are the directors' fiduciary duties?**<br><br>    vii.    Duty of due care;<br>    viii.   Duty of loyalty;  and<br>    ix.    Duty to act in good faith.<br><br>**DUTY OF CARE**<br><br>•    requires directors to use that amount of care which | Record Cites for Element 2:<br><br>**Lack of Independence as a Director**<br>"I began working for HNA Capital in 2010 as a Senior Business Manager in the Investment Banking Department and eventually became Managing Director. Then, in 2013, I became the Chairwoman of HNA Capital Investment Co., Ltd. [...] HNA Capital Investment is the investment banking arm of HNA Capital. It assists HNA companies with a variety of capital operations and financial advisory services. We are a subsidiary of HNA Capital, which operates around the world managing assets worth over $61 |

ordinarily careful and prudent men would use in similar circumstances.

• requires directors to "consider all material information reasonably available in making business decisions…" *Walt Disney, supra* 907 A.2d 693 at 749.

The *Walt Disney* court gave examples of <u>two examples of a breach of the duty of care</u>:

• [f]irst, such liability may be said to follow from a board decision that results in a loss because that decision was ill advised or "negligent".

• Second, liability to the corporation for a loss may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss.

*Walt Disney, supra* 907 A.2d 693 at 749.

The duty of care is the duty of a director to make an informed and deliberate business decision. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985) (CL-13).

### DUTY OF LOYALTY

• The duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Frederick Hsu Living Trust vs. ODN Holding Corp.,* 2017 Del. Ch. LEXIS 67, *44 (Del. Ch. Apr. 14, 2017).

• "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone vs. Ritter*, 911 A2d 362, 370 (2006).

billion with revenues over $5 billion." Witness Statement of Li Ming Bi, ¶ 3.

"Chod, Thanks very much for your performance over the special board meeting call just now. Your argument and strategy are awesome and in the best interest of HNA. Keep in touch. Kind regards, Mab" C-2025 (March 2, 2017 email from Li Ming Bi to Mobus and Tan).

[Please refer to Claimant's Reply Brief (Legal Section), ¶ 77 for further details.]

**Respondents' Insufficient Production of Evidence of Fair Dealing and Fair Price**
[Note, Delaware law places the burden on RESPONDENTS to demonstrate that their conduct was the product of both fair dealing and fair price to their fiduciaries—the Claimants. The record is devoid of any evidence that Respondents made an informed and deliberated decision. Therefore cites to the record for the fiduciary duty claims are to demonstrate the flippant nature with which Respondents approached their duties to the minority stockholders.]

**Breach of Duty of Loyalty**

"I agreed with Shi's assessment that Travana was not ready for a marketing campaign and suggested to Shi that in my view, Travana would best be served reducing its marketing spend and focusing its remaining resources on developing a viable and competitive product." Witness Statement of Adam Tan, ¶ 30.

"I told Chen that HNA would consider continuing to support Travana, but suggested that the company not implement Chen's marketing plan until a new ramp-up plan could be considered by the board of directors." Witness Statement of Adam Tan, ¶ 36.

### DUTY TO ACT IN GOOD FAITH

•     The good faith required of a corporate fiduciary includes: not simply the duties of care and loyalty…but all actions required by a true faithfulness and devotion to the interests of the corporation and its stockholders. *Walt Disney, supra* 907 A.2d 693 at 755.

•     To act in good faith, "a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation." *Id.*

"A court determines whether directors have fulfilled their fiduciary duties by evaluating the challenged decision through the lens of the applicable standard of review." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013).

"Under Delaware law, the standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013).

"[The business judgment rule] is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[The BJR's] protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.

"After my conversation with Shi, I called Adam Tan over the phone and told him what Shi told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]"Witness Statement of Jason Chen, ¶ 170.

"I personally confronted Shi Lei several times both one-on-one and in meetings to ask why he was interfering with my management and drastically changing Travana's business model. Shi told me that he was not interfering, but was implementing what Wang Jian and Adam Tan had told him to do." Witness Statement of Jason Chen, ¶ 180.

"I reached out to Charles Mobus twice in late December in the hopes that he would agree with me that a board meeting should be held as soon as possible, but he did not respond." Witness Statement of Jason Chen, ¶ 198.

"Shi emailed Charles Mobus behind my back in a February 8-12, 2017 email chain, touting his secret plan. Contrary to his fiduciary duties to Travana, Shi asked Mobus for his advice on Shi's new plan to move Travana's platform elsewhere in the HNA family, and asked Mobus to talk to Adam Tan about the plan as well." Witness Statement of Jason Chen, ¶ 224; see C-1188.

"Mobus responded on February 17, 2017, telling Shi, "You have my full support and help" and that Mobus' business partner, Paul Rahn, a non-board member, could sign documents on Mobus' behalf if something time-critical came up." Witness Statement of Jason Chen, ¶ 227; see C-1192.

"[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (CL-01).

"[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (CL-01).

"This lack of independence can be shown when a plaintiff pleads facts that establish 'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized.'" *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (CL-101).

"Entire fairness places the burden on the Director Defendants to establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price." *Encite LLC v. Soni*, Civil Action No. 2476-VCG, 2011 Del. Ch. LEXIS 177, at *65 (Ch. Nov. 28, 2011) (footnote and quotes omitted) (CL-03).

"I received no further reply from Wang Jian or Adam Tan, and so on February 20, 2017 I sent a letter to the full Board of Directors to advise them of the current state of affairs at Travana. (The letter is Ex. C-0124.) In this letter, I told the Board about Shi's destructive behavior and that he had been inappropriately wielding authority that only the Board of Directors should have been permitted to." Witness Statement of Jason Chen, ¶ 235.

"In my March 6, 2017 letter, I included a Report to the Board of Directors of Travana, Inc., by our entire management team[.]" Witness Statement of Jason Chen, ¶ 243.

"As far as I know, the Special Committee did not make any effort to interview the executives at Travana regarding the issues I raised in my whistleblower letter or the management report." Witness Statement of Jason Chen, ¶ 244.

"Because I had not heard from the Board, I followed up with letters dated March 9, 2017, one to the Board and one to Adam Tan. In the letter to the Board, I stated that the Board must take immediate action to protect Travana and admonished the Board for continuously postponing Board meetings. (Exhibit C-0133.) I also questioned whether Chod Mobus had taken any actual steps to address the crisis facing Travana in his 'supervisory' executive position of the Special Committee, particularly given that Mobus had cancelled at the last minute a trip to visit Travana in San Francisco on March 7." Witness Statement of Jason Chen, ¶ 245.

"Over dinner, Shi brought up his concerns about Travana, particularly regarding Chen's spending and Travana's cash position. […] Shi said he had raised these concerns at his meeting with Adam Tan as well, consistent with his role at Travana as liaison with HNA." Witness Statement of Charles Mobus, ¶ 59.

"Adam, See below. I have discussed the situation at length with the

<table>
<tr><td></td><td></td><td>

lawyers, and will get the situation resolved appropriately for you. Best, chod" C-2016 (February 27, 2017 email from Mobus to Tan).

"Chod, Thanks very much for your performance over the special board meeting call just now. Your argument and strategy are awesome and in the best interest of HNA. Keep in touch. Kind regards, Mab" C-2025 (March 2, 2017 email from Li Ming Bi to Mobus and Tan).

**Breach of Duty of Due Care/Good Faith**

The HNA-appointed Directors failed to inform and apprise themselves by failing to obtain and consider information and analysis directly from the OTA experts at Travana, indicating readiness to launch marketing, that stood contrary to Shi Lei's personal views.

The HNA Directors failed to review or consider any objective, validated data or analysis in connection with Travana's readiness to launch its marketing program.

"From that point on, I began to feel skeptical about whether HNA should keep funding Travana's marketing spending." Witness Statement of Li Ming Bi, ¶ 16 (the only sentence in her statement that testifies to anything that could be described as her involvement in Travana from October 2016 through February 20, 2017).

"On March 1, 2017, a general board meeting was finally called to order […]"Witness Statement of Jason Chen, ¶ 238.

"After postponing a meeting four times, the directors called a final Board meeting on March 15, 2017." Witness Statement of Jason Chen, ¶ 248.

</td></tr>
</table>

**Relief for Breach of Fiduciary Duties cause of action against Li Ming Bi:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Breach of Fiduciary Duties**
against **HNA Group (International) Co., Ltd.** as a majority stockholder of Travana
and **HNA Capital Ltd.** as a member of the majority stockholder control group of Travana.

| Elements: | Element 1:<br>A fiduciary duty exists. | Record Cites for Element 1: |
|---|---|---|
| "The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, C.A. No. 1484-K, 2002 Del. Ch. LEXIS 17, at *9 (Ch. Feb. 27, 2002) (RL-024). | "Absent effective protective provisions, minority stockholders must rely for protection solely on the fiduciary duties owed to them by the directors and the majority stockholder, since the minority stockholders have lost the power to influence corporate direction through the ballot." *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 43 (1993) (CL-11).<br><br>As to the majority or controlling stockholder, their duty of loyalty "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the stockholders generally." *Frederick Hsu, supra* at *101. | C-0062 (Travana's Capitalization Table as of December 31, 2016, showing HNA Group (International) Co., Ltd. with a majority ownership interest).<br><br>When a majority of a corporation's voting shares are acquired by a single "entity, or by a cohesive group acting together, there is a significant diminution in the voting power of those who thereby become minority stockholders." *Paramount Communications vs. QVC Network*, 637 A.2d 34, 42 (1993). Thus, "minority stockholders must rely for protection solely on the fiduciary duties owed to them by the directors and the majority stockholder, since the minority stockholders have lost the power to influence corporate direction through the ballot." *Id.* at *43.<br><br>HNA Int'l and HNA Capital, both controlled by HNA Group, together acquired majority voting power over Travana's shares -- this placed HNA in the position of a fiduciary. As such, they owed fiduciary duties to the Claimant minority stockholders to refrain from using their power for ulterior purposes adverse to the interests of the corporation or the minority stockholders. |

| | Element 2:<br>The fiduciary breached that duty.<br><br>"A court determines whether directors have fulfilled their fiduciary duties by evaluating the challenged decision through the lens of the applicable standard of review." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013).<br><br>Stockholders of a corporation subject to the Delaware General Corporation Law may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation." *CA, Inc. vs. AFSCME Emples, Pension Plan*, 953 A.2d 227, 232 (2008), (CL-98). | Record Cites for Element 2:<br><br>•    HNA had no management authorization in any Delaware corporate law statute, nor under any provision of Travana's Amended and Restated Certificate of Incorporation ("COI").<br><br>•    Here, the directors appointed by HNA ignored their fiduciary duties and instead acted as agents of HNA, when the directors followed HNA's order to stop marketing and fundamentally change Travana's business – which effectively eliminated the minority stockholders' equity position and led to the destruction of Travana. The directors' actions can be attributed to HNA. *See Frederick Hsu* at *103. |

**Relief for Breach of Fiduciary Duties cause of action against HNA Group (International) Co., Ltd. and HNA Capital Ltd.:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation: $53,446,935

- Based on Saba Optimistic and Reasonable Valuation: $77,338,703

**Aiding and Abetting Breach of Fiduciary Duties**
against **Adam Tan**
and **HNA Group**; each as an agent or principal of the other.

| Elements:<br><br>"[Aiding and abetting breach of fiduciary duty] has four elements:<br>(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the | Element 1:<br>Existence of a fiduciary relationship.<br><br>[addressed in claims above] | Record Cites for Element 1:<br><br>[addressed in claims above] |

| | | |
|---|---|---|
| breach." *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 80 (Del. Ch. 2014) (CL-07). | | |
| | **Element 2:**<br>**Breach of the fiduciary's duties.**<br><br>[addressed in claims above] | **Record Cites for Element 2:**<br><br>[addressed in claims above] |
| | **Element 3:**<br>**Knowing participation in the breach by the non-fiduciary defendants.**<br><br>"This element is satisfied when the aider and abettor acts with the knowledge that the conduct advocated or assisted constitutes such a breach." *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 97 (Del. Ch. 2014) (quotes omitted) (CL-07). | **Record Cites for Element 3:**<br><br>**Adam Tan's own admissions that he "knowingly participated" and aided-and-abetted in inducing the HNA-appointed <u>Directors' breach of fiduciary duties.</u>**<br><br>"In mid-September 2015, Chen and his team traveled to Beijing to meet with Shi and me to further discuss the potential investment. I greeted the team briefly, and then met with Chen and Shi to discuss the proposed business and investment structure. During this meeting, I gave Chen some encouragement that HNA would support his new OTA venture. However, I did not give my final approval for the investment at this meeting. The proposal had to go through HNA's internal approval system, and did not receive final approval until on or around November 1, 2015." Witness Statement of Adam Tan, ¶ 20.<br><br>"Mobus suggested we reduce HNA's risk by conditioning HNA's cash contributions to the new company on certain objective milestones. I agreed with Mobus' proposal to condition funding on the meeting of milestones, which is a standard venture capital financing arrangement." Witness Statement of Adam Tan, ¶ 17.<br><br>"The parties then worked to finalize the Series B Agreement under which HNA would acquire approximately 90% equity in Travana for an investment of up to $200 million, with the additional 10% vesting in favor of Chen and his associates upon completion of the milestones." Witness Statement of Adam Tan, ¶ 21.<br><br>"I agreed with Shi's assessment that Travana was not ready for a |

| | | |
|---|---|---|
| | | marketing campaign and suggested to Shi that in my view, Travana would best be served reducing its marketing spend and focusing its remaining resources on developing a viable and competitive product." Witness Statement of Adam Tan, ¶ 30.<br><br>**Additional evidence that Tan aided-and-abetted.**<br><br>"I told Chen that HNA would consider continuing to support Travana, but suggested that the company not implement Chen's marketing plan until a new ramp-up plan could be considered by the board of directors." Witness Statement of Adam Tan, ¶ 36.<br><br>"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.<br><br>"After my conversation with Shi, I called Adam Tan over the phone and told him what Shi had told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]" Witness Statement of Jason Chen, ¶ 170.<br><br>[Please refer to Claimant's Reply Brief (Legal Section), ¶¶ 176-183 for further details.] |
| | **Element 4:**<br>**Damages proximately caused by the breach.**<br><br>"Persons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust **are jointly and severally liable for any injury which resul**ts." *Malpiede v. Townson*, 780 A.2d 1075, 1096 n.74 (Del. 2001) (CL-119). | **Record Cites for Element 4:**<br><br>"However, based on our projections at the time and research that I have seen since, we would have hit the milestones, received funding, and caused our Founders shares to fully vest." Witness Statement of Jason Chen, ¶ 262.<br><br>"And the other minority stockholders and I would have met all of the vesting milestones. Instead, Claimants' were uniquely harmed in October 2016 when the Respondents prevented our shares from |

| | | vesting in a company, Travana, that was then worth hundreds of millions of dollars." Witness Statement of Jason Chen, ¶ 17. |
| --- | --- | --- |

**Relief for Aiding and Abetting Breach of Fiduciary Duties cause of action against Adam Tan and HNA Group:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Breach of the Implied Covenant of Good Faith and Fair Dealing**
against **HNA Group (International) Co., Ltd.**

| Elements: | Element 1:<br>A specific implied contractual obligation. | Record Cites for Element 1: |
| --- | --- | --- |
| "To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation, a breach of that obligation, and damages resulting from the breach." *Aviation W. Charters, LLC v. Freer*, No. N14C-09-271 WCC CCLD, 2015 Del. Super. LEXIS 468, at *28 (Super. Ct. July 2, 2015) (footnote and citation omitted) (CL-02). | "The court's focus is whether, at the time of contract formation, the parties would have prohibited the conduct had they contemplated it or thought to negotiate about it." *Aviation W. Charters, LLC v. Freer*, No. N14C-09-271 WCC CCLD, 2015 Del. Super. LEXIS 468, at *28 (Super. Ct. July 2, 2015) (footnotes and citations omitted) (CL-02). | Per HNA's demand, the Claimants entered into their respective Vesting Agreements on November 25, 2015 among HNA International, Claimants and Travana, which made any unvested common stock and any warrant shares held by Claimants non-transferrable and subject to repurchase by Travana and HNA International upon certain conditions.<br><br>This repurchase right or option would mature at the expiration of the five-year term of the Vesting Agreements on November 25, 2020, if the Milestones were not met.  In order to exercise the purchase option, Travana would be required to exercise it within the 90 day period after November 25, 2020.  If Travana failed to exercise the purchase option, then HNA Group (International) Co., Ltd. would have an additional 60 days to exercise the purchase option.  (See Section 3.1 of each of the Vesting Agreements).<br><br>The Vesting Agreements incorporated an implied obligation that HNA International would act in good faith and with fair dealing in |

<table>
<tr>
<td></td>
<td></td>
<td>not taking actions that would frustrate the purpose of the agreements, i.e. manipulative acts to prevent the milestones from being met and by the same token, interference to prevent the Claimants' shares from fully vesting.

[Addressed in Claimants' Statement of Claim and Defense by Counter-Respondent Chen, ¶¶ 229-242.]</td>
</tr>
<tr>
<td></td>
<td>**Element 2:**
**Breach of that obligation.**

This implied covenant was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.* at *28.

"Good faith" contemplates "*faithfulness to the scope, purpose, and terms of the parties' contract." NAMA Holdings, LLC v. Related WMC, LLC, 2014 Del.Ch. LEXIS 232, *50 (Del.Ch. Nov. 17, 2014); accord Restatement (Second) of Contracts § 205 cmt. a* (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .").</td>
<td>**Record Cites for Element 2:**

In breach of the implied covenant, HNA International through its CEO, Tan, intentionally and effectively prevented fulfillment of the Milestones by acting to cut Travana's marketing expenditures.

Claimants would not have agreed to enter into the Vesting Agreements and subject their stock to milestone-based vesting per the terms if they knew that HNA International would act to prevent Travana from reaching the Milestones.

In the event of a failure to meet the Milestones, HNA International would be in a position to own substantially all of Travana's stock at nominal cost to HNA (with the exception of vested options under the 2016 Stock Incentive Plan), either by Travana acquiring all of the minority stockholders' equity interests leaving HNA's affiliates as the only stockholders, or by HNA International directly acquiring the minority stockholders' equity interests for a nominal purchase price.

Respondents offer two arguments against this claim, and each of them fail. First, Respondents argue that Tan did not make a cease marketing order. However, this is contrary to Shi Lei's own sworn testimony. Please also see March 4, 2017 email from Shi confirming that the CEO and Chairman Tan directed no more marketing. Ex. C-2085. Thus, the Respondents' first argument must be rejected.

Respondents argue that Tan's actions cannot be imputed to HNA International. However, it is clear that Tan, the third highest ranking executive sitting at the top of the HNA conglomerate, was in a position to, and actually did, exert control over HNA's subsidiaries,</td>
</tr>
</table>

<table>
<tr><td></td><td></td><td>including HNA International.  Thus, this argument must be rejected as well.

Tan and HNA International's actions thwarted the performance of the Vesting Agreements, violated the spirit of those agreement, and deprived Claimants the fruits of their bargain.  Accordingly, Tan and HNA International must be held liable for damages suffered by the Claimants.


[Please also refer to Claimants' Statement of Claim and Defense by Counter-Respondent Chen, ¶¶ 229-242.]</td></tr>
<tr><td></td><td>**Element 3:**
**Damages resulting from the breach.**

      The standard remedy for breach of contract is based upon "the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." *SIGA, supra* 132 A.3d 1108 at 1130.

      Under Delaware law, "the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach." *SIGA, supra* at 1132-1133.</td><td>**Record Cites for Element 3:**

"However, based on our projections at the time and research that I have seen since, we would have hit the milestones, received funding, and caused our Founders shares to fully vest." Witness Statement of Jason Chen, ¶ 262.


"And the other minority stockholders and I would have met all of the vesting milestones. Instead, Claimants' were uniquely harmed in October 2016 when the Respondents prevented our shares from vesting in a company, Travana, that was then worth hundreds of millions of dollars." Witness Statement of Jason Chen, ¶ 17.

      Claimants agreed to enter into the Vesting Agreements expecting that Respondents would not interfere with the vesting of their shares, and expected the full value of their percentage ownership of Travana.  Accordingly, the Claimants are entitled to expectation damages under the contract equal to that value.</td></tr>
</table>

**<u>Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing cause of action against HNA Group (International) Co., Ltd.:</u>**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Fraud**
against **Adam Tan**
and **HNA Group (International) Co., Ltd.**; each as an agent or principal of the other.

| Elements: | Element 1:<br>Defendant falsely represented a material fact or omitted facts that the defendant had a duty to disclose. | Record Cites for Element 1: |
|---|---|---|
| "In order to survive a motion to dismiss a fraud claim, a plaintiff must allege that: (1) defendant falsely represented a material fact or omitted facts that the defendant had a duty to disclose; (2) defendant knew that the representation was false or made with a reckless indifference to the truth; (3) defendant intended to induce plaintiff to act or refrain from action; (4) plaintiff acted in justifiable reliance on the representation; and (5) plaintiff was injured by its reliance on defendant's representation." *Aviation W. Charters, LLC v. Freer*, No. N14C-09-271 WCC CCLD, 2015 Del. Super. LEXIS 468, at *14-15 (Super. Ct. July 2, 2015) (CL-02). | | "Adam confirmed that he had told Shi to give the cease-marketing order, but said that Shi did not know what he was talking about when he said HNA was not going to continue funding Travana." Witness Statement of Jason Chen, ¶ 170.<br><br>"Further, at [the December 2016 meeting], Adam Tan reiterated his and HNA's and HNA Group's support for Travana's development and launch. He told me not to worry about Travana's finances, and assured me that funding from HNA would be in place for Travana to continue on its planned course of development." Witness Statement of Jason Chen, ¶ 190.<br><br>"[Adam Tan] was not interested in viewing the presentation [on February 14, 2017], and said HNA would not provide any further funding for Travana." Witness Statement of Jason Chen, ¶ 209. |
| | Element 2:<br>Defendant knew that the representation was false or made with a reckless indifference to the truth. | Record Cites for Element 2:<br><br>"[Adam Tan] was not interested in viewing the presentation [on |

| | | |
|---|---|---|
| | | February 14, 2017], and said HNA would not provide any further funding for Travana." Witness Statement of Jason Chen, ¶ 209. |
| | **Element 3:**<br>**Defendant intended to induce Plaintiff to act or refrain from action.** | **Record Cites for Element 3:**<br><br>[Please refer to Claimants' Statement of Claim and Defense by Counter-Respondent Chen, ¶ 253.] |
| | **Element 4:**<br>**Plaintiff acted in justifiable reliance on the representation.** | **Record Cites for Element 4:**<br><br>"Moreover, even if I could, I knew it would have been unwise to ignore the cease-marketing order when Adam Tan had agreed to meet with me to discuss this very issue." Witness Statement of Jason Chen, ¶ 170.<br><br>"Adam said that he wanted to use HNA's and HNA Group's resources to "push Travana to the top of the wave" and then have other HNA Group public subsidiaries invest in Travana to continue to support its growth." Witness Statement of Jason Chen, ¶ 191.<br><br>"[Adam Tan] was not interested in viewing the presentation [on February 14, 2017], and said HNA would not provide any further funding for Travana." Witness Statement of Jason Chen, ¶ 209. |
| | **Element 5:**<br>**Plaintiff was injured by its reliance on Defendant's representation.** | **Record Cites for Element 5:**<br><br>"In response, I told Shi that if HNA was not going to fund Travana's approved business plan, I would look elsewhere for funding for Travana. However, Shi rejected my suggestion, saying it was unnecessary and not to do it." Witness Statement of Jason Chen, ¶ 169. |

**Relief for Fraud cause of action against Adam Tan and HNA Group (International) Co., Ltd.:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

| | | |
|---|---|---|
| **Tortious Interference with the Implied Covenant of Good Faith and Fair Dealing**<br>against **Adam Tan**<br>and **HNA Group**; each as an agent or principal of the other. | | |
| **Elements:**<br><br>"For a plaintiff to recover for tortious interference with contractual relations, '[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.'" *NAMA Hldgs., LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232, at *80 (Ch. Nov. 17, 2014) (CL-10). | **Element 1:**<br>A contract. | **Record Cites for Element 1:**<br><br>Vesting Agreements at C-0019, C-0020, and C-0021. |
| | **Element 2:**<br>Defendant knew of the contract. | **Record Cites for Element 2:**<br><br>"'**Founder Vesting Agreement**' means each vesting agreement between each of the Founders and the Company in the forms attached in <u>Exhibit K</u>, providing for Milestone-based vesting of the shares of common stock held by the Founders." C-0012, p. 5 (Series B Stock Purchase Agreement).<br><br>"Q. Okay. HNA International's investment in Travana was approved by Wang Jiang and Adam Tan, correct?<br>A. We have internal approval system, which go through different departments at a subsidiary level and at a group level, which ultimately will be approved by Adam Tan and Wang Jiang and also fully by Chen Fong." C-1181, p. 8 (Confidential Videotaped Deposition of Lei Shi). |
| | **Element 3:** | **Record Cites for Element 3:** |

| | | |
|---|---|---|
| | **Intentional act that is a significant factor in causing the breach of the contract.** | "However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.<br><br>"After my conversation with Shi, I called Adam Tan over the phone and told him what Shi had told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]" Witness Statement of Jason Chen, ¶ 170. |
| | **Element 4:**<br>**No justification.**<br><br>"Determining when intentional interference becomes improper requires a complex normative judgment relating to justification based on the facts of the case and an evaluation of many factors. Section 767 of the Restatement (Second) of Torts provides such a list, which the Delaware Supreme Court has adopted. The factors are: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *NAMA Hldgs., LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232, at *81-82 (Ch. Nov. 17, 2014) (citations and quotes omitted) (CL-10). | **Record Cites for Element 4:**<br><br>Tan, Wang, and HNA Group knew that Claimants' shares were subject to vesting per the Milestones pursuant to the Vesting Agreements HNA had asked Claimants to sign.<br><br>By intentionally ordering Travana to stop marketing spending, Tan and Wang, as officers of HNA Group, and Tan, as CEO of HNA International, intentionally acted to prevent Travana from ever achieving the Milestones and thereby thwarting any possibility of Claimants' shares vesting.<br><br>There is no justification for Tan's, Wang's, and HNA Group's tortious interference. They acted in bad faith by interfering with the management of Travana, by ordering marketing spending stop, and by inducing its subsidiary, HNA International, to breach the implied covenant of good faith and fair dealing, and intentionally interfered with the Claimants' business relationship.<br><br>"The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Subsection (a) of 8 Del. C. § 141 (CL-16). |

| | | |
|---|---|---|
| | | **There was no justification:**<br><br>"The HNA Agreement, Investors' Rights Agreement and Travana COI Do Not Authorize HNA to Directly Manage Travana" (Kelly Expert Report, Section XI., p.82, ¶¶ 347-358)<br><br>"The Investors' Rights Agreement could have granted HNA authority over actions such as expenditures over a certain amount, or the hiring or firing of employees, but the Investors' Rights Agreement did not do so. The Investors' Rights Agreement also says nothing about the right of shareholders to control marketing expenditures." (Id. ¶357). "HNA had an opportunity to negotiate direct management rights in the HNA Agreement, the Travana COI and the Investors' Rights Agreement, but did not do so. " (Id. ¶358)<br><br>"In the absence of any direct management rights, HNA's efforts to direct management through Wang Jian, Adam Tan, Shi Lei and others were inconsistent with the agreements between HNA and Travana, inconsistent with the Travana COI, and grossly inconsistent with U.S. corporate governance custom and practice.  Any direct management actions on the part of HNA should be considered illegitimate, and HNA should be held accountable for its improper actions." (Id. ¶358) |
| | **Element 5:**<br>**Injury.**<br><br>**DAMAGES FOR  TORTIOUS INTERFERENCE:**<br><br>  (1)  **One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for:**<br><br>     (a)     **the pecuniary loss of the benefits of the contract or the prospective relation;**<br>     (b)     **consequential losses for which the interference is a legal cause; and**<br>     (c)     **emotional distress or actual harm to reputation,** | **Record Cites for Element 5:**<br><br>"However, based on our projections at the time and research that I have seen since, we would have hit the milestones, received funding, and caused our Founders shares to fully vest." Witness Statement of Jason Chen, ¶ 262.<br><br>"And the other minority stockholders and I would have met all of the vesting milestones. Instead, Claimants' were uniquely harmed in October 2016 when the Respondents prevented our shares from vesting in a company, Travana, that was then worth hundreds of millions of dollars." Witness Statement of Jason Chen, ¶ 17. |

| | | |
|---|---|---|
| | if they are reasonably to be expected to result from the interference.<br><br>(2) **In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment.**<br><br>**(Restatement 2d. of Torts, § 774A)** | |

**Relief for Tortious Interference with the Implied Covenant of Good Faith and Fair Dealing cause of action against Adam Tan and HNA Group:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation: $53,446,935

- Based on Saba Optimistic and Reasonable Valuation: $77,338,703

| |
|---|
| |

| |
|---|
| |

**Tortious Interference with Business Relations**
against **HNA Group**;
**HNA Group (International) Co., Ltd.**;
**HNA Capital Ltd.**;
**Adam Tan**;
**Shi Lei**;
**Charles Mobus**;
and **Li Ming Bi**; each as an agent or principal of the other.

| Elements: | Element 1: | Record Cites for Element 1: |
|---|---|---|

| | | |
|---|---|---|
| "To succeed on a claim for tortious interference with a prospective business relationship, [plaintiff] must prove that (1) [plaintiff] had a prospective advantageous relationship with [a business entity], (2) [defendant] knowingly induced a breaking of the relationship, (3) [defendant's] interference with the relationship, in addition to being intentional, was improper in motive or means, and (4) [plaintiff] was harmed by [defendant's] actions." *Encite LLC v. Soni*, Civil Action No. 2476-VCG, 2011 Del. Ch. LEXIS 177, at \*88 (Ch. Nov. 28, 2011) (CL-03). | **Plaintiff had a prospective advantageous relationship with a business entity.** | Vesting Agreements at C-0019, C-0020, and C-0021. |
| | **Element 2:**<br>**Defendant knowingly induced a breaking of the relationship.** | **Record Cites for Element 2:**<br><br>**Knowingly**<br>"'**Founder Vesting Agreement**' means each vesting agreement between each of the Founders and the Company in the forms attached in <u>Exhibit K</u>, providing for Milestone-based vesting of the shares of common stock held by the Founders." C-0012, p. 5 (Series B Stock Purchase Agreement).<br><br>"Q. Okay. HNA International's investment in Travana was approved by Wang Jiang and Adam Tan, correct?<br>A. We have internal approval system, which go through different departments at a subsidiary level and at a group level, which ultimately will be approved by Adam Tan and Wang Jiang and also fully by Chen Fong." C-1181, p. 8 (Confidential Videotaped Deposition of Lei Shi).<br><br>**Inducement**<br>"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168.<br><br>"After my conversation with Shi, I called Adam Tan over the phone |

| | | and told him what Shi had told me. Adam confirmed that he had told Shi to give the cease-marketing order[.]" Witness Statement of Jason Chen, ¶ 170. |
|---|---|---|
| | **Element 3:**<br>**Interference was intentional and improper in motive or means.** | **Record Cites for Element 3:**<br><br>"The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Subsection (a) of 8 Del. C. § 141 (CL-16). |
| | **Element 4:**<br>**Harm.**<br><br>**DAMAGES FOR  TORTIOUS INTERFERENCE:**<br><br>    **(3)  One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for:**<br><br>      **(a)**      **the pecuniary loss of the benefits of the contract or the prospective relation;**<br>      **(b)**      **consequential losses for which the interference is a legal cause; and**<br>      **(c)**      **emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.**<br><br>    **(4)  In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment.**<br><br>**(Restatement 2d. of Torts, § 774A)** | **Record Cites for Element 4:**<br><br>"However, based on our projections at the time and research that I have seen since, we would have hit the milestones, received funding, and caused our Founders shares to fully vest." Witness Statement of Jason Chen, ¶ 262.<br><br>"And the other minority stockholders and I would have met all of the vesting milestones. Instead, Claimants' were uniquely harmed in October 2016 when the Respondents prevented our shares from vesting in a company, Travana, that was then worth hundreds of millions of dollars." Witness Statement of Jason Chen, ¶ 17. |

**Relief for Tortious Interference with Business Relations cause of action against HNA Group; HNA Group (International) Co., Ltd.; HNA Capital Ltd.; Adam Tan; Shi Lei; Charles Mobus; and Li Ming Bi:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation:  $53,446,935

- Based on Saba Optimistic and Reasonable Valuation:  $77,338,703

---

**Tortious Interference with Contract (Jason Chen's Employment Agreement)**
against **HNA Group**;
**HNA Group (International) Co., Ltd.**;
**HNA Capital Ltd.**;
**Adam Tan**;
**Shi Lei**;
**Charles Mobus**;
and **Li Ming Bi**; each as an agent or principal of the other.

| Elements: | Element 1:<br>A contract. | Record Cites for Element 1: |
|---|---|---|
| "For a plaintiff to recover for tortious interference with contractual relations, '[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.'" *NAMA Hldgs., LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232, at *80 (Ch. Nov. 17, 2014) (CL-10). | | "WHEREAS, the Company entered into an executive employment agreement with Jason Y. Chen as Chief Executive Officer of the Company, effective November 1, 2015 ("CEO Employment Agreement"), which agreement was approved by the Board; and WHEREAS, the Board has been presented with a copy of the CEO Employment Agreement. RESOLVED, that the CEO Employment Agreement is hereby acknowledged." C-0114, p. 4.<br><br>"A true and correct copy of the employment agreement with Chen as acknowledged by the board of directors is in Ex. C-0904." Witness Statement of Edgar Park, ¶ 688. |

| | | |
|---|---|---|
| | | "This EMPLOYMENT AGREEMENT (this 'Agreement') is made as of November 1, 2015 ('Agreement Date') by and between AirTourist Inc., a Delaware corporation (the 'Company'), and Jason Yu-Ming Chen[…]" C-0904, p. 1. |
| | **Element 2:**<br>**Defendant knew of the contract.** | **Record Cites for Element 2:**<br><br>There was an employment contract between Claimant Chen and Travana.  The implied covenant of good faith and fair dealing extends to that employment contract as with every other contract.  Good faith and fair dealing required that Travana allow Chen to perform his job and work to achieve the milestones without illegitimate interference.<br><br>Respondents knew of the contract.<br><br>In September 2015, I traveled with our newly recruited team, with conditional employment agreements to Beijing to meet with Adam Tan." Witness Statement of Jason Chen, ¶ 43.<br><br>"On January 27, 2016, we had the first Travana Board Meeting and I met the HNA-appointed Directors over the phone." Witness Statement of Jason Chen, ¶ 61. |
| | **Element 3:**<br>**Intentional act that is a significant factor in causing the breach of the contract.** | **Record Cites for Element 3:**<br><br>Respondents' conduct prevented performance or made performance more difficult. Specifically as shown above, Respondents acted to prevent achievement of the milestones, which CEO Chen and his team were hired to do.  But for Respondent's interference, Chen would have continued his employment as CEO at a going concern, or would have received a multi-year severance if Travana elected to terminate the at-will employment relationship early.<br><br>"However, on or about October 13, 2016, the same day, Shi Lei returned from a meeting in New York with Adam Tan and Wang Jian and told me that HNA 'decided to stop funding for Travana' and that we must cease all planned marketing activities and expenditures." Witness Statement of Jason Chen, ¶ 168. |

| | | |
|---|---|---|
| | | "Adam confirmed that he had told Shi to give the cease-marketing order […]"Witness Statement of Jason Chen, ¶ 170.<br><br>"I advised Shi that it would, in my view, make sense to resume marketing spending once the technology was able to produce a consistent price advantage." Witness Statement of Adam Tan, ¶ 30.<br><br>"Without marketing, we had no way to attract traffic to Janbala.com, and without traffic, there was no way to meet the revenue milestones." Witness Statement of Jason Chen, ¶ 262.<br><br>On February 14, 2017, Tan told Chen "that maybe Chen should not be CEO anymore because Travana had not met the milestones in the Series B Agreement." (Tan Witness Statement, p.12, ¶39) Regarding termination, Tan further noted that the Board of Directors of Travana would make that decision (*Id*.), however as shown above, Tan controlled the board of directors.<br><br>Respondents intended to disrupt the performance of this contract or knew that disruption of performance was certain or substantially certain to occur.<br><br>Chen was harmed by the discontinuation of his employment at a going concern, and by the failure to pay his severance.<br><br>Respondents' conduct was a substantial factor in causing Chen's harm and are liable for that harm. |
| | **Element 4:**<br>**No justification.**<br><br>"Determining when intentional interference becomes improper requires a complex normative judgment relating to justification based on the facts of the case and an evaluation of many factors. Section 767 of the Restatement (Second) of Torts provides such a list, which the Delaware Supreme Court has adopted. The factors are: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, | **Record Cites for Element 4:**<br><br>"The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Subsection (a) of 8 Del. C. § 141 (CL-16). |

| | | |
|---|---|---|
| | (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *NAMA Hldgs., LLC v. Related WMC LLC*, No. 7934-VCL, 2014 Del. Ch. LEXIS 232, at *81-82 (Ch. Nov. 17, 2014) (citations and quotes omitted) (CL-10). | |
| | **Element 5:**<br>**Injury.**<br><br>**DAMAGES FOR  TORTIOUS INTERFERENCE:**<br><br>    **(5)  One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for:**<br><br>      **(a)**      **the pecuniary loss of the benefits of the contract or the prospective relation;**<br>      **(b)**      **consequential losses for which the interference is a legal cause; and**<br>      **(c)**      **emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.**<br><br>    **(6)  In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment.**<br><br>**(Restatement 2d. of Torts, § 774A)** | **Record Cites for Element 5:**<br><br>"The directors then […] voted (over my objection and vote) to terminate substantially all Travana employees, including me." Witness Statement of Jason Chen, ¶ 249.<br><br>"Despite the fact that my termination was classified as a 'layoff,' thus requiring severance payment under my employment agreement, I never received any severance pay." Witness Statement of Jason Chen, ¶ 250.<br><br>$385,000 annual salary. C-0904, p. 2 (Employment Agreement between Travana and Jason Chen).<br><br>Bonus. C-0904, p. 2 (Employment Agreement between Travana and Jason Chen).<br><br>Stock Options, for which 20% of his 3,000,000 shares of Travana common stock had vested. C-0904, p. 2 (Employment Agreement between Travana and Jason Chen); Witness Statement of Edgar Park, ¶¶ 452-456; C-0068, p. 7 (Employee Stock Option Plan).<br><br>Approximately $173,250 in benefits, annually. Rebuttal Witness Statement of Claimant and Counter Respondent Jason Chen in Support of Reply Brief, ¶ 91; see C-0904, p. 3 (Employment Agreement between Travana and Jason Chen). |

|  |  | Severance Pay - if Chen is terminated without Cause for "50% of the remaining Term of this Agreement based on the [Chen's] then-applicable Base Compensation less all appropriate federal and state income and employment taxes. C-0904, p. 5 (Employment Agreement between Travana and Jason Chen). |
|---|---|---|

**Relief for Tortious Interference with Employment Contract cause of action against HNA Group; HNA Group (International) Co., Ltd.; HNA Capital Ltd.; Adam Tan; Shi Lei; Charles Mobus; and Li Ming Bi:**

The itemized damages that Jason Chen was deprived of from his Employment Agreement by the interference:

- Options:

  - Based on Amount Vested at Termination: $2,728,689 to $4,003,042

  - Based on Full Vesting due to Liquidity Event: $10,232,584 to $15,011,407

- Salary: $735,826

| **Unjust Enrichment**<br>against **HNA Group (International) Co., Ltd.** | | |
|---|---|---|
| **Elements:** | **Element 1:**<br>**An enrichment.** | **Record Cites for Element 1:** |

| | | |
|---|---|---|
| "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *110 (Ch. Apr. 14, 2017) (CL-04). | | "The aggregate purchase price for the Purchased Shares is Fifty Million Dollars ($50,000,000), consisting of cash in the amount of $49,450,000 and cancellation of the Note in the amount of $550,000 ('**Purchase Amount**'). The Purchase Amount shall be delivered to the Company in installment (the '**Milestone Purchase Amount Payment**'), and upon and subject to the satisfaction by the Company of the Milestones related to such installments as set forth in <u>Exhibit G</u>." C-0012, p. 2 (Series B Stock Purchase Agreement).<br><br>"$15 million shall be advanced to the Company upon achievement of Milestone 2 [...]" C-0012, p. 129 (Series B Stock Purchase Agreement).<br><br>"$8 million shall be advanced to the Company upon achievement of Milestone 3 [...]" C-0012, p. 129 (Series B Stock Purchase Agreement). |
| | **Element 2:**<br>**An impoverishment.** | **Record Cites for Element 2:**<br><br>"$15 million shall be advanced to the Company upon achievement of Milestone 2 [...]" C-0012, p. 129 (Series B Stock Purchase Agreement).<br><br>"$8 million shall be advanced to the Company upon achievement of Milestone 3 [...]" C-0012, p. 129 (Series B Stock Purchase Agreement). |
| | **Element 3:**<br>**Relation between the enrichment and impoverishment.** | **Record Cites for Element 3:**<br><br>"Absent effective protective provisions, minority stockholders must rely for protection solely on the fiduciary duties owed to them by the directors and the majority stockholder, since the minority stockholders have lost the power to influence corporate direction through the ballot." *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 43 (1993) (CL-11). |
| | **Element 4:** | **Record Cites for Element 4:** |

| | | |
|---|---|---|
| | **Absence of justification.** | "[I]t is well-established that stockholders of a corporation subject to the [Delaware General Corporation Law] may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation." *CA, Inc. v. AFSCME Emples. Pension Plan*, 953 A.2d 227, 232 (Del. 2008) (CL-98).<br><br>"I agreed with Shi's assessment that Travana was not ready for a marketing campaign and suggested to Shi that in my view, Travana would best be served reducing its marketing spend and focusing its remaining resources on developing a viable and competitive product." Witness Statement of Adam Tan, ¶ 30.<br><br>"Q. Now, Wang Jiang and Adam Tan gave you directions on how to run Travana, correct?<br>MR. REGAN: Objection to the form.<br>THE WITNESS: Wang Jiang and Adam, as ultimate decision-makers of HNA, they clearly have the rights to make decisions on how they want to run subsidiaries of the companies.<br>BY MR. ERGO:<br>Q. Such as Travana?<br>A. Travana is controlled 90 percent by HNA. So I think in theory, yes." C-1181, p. 9 (Confidential Videotaped Deposition of Lei Shi). |
| | **Element 5:**<br>**Absence of a remedy provided by law.** | **Record Cites for Element 5:**<br><br>[Dependent on outcome of other causes of action.] |

**Relief for Unjust Enrichment cause of action against HNA Group (International) Co., Ltd.:**

Value of Claimants' equity ownership of Travana as of the date of valuation:

- Based on Saba Conservative Valuation: $53,446,935

- Based on Saba Optimistic and Reasonable Valuation: $77,338,703

# Chart D:  Air Only Gross Margins from 3 Travana Internal Pro Forma Financials

## 1. Air Only Gross Margin from March 2016 Travana Pro Forma (C-0171)



## 2. Air Only Gross Margin from August 2016 Travana Pro Forma (C-0196) (New Air Only Calculations added from Line 22 to 25)



## 3. Air Only Gross Margin from February 2017 Travana Pro Forma (C-0184) (New Air Only Calculations added in Line 109)